**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

SEA SHEPHERD NEW ZEALAND, *a New Zealand registered charity*

*and*

SEA SHEPHERD CONSERVATION SOCIETY, *a United States nonprofit organization,*

                Plaintiffs,

     v.

WILBUR ROSS, *in his official capacity as Secretary of Commerce,*

UNITED STATES DEPARTMENT OF COMMERCE, *a United States government agency,*

CHRIS OLIVER, *in his official capacity as Assistant Administrator of the National Marine Fisheries Service,*

NATIONAL MARINE FISHERIES SERVICE, *a United States government agency,*

STEVEN MNUCHIN, *in his official capacity as Secretary of the Treasury,*

UNITED STATES DEPARTMENT OF THE TREASURY, *a United States government agency,*

CHAD WOLF, *in his official capacity as Acting Secretary of Homeland Security,*

*and*

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *a United States government agency,*

                Defendants.

Civil Action No. 20-cv-00112

**COMPLAINT**

## INTRODUCTION

1.      The Māui dolphin, endemic to New Zealand, is the most endangered marine dolphin in the world.  As of 2016, only an estimated 57 individuals remained. These dire numbers are in stark contrast with the estimated 2,000 individuals that ranged along the entire coastline of the North Island of New Zealand in 1970. In light of these numbers, the Scientific Committee of the International Whaling Commission ("IWC") has repeatedly stated that "[t]he human-caused death of even one individual would increase the extinction risk." The primary cause of the drastic decline of the Māui dolphins, and the leading threat to the survival of this subspecies, is their incidental capture, or bycatch, in gillnet and trawl fisheries within their range.

2.      In 1972, in recognition of the significant aesthetic, recreational, and economic value of marine mammals such as the Māui dolphin, and the threat to such species posed by human activities, Congress enacted the Marine Mammal Protection Act ("MMPA"). *See* 16 U.S.C. § 1361 *et seq*. The dangers of bycatch were central to Congress' analysis when it enacted the MMPA. In accord with this Congressional intent, the MMPA bans not only the intentional killing of marine mammals but also strictly limits the degree to which the United States fishing industry may incidentally harm or kill marine mammals. 16 U.S.C. § 1371(a)(2). Key to the MMPA's scheme is the "Zero Mortality Rate Goal" ("ZMRG"), which is to reduce the incidental mortality or serious injury of marine mammals in the course of commercial fishing operations to insignificant levels approaching zero. *Id.*

3.      Recognizing that the United States could shape policy in foreign nations as a result of its substantial import market for fisheries products, Congress chose to prohibit imports from foreign fisheries that fail to reduce the bycatch of marine mammals to insignificant levels approaching the ZMRG. Accordingly, the MMPA requires that the United States "ban the

importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. § 1371(a)(2). The Secretary of Commerce, the United States Department of Commerce, the Secretary of the Treasury, the United States Department of the Treasury, the Administrator of the National Marine Fisheries Service, the National Marine Fisheries Service, the Secretary of Homeland Security, and the United States Department of Homeland Security (collectively, "Defendants") are responsible for administering and/or implementing the MMPA's requirements.

4.     Māui dolphins are being caught with commercial fishing technology that results in their incidental death or serious injury at a rate that exceeds United States standards, and New Zealand has not provided reasonable proof of the effects of its fisheries on the Māui dolphin. As such, Sea Shepherd New Zealand and Sea Shepherd Conservation Society (collectively, "Plaintiffs") urge this Court to declare that Defendants are violating federal law and to enter an injunction requiring Defendants to ban the import of fish and fish products that are caught in, or derived from, New Zealand commercial fisheries that use gillnets or trawls that result in the incidental death or serious injury of Māui dolphins.

5.     Pursuant to the MMPA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*, on February 6, 2019, Plaintiffs submitted a Petition to Defendants urging them to enact an emergency rule banning the import of fish and fish products from New Zealand that result in the incidental kill or serious injury of Māui dolphins in excess of United States standards. The MMPA provides that Defendants must engage in emergency rulemaking if they determine that "the incidental mortality and serious injury of marine mammals from commercial fisheries is

having, or is likely to have, an immediate and significant adverse impact on a stock or species." 16 U.S.C. § 1387(g)(1); 81 Fed. Reg. 54390, 54395 (Aug. 15, 2016).

6.     Defendants denied Plaintiffs' Petition on June 18, 2019. Defendants' denial of Plaintiffs' Petition, which was based largely on potential actions that the New Zealand government may take in the future, was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A).

7.     Defendants' actions violate the MMPA and threaten the existence of the critically endangered Māui dolphin. If the Court does not require Defendants to take immediate action, the world may lose the Māui dolphin forever.

## JURISDICTION

8.     This Court has exclusive jurisdiction over Plaintiffs' first claim for relief because Plaintiffs are seeking an embargo "on the importation of merchandise for reasons other than the protection of the public health or safety." 28 U.S.C. § 1581(i)(3). Plaintiffs' claim is against United States agencies and officers under MMPA section 101(a)(2), which provides for an embargo of certain fish and fish products. *See* 16 U.S.C. § 1371(a)(2) ("The Secretary of the Treasury shall ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards."). This Court has supplemental jurisdiction over Plaintiffs' second request for relief. *See* 28 U.S.C. § 1367(a) (providing that district courts "have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy"); 28 U.S.C. § 1585 (providing that the Court of International Trade possesses "all the powers in law and equity of, or as conferred by statute upon, a district court of the United States").

9.     This Court may grant the relief requested pursuant to MMPA section 101(a)(2), 16 U.S.C. § 1371(a)(2), the Administrative Procedure Act (APA), 5 U.S.C. §§ 706(1)–(2), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

## PARTIES

10.     Sea Shepherd New Zealand Ltd ("SSNZ") is a registered New Zealand charity whose object and purpose is to educate the New Zealand public about marine conservation, protect and preserve New Zealand's ocean environment including its ecosystems, flora, and fauna, and support organizations and initiatives that are consistent with and will further these charitable purposes. SSNZ implements its marine conservation and ecosystem protection goals through advocacy, research, education, grass-roots activities, and direct action. Protecting the Māui dolphin is an integral part of SSNZ's mission and purpose, and as such SSNZ has a long history of actively advocating for protection of the Māui dolphin.

11.     Sea Shepherd Conservation Society ("SSCS") is a 501(c)(3) nonprofit corporation incorporated in Oregon. SSCS operates as an international nonprofit, marine wildlife conservation organization, with thousands of supporters and volunteers throughout the world, including in New Zealand. Established in 1977, SSCS's mission is to end the destruction of habitat and slaughter of wildlife in the world's oceans in order to conserve and protect ecosystems and species. SSCS uses innovative direct-action tactics, as well as scientific and legal tools, to investigate, document, and take action when necessary to expose and confront illegal activities in the world's oceans. By safeguarding the biodiversity of the planet's delicately balanced ocean ecosystems, SSCS works to ensure the Māui dolphin's and other species' survival for their own sake and for that of future generations. SSCS is an integral part of the global Sea Shepherd network. Collectively, Sea Shepherd has offices in over forty countries, including SSNZ.

12.     SSNZ and SSCS have supporters and volunteers who travel to or reside in New Zealand, and who derive ongoing and lasting recreational, aesthetic, professional, moral, spiritual, and cultural benefits from observing Māui dolphins in the wild and knowing that Māui dolphins continue to exist in the world.

13.     SSNZ's and SSCS's supporters' and volunteers' interests have been harmed and will continue to be harmed by Defendants' failure to ban the import of fish and fish products that are caught in, or derived from, New Zealand commercial fisheries that use gillnets or trawls that result in the incidental death or injury of Maui dolphins in excess of United States standards, and by Defendants' arbitrary and capricious denial of Plaintiffs' Petition. These supporters and volunteers are concerned that, absent a ban, the Māui dolphin population will continue to decline and likely become extinct. If action is not taken now to protect Māui dolphins, the future opportunities of these supporters and volunteers to fulfill their plans to observe or continue to observe Māui dolphins will be greatly diminished, and the joy and benefits they receive from seeing Māui dolphins in the wild, and knowing that they might be able to see them in the future, will be lessened.

14.     The above-described interests of SSNZ's and SSCS's supporters and volunteers have been, are being, and unless the relief prayed for herein is granted, will continue to be adversely affected by Defendants' disregard of their statutory duties under the MMPA and APA and by the devastating, ongoing harm caused to the small Māui dolphin population resulting from such disregard. The relief requested in this lawsuit will redress these injuries.

15.     Defendant United States Department of Commerce oversees the National Marine Fisheries Service's compliance with the MMPA and is responsible for implementing the MMPA,

including portions of section 101(a)(2). Therefore, the Department of Commerce is responsible for the violations alleged in this complaint.

16.     Defendant Wilbur Ross is the Secretary of Commerce and directs all business of the United States Department of Commerce. Therefore, Secretary Ross in his official capacity is responsible for the violations alleged in this complaint.

17.      The Department of Commerce has delegated responsibility for implementing the MMPA to the National Oceanic and Atmospheric Administration's National Marine Fisheries Service ("NMFS"), including implementation of section 101(a)(2). Therefore, NMFS is responsible for the violations alleged in this complaint.

18.     Defendant Chris Oliver is the Assistant Administrator of NMFS and directs all business of NMFS. Therefore, Assistant Administrator Oliver in his official capacity is responsible for the violations alleged in this complaint.

19.     Section 101(a)(2) of the Act directs the United States Department of the Treasury to ban the importation of commercial fish and fish products that do not meet United States standards for the protection of marine mammals. Therefore, the Department of the Treasury is responsible for the violations alleged in this complaint.

20.     Defendant Steven Mnuchin is the Secretary of the Treasury and directs all business of the United States Department of the Treasury. Therefore, Secretary Mnuchin in his official capacity is responsible for the violations alleged in this complaint.

21.     Pursuant to the Homeland Security Act, the Department of the Treasury has partially delegated its authority related to trade bans to the United States Department of Homeland Security. *See* 6 U.S.C. §§ 203(1), 212(a)(1); 68 Fed. Reg. 28,322 (May 23, 2003). Therefore, the Department of Homeland Security is responsible for the violations alleged in this Complaint.

22.     Defendant Chad Wolf is the Acting Secretary of Homeland Security and directs all business of the United States Department of Homeland Security. Therefore, Acting Secretary Wolf is responsible in his official capacity for the violations alleged in this Complaint.

## LEGAL BACKGROUND

### Marine Mammal Protection Act

23.     The MMPA was enacted in 1972 to protect and restore marine mammal species that "are, or may be, in danger of extinction or depletion as a result of man's activities." 16 U.S.C. § 1361(1). In adopting the MMPA, Congress recognized that marine mammal species and populations "should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and, consistent with this major objective, they should not be permitted to diminish below their optimum sustainable population." *Id.* § 1361(2). Further, Congress recognized that "marine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic," and found "that they should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management[.]" *Id.* § 1361(6). NMFS and the United States Fish and Wildlife Service are jointly responsible for administering the MMPA. *Id.* §§ 1362(12)(A), (B).

24.     Bycatch resulting from commercial fishing has led to the severe depletion of marine mammals throughout the world. In response to this issue, Congress included the ZMRG in the MMPA, which has the overarching "immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate." *Id.* § 1371(a)(2). In order to achieve the ZMRG, section 101(a)(2) of the MMPA (hereafter, the "Imports Provision") directs

that the Secretary of the Treasury "shall ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." *Id.* § 1371(a)(2). Accordingly, the Imports Provision calls for a mandatory ban when bycatch in the foreign fishery exceeds "United States standards."

25.     To evaluate the necessity of a ban, the MMPA requires that the Secretary of Commerce "insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States[.]" *Id.* § 1371(a)(2)(A).

26.     In order to achieve the ZMRG, the MMPA includes specific standards for tracking, assessing, and limiting marine mammal bycatch:

a.     **Stock Assessments:** NMFS must prepare a "stock assessment" for each marine mammal population in United States waters. The assessment includes a report concerning the population's abundance, the current population trend, the fisheries that interact with the population, the level of "mortality and serious injury" caused by those fisheries each year, and whether the mortality from commercial fisheries is "insignificant and is approaching a zero mortality and serious injury rate." *Id.* § 1386(a).

b.     **Potential Biological Removal:** A "potential biological removal" ("PBR") level must be derived for each marine mammal population. *Id.* PBR is the "maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum

sustainable population." *Id.* § 1362(20). Calculated using a specific formula, the PBR method has the principal goal of ensuring that human-caused mortality is below a level that could lead to population depletion.

      c.    **Take Reduction Plan:** A "take reduction plan" must be developed when a commercial fishery is incidentally killing a marine mammal population at or above the PBR, or that species is listed (or likely to be listed) as threatened or endangered under the Endangered Species Act. The take reduction plan sets an immediate goal of reducing fishery-related mortality and serious injury below the PBR within six months and a long-term goal of reducing bycatch levels to "insignificant levels approaching a zero mortality and serious injury rate" within five years. *Id.* § 1387(f).

      d.    **Monitor and Estimate Bycatch Provision:** NMFS must establish "a program to monitor incidental mortality and serious injury of marine mammals during the course of commercial fishing operations" in order to "obtain statistically reliable estimates" of bycatch. *Id.* § 1387(d). This monitoring goal may be achieved by placing human observers onboard fishing vessels to record, among other things, marine mammal sightings and the number of marine mammals killed during the fishing operations. *Id.*

27.    These MMPA standards, including the ZMRG, are "United States standards" under the Imports Provision and apply to domestic commercial fisheries and foreign fisheries that import fish and fish products into the United States. *Id.* § 1371(a)(2).

28.    In 2016, NMFS promulgated regulations regarding importation of fish products from foreign fisheries. 81 Fed. Reg. 54,390 (Aug. 15, 2016) (the "Imports Rule"). The Imports Rule "establishes conditions for evaluating a harvesting nation's regulatory program to address

incidental and measures to address intentional mortality and serious injury of marine mammals in fisheries that export fish and fish products to the United States." *Id*. Under this Rule, fish and fish products can only be imported into the United States if the foreign nation has received a comparability finding from NMFS. *Id.* The Imports Rule includes a five-year exemption period for foreign commercial fisheries. 50 C.F.R. §§ 216.3, 216.24(h)(2)(ii).

29.    Section 118(g) of the MMPA provides that the Secretary of Commerce "shall" undertake emergency rulemaking actions if he or she "finds that the incidental mortality and serious injury of marine mammals from commercial fisheries is having, or is likely to have, an immediate and significant adverse impact on a stock or species[.]" 16 U.S.C § 1387(g)(1).

30.    Although section 118(g) applies to domestic fisheries, in its publication of the final Imports Rule, NMFS referenced this statutory section as support for extending a similar emergency rulemaking regime to the foreign fisheries context. 81 Fed. Reg. 54390, 54395 (col. 2 & 3) (Aug. 15, 2016). Specifically, NMFS stated that it "would likewise consider an emergency rulemaking for an export or exempt fishery having or likely to have an immediate and significant adverse impact on a marine mammal stock interacting with that fishery." *Id*. at 54395 (col. 2). NMFS further observed that emergency rulemaking "allow[s] for timely treatment of cases where the usual process and timeframe could result in unacceptable risks to the affected marine mammal stock or species." *Id*. at 54395 (col. 2 & 3). Under this standard, NMFS recognized that emergency rulemaking would be appropriate in the case of a "very small population[] where any incidental mortality could result in increased risk of extinction[.]" *Id*. at 54395 (col. 3). Thus, this emergency rulemaking provision is an exception to the Import Rule's five-year moratorium.

31.    Prior to initiating an emergency rulemaking, NMFS noted that it would consult with the exporting nation and urge it to take measures to reduce bycatch of the marine mammal, and

that NMFS would consider imposing a ban if the country failed to implement NMFS's requested measures. *Id*. at 54395 (col. 2).

32.     The MMPA established the Marine Mammal Commission ("MMC") as an independent United States agency. 16 U.S.C. § 1401(a). Among other duties imposed by the MMPA, the MMC must "recommend to the Secretary [of Commerce] and to other Federal officials such steps as it deems necessary or desirable for the protection and conservation of marine mammals." *Id.* § 1402(a)(4). Federal officials must explain in detail any deviation from such recommendations. *Id.* § 1402(d).

### Administrative Procedure Act

33.     APA section 706(1) provides that a reviewing court "shall … compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1). This provision applies to all discrete actions an agency is required to make. *Natural Res. Def. Center v. Ross,* 332 F.Supp. 3d 1338, 1353 (Ct. Int'l Trade Aug. 14, 2018).

34.     APA section 702 provides a cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

35.     Courts must "hold unlawful and set aside" an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Arbitrary and capricious review under the APA requires a court to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Lady Kim T. Inc. v. U.S. Secretary of Agriculture.,* 491 F. Supp 2d. 1366, 1369 (Ct. Int'l Trade June 6, 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

36.     The APA further provides that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e).

37.     The denial of a petition for rulemaking is a final agency action reviewable under the APA. *See* 5 U.S.C. § 704.

## FACTUAL BACKGROUND

### Māui Dolphin Biology, Habitat, and Range

38.     Māui dolphins, found only in the inshore waters around New Zealand's North Island, are on the verge of extinction. Māui dolphins have suffered a dramatic decline in population over the past 50 years. From 1970 to 2016, the population decreased from approximately 2,000 to 57 dolphins. The estimate of 57 dolphins is based on analyses by members of the IWC Scientific Committee in 2018. The Māui dolphin is listed as critically endangered by the International Union for Conservation of Nature ("IUCN"), meaning that the subspecies is considered to be facing an extremely high risk of extinction in the wild.



**Source: Sea Shepherd New Zealand**

39.     The Māui dolphin is one of two imperiled subspecies of Hector's dolphin, both subspecies being endemic to New Zealand's waters. The Māui dolphin is of special importance to the indigenous population of New Zealand, the Māori. The Māori consider the Māui dolphin to be *taonga* or a sacred cultural treasure.

40.     Māui dolphins have a lifespan of approximately 25 years and have a low reproductive rate (calving every 2–4 years) and late onset of sexual maturity (7–9 years). These characteristics contribute to Māui dolphins' low maximum population growth rate, which means that even low levels of human-caused mortality threaten the survival of the species. Given their specific biological traits, including very small population size, low fecundity, and rapid decline in numbers, the Māui dolphin is at extremely high risk of extinction. Small populations, in particular, are more vulnerable simply due to their small size. For example, losing a single breeding female (due to natural causes or human impact) has a much larger impact on Māui dolphins because there are less than 20 (14 – 17) breeding females.

41.     Māui dolphins inhabit New Zealand's coastal and inshore waters and are typically seen in small groups. The Māui dolphin's range extends around the North Island coastline, with the core range of the dwindling population primarily on the west coast of the North Island, from Maunganui Bluff in the north to Whanganui in the south, including harbors. Figure 1 below is a map of the North Island depicting the most recent sighting data for the Māui dolphin. This map confirms the wide distribution of Māui dolphins along the North Island coastline.

///

///

///

///



**Figure 1: Māui dolphin sightings off New Zealand's North Island (Source: New Zealand National Institute of Water and Atmospheric Research)**

42.      Given the nature of the offshore topography around the North Island, and the observed habitat-use patterns of the Māui dolphin, protection of its habitat should be based on depth contour (a line connecting points of equal depth) rather than lateral distance from shore. The 100-meter depth contour best matches the offshore extent of Māui dolphin habitat.

///

///

**The Significant Incidental Mortality of Māui Dolphins in New Zealand Fisheries**

43.     Māui dolphins are captured and killed or seriously injured in what is known as "bycatch," which NMFS defines as "discarded catch of marine species and unobserved mortality due to a direct encounter with fishing vessels and gear." In this case, Māui dolphins are entangled and killed or seriously injured in gillnets (also known as "set nets") and trawl nets. Gillnets are a type of non-selective fishing net that is hung vertically in the water for hours or up to days at a time to harvest marine fish and other species. Given that they are non-selective, gillnets capture and incidentally kill a vast array of sealife, and it is common for the target species to comprise only a small percentage of a gillnet's total catch. Trawl fishing is another type of indiscriminate fishing method whereby one or two boats drag a large net through the water column, catching almost everything in the net's path. The New Zealand government has acknowledged on numerous occasions that "[i]t is widely accepted that incidental mortality in coastal fisheries, notably set nets and to a lesser extent trawls, is the most significant threat to Hector's and Māui dolphins."

44.     The general vulnerability of Māui dolphins to human-caused mortality can be best understood through the calculation of a PBR for this subspecies. In a 2017 report to the IWC Scientific Committee, experts calculated a PBR indicating that only one Māui dolphin roughly every 20 years could be removed from the population while still allowing Māui dolphins to reach or maintain their optimum sustainable population.

45.     A 2019 study discussed by the IWC Scientific Committee estimated mean annual bycatch mortality for Māui dolphins. This study estimated that the annual mean bycatch in recent years was 1.8 to 2.4 Māui dolphins per year, which vastly exceeds their calculated PBR of "one individual roughly every 20 years." The study further demonstrated that Māui dolphins are 14 to

20 times more vulnerable to fisheries bycatch than had been estimated by the New Zealand government.

46.     The IWC Scientific Committee also expressed concern regarding New Zealand's failure to account for the significant and tremendously detrimental impact of bycatch on Māui dolphins—stating in 2017, for example, that (1) it is "estimated that the reported bycatch of Hector's and Maui dolphins [i]s 4-5% of actual bycatch, due to low levels of observer coverage and voluntary reporting by fishermen" and (2) "bycatch [is] estimated to substantially exceed sustainable levels calculated using the PBR approach."

**New Zealand's Failure To Protect Māui Dolphins Throughout Their Range**

47.     Since 2003, New Zealand has enacted some restrictions to protect Māui dolphins from the risk of bycatch due to commercial fisheries operating in their range. However, the existing protections are wholly inadequate to protect Māui dolphins from bycatch and the risk of extinction.

48.     As Figure 2 below clearly shows, areas with fishing restrictions cover only a small fraction of the Māui dolphin's range. As acknowledged by NMFS,  trawling has been banned in approximately 5% of the habitat of the Māui dolphin, while gillnets are banned in an additional 14% of that habitat." 84 Fed. Reg. 5977, 5977 (col. 3) (February 25, 2019). These limited protections are grossly inadequate and virtually guarantee the extinction of the Māui dolphin.

///

///

///

///

///

///

17



**Figure 2: Māui dolphin range and extent of current protections. (Red: Range of Māui dolphin [100-meter depth contour]. Dark green: Areas where gillnets and trawling are banned. Light green: Areas where gillnets are banned but trawling is permitted.)**

49.     The IUCN has strongly urged New Zealand to "extend dolphin protection measures, with an emphasis on banning gill net and trawl net use from the shoreline to the 100 metre depth contour in all areas where Hector's and Maui's Dolphins are found, including harbours." Accordingly, the IUCN's recommended protection measures extend throughout the entire area depicted in red in Figure 3 above.

**New Zealand's Efforts To Protect Māui Dolphins Fall Far Short
of United States Standards**

50.     The MMPA imposes strict standards on United States domestic, commercial fisheries designed to protect marine mammals from incidental mortality in such fisheries. *See* 16 U.S.C. § 1387. New Zealand has failed to adopt similar statutorily mandated standards for marine mammals in general and for the Māui dolphin in particular.

*New Zealand Law Does Not Include Anything Approximating the ZMRG*

51.     New Zealand law does not require, or set as a standard or goal, the reduction of the incidental mortality or serious injury of marine mammals in the course of commercial fishing operations to insignificant levels approaching zero, a fact admitted by the New Zealand government. In 2013, the Ministry of Primary Industries ("MPI") (an entity that includes the Ministry of Fisheries) observed that "the [Fisheries] Act does not oblige [the government] to reduce the risk of fishing-mortality rates to zero."

*New Zealand Does Not Prepare Stock Assessment Reports for Marine Mammals*

52.     In the United States, the MMPA requires preparation and periodic updating of a stock assessment report to track the status of marine mammal populations based on the best available science. The stock assessment reporting process includes a framework for analyzing and managing the risk to marine mammals from bycatch in commercial fisheries. This framework incorporates, among other things, methods to judge the efficacy of observer coverage to ensure that regulators can reliably assess the impact of bycatch on a marine mammal population.

53.     New Zealand does not require the preparation of anything approximating a stock assessment report for the marine mammals in its waters.

*New Zealand Has Not Adopted a Standard Equivalent to the PBR*

54.     New Zealand does not include the PBR approach in assessing the management measures necessary to protect the Māui dolphin. Instead, New Zealand has adopted a considerably less protective variant of the United States' PBR standard: the Population Sustainability Threshold ("PST"). As summarized by MPI: "The PST is an index of the population productivity, adapted from the PBR. It is an estimate of the maximum number of human-caused mortalities that will

allow populations to remain above half their carrying capacity after 200 years, with a 95% probability . . ."

55.     Material differences between the PST and the PBR formulas often result in the calculation of a considerably higher PST (*e.g.*, nearly three times higher for the Māui dolphin) than under the more precautionary PBR approach. By permitting a higher level of mortality, the PST results in the adoption of far less protective management measures. Additionally, the PST's use of a long timescale (200 years) for population recovery is unacceptable for depleted populations like the Māui dolphin. In contrast, under the more precautionary PBR standard, the United States has recognized that, for depleted species like the Māui dolphin, PBR should be set to 0 – resulting in the closure of the fishery negatively impacting that species. Thus, the PST is not equivalent to the PBR standard.

56.     The estimated annual bycatch of Māui dolphins is 1.5–2.4 animals per year. The species-specific PBR for Māui dolphins is 0.05 (or 1 dolphin mortality every 20 years). By comparison, the PST is 0.14 (or 1 dolphin mortality every 7 years). Thus, estimated bycatch mortality substantially exceeds both the PBR and PST. Furthermore, the more precautionary PBR standard yields a considerably smaller (about three times smaller) annual mortality threshold that counsels more protective measures, including the prohibition of all gillnet and trawl fishing in the entire Māui dolphin range—as urged by the IUCN.

57.     When the incidental mortality of a marine mammal species exceeds PBR, under United States standards, a take reduction plan must be prepared. 16 U.S.C. § 1387(f). In New Zealand, exceeding the PST does not trigger any particular statutorily mandated management measures.

### *New Zealand Has Not Adopted Anything Similar to a "Take Reduction Plan"*
### *for the Māui Dolphin*

58.     In 1999, the New Zealand Minister of Conservation designated the Māui dolphin as a "threatened species." The Māui dolphin is also defined as a "protected species" under New Zealand's Marine Mammal Protection Act (1978) ("New Zealand MMPA") and Fisheries Act (1996). The New Zealand MMPA allows for the approval of a population management plan ("PMP") for any protected species. A PMP imposes a maximum allowable level of fishing-related mortality that will allow the species to achieve non-threatened status in less than 20 years. The PMP process also contains other statutory mandates designed to achieve this goal.

59.     To date, a PMP has not been developed for the Māui dolphin.

60.     Since 2007, New Zealand has had a threat management plan ("TMP") for the Māui dolphin. Unlike a PMP, the TMP is not a statutory document containing conservation-orientated legal mandates, but rather it is a discretionary management plan identifying human-induced threats to the Māui dolphin and outlining strategies to mitigate those threats. The Māui dolphin TMP is the first in a series of steps on the road to possible legal change but the actual implementation of any new protections into law will take additional time and be subject to legal challenge.

61.     The TMP is not equivalent to the take reduction plan required under the MMPA when incidental mortality exceeds the PBR. In addition to being the product of a discretionary, non-statutory process, the TMP fails to incorporate the safeguards of a take reduction plan, including, for example, the requirement to identify and implement actions that will achieve PBR within six months and the ZMRG within five years of plan implementation. *Id.* Instead, although New Zealand introduced the first TMP in 2007, thirteen years later the Māui dolphin population remains seriously imperiled.

*///*

*New Zealand Fails To Adequately Monitor the Incidental Mortality and Serious Injury*
*of Māui Dolphins During Commercial Fishing Operations*

62.     In order to set appropriate management actions, such as sufficiently protective area-based fishing restrictions, New Zealand must effectively monitor the fisheries impacting the Māui dolphin population. In the United States, the MMPA requires implementation of a monitoring program in commercial fisheries to, among other things "obtain statistically reliable estimates of incidental mortality and serious injury." 16 U.S.C. § 1387(d). New Zealand does not have a similar statutory mandate. While the Fisheries Law includes general observer requirements, there are not any specific observer standards related to incidental marine mammal mortality. Rather, the TMP sets forth discretionary monitoring objectives that have remained unfulfilled.

63.     Observer coverage in Māui dolphin habitat off the west coast of the North Island is 14.6% for trawling vessels and 12.7% for gillnetting vessels greater than six meters in length, with no observer coverage for smaller craft. However, the risk to Maui dolphins is based not on the size of the vessel, but on the amount (length) of net set in the water. If observer rates are assessed based on total length set, then observer coverage adds up to only 2% because the coverage calculation then includes the smaller craft. If east coast of the North Island were included in these calculations, the aggregate number would be even lower—reflecting the lack of any observer coverage in that segment of Māui dolphin habitat.

64.     In addition to observer data, New Zealand relies upon self-reporting of Māui dolphin mortality by the fishers themselves in assessing the impact of bycatch on the population. Nevertheless, New Zealand acknowledges that fishers do not report Māui dolphins killed during fishing operations—admitting that there is a "strong likelihood of underreporting."

65.     Inadequate observer coverage, in conjunction with the failure of fishers to report Māui dolphin bycatch, contributes to New Zealand's material underestimate of the impact of fisheries on the Māui dolphin.

66.     Given the absence of statutory mandates concerning the monitoring of incidental marine mammal mortality and serious injury coupled with low observer coverage and a lack of fisher reporting, New Zealand's monitoring standards are not equivalent to those in the United States.

**A Decision on New Zealand's Current Draft TMP Will Not Result in Adequate Protections for Māui Dolphins**

67.     In 2018, New Zealand began the process of revising the Hector's and Māui Dolphin TMP. New Zealand estimated that public consultation on the draft TMP would conclude in April 2019 and that a final decision would be presented to the government Ministers in May 2019. New Zealand did not keep to this schedule.

68.     In June 2019, the New Zealand government released a draft TMP containing four options that it is considering to manage threats to Hector's and Māui dolphins, including threats from fisheries' bycatch. The first option would keep current restrictions in place, thus maintaining the status quo. The second and third options include progressively greater protections compared with the status quo but still fail to go nearly far enough to save the Māui dolphin. The fourth option would ban fishing with set-nets and trawling gear in a larger percentage of the Māui dolphin's range but only out to the 100-meter depth contour for a portion of that range. The fourth option also falls far short of the IUCN's recommendation that protections be extended to the entire Māui dolphin range, including along the east coast of the North Island.

69.     The draft TMP inappropriately minimizes the effect of fisheries bycatch on the Māui dolphin while substantially overemphasizing the relative impact of the disease

toxoplasmosis. This disease arises from exposure to the parasite *Toxoplasma gondii*, which is transmitted through cat feces found in runoff from terrestrial sources. A 2019 study presented to the IWC Scientific committee questioned the reliability of New Zealand's toxoplasmosis mortality projections. The study noted that the projections are based upon "limited necropsy data" and concluded that the most accurate model supported fisheries bycatch as the primary cause of Māui dolphin mortality.

70.     In 2018, New Zealand convened an expert stakeholder panel to assess New Zealand's approach in formulating the TMP. With respect to toxoplasmosis, the expert panel criticized New Zealand's reliance on the limited necropsy data and strongly advised that New Zealand lacked the information needed to compare toxoplasmosis and fisheries bycatch mortality estimates.

71.     By promoting toxoplasmosis as a more significant cause of Māui dolphin mortality in comparison with fisheries bycatch, the draft TMP's results are biased against the implementation of critically needed protections throughout the range of the Māui dolphin.

72.     To date, New Zealand's has not released a final TMP selecting one of the four proposed management measures. Nevertheless, even in the unlikely event that New Zealand ultimately selects the most protective option (the fourth option), that selection does not go far enough to save the Māui dolphin from extinction.

### The Improper Denial of Plaintiffs' Petition

73.     Recognizing the dire threat to the survival of the Māui dolphin, on February 6, 2019, Plaintiffs filed a petition with Defendants asking them to perform their non-discretionary duties established under the MMPA by implementing an emergency rulemaking that would "ban the importation of commercial fish or products from fish" harvested using fishing activities that

"result[] in the incidental kill or incidental serious injury" of Māui dolphins "in excess of United States standards." 16 U.S.C. § 1371(a)(2). *See* Exhibit A (Plaintiffs' Petition). Specifically, the Petition requested that Defendants immediately ban, pursuant to the MMPA Imports Provision, all fish and fish products originating from fisheries in the Māui dolphin's range that employ either gill nets or trawls—the fishing gear responsible for the near extinction of the Māui dolphin.

74.     On March 27, 2019, the MMC submitted comments on the Petition. In its letter, the MMC stated that "given the small numbers of Māui dolphins remaining, the population's trend, the low capacity of the species to withstand further losses, and the ongoing number of deaths attributed to fisheries bycatch, it is plainly evident that commercial fisheries are having such an [immediate and significant adverse] impact on the Māui dolphin." The MMC concluded that a complete ban on gillnet fishing and trawling within the range of Māui dolphins is the measure most likely to achieve a significant reduction in the death of Māui dolphins and to make New Zealand's efforts to conserve Māui dolphins comparable with U.S. standards. While the MMC noted that New Zealand is in the process of developing a revised TMP, it stated that it is likely the plan will take considerable time to implement and that "the Māui dolphins are at too great a risk of further decline and extinction to allow for customary, but potentially drawn-out procedures" that may not have a significant impact.

75.     In its March 27, 2019 letter, the MMC recommended that NMFS accelerate its emergency rulemaking process by promptly publishing a proposed or final rule to ban imports of fish or fish products from fisheries that are likely to result in take of Māui dolphins in excess of United States standards unless it has received new information that indicates New Zealand is implementing additional mitigation measures that are highly likely to reduce the mortality and

serious injury of Māui dolphins incidental to gillnet and trawl fisheries to a level lower than the species' PBR level.

76.     Upon information and belief, New Zealand did not submit information to NMFS establishing that New Zealand has implemented additional mitigation measures that are highly likely to reduce the mortality and serious injury of Māui dolphins incidental to gillnet and trawl fisheries to a level lower than the species' PBR level. Upon information and belief, New Zealand has not implemented any such mitigation measures.

77.     On June 18, 2019, the day after New Zealand released the draft TMP, NMFS denied Plaintiffs' Petition. *See* 84 Fed. Reg. 32853, 83854–32855 (July 1, 2019). NMFS stated that it was rejecting the Petition because (1) "New Zealand is implementing a regulatory program comparable in effectiveness to the United States;" (2) "New Zealand has in place an existing regulatory program to reduce Māui dolphin bycatch;" and (3) New Zealand "was proposing additional regulatory measures" that would "further reduce the risk" to Māui dolphins. *Id.* at 32854 (col. 1-2).

78.     NMFS's denial of the Petition relied significantly on the much delayed and scientifically flawed TMP process that is not equivalent to United States standards. NMFS has also admitted that New Zealand's current protections for Māui dolphins fall far short of United States standards. Specifically, in discussing Plaintiffs' Petition internally, NMFS stated: "Recognizing that there have been no changes to the regulatory regime governing fisheries in Maui dolphin habitat since 2013 and that the IWC has found the current regulations inadequate, the U.S. government cannot in good faith find the current regulatory regime comparable to the U.S. regulatory regime." Accordingly, NMFS's denial was based upon an incorrect finding that New

Zealand's standards for preventing the incidental mortality or serious injury of Māui dolphins in commercial fisheries were equivalent to United States standards.

### Seafood Trade Between New Zealand and the United States

79.     Bycatch of Māui dolphins in gillnet and trawl fisheries is the primary threat to the dolphins' survival. There are many commercial gillnet and trawl fishers that operate within the Māui dolphins' range, and fish and fish products caught in these gillnet and trawl fisheries are exported to the United States.

80.     As one of the largest importers of seafood products in the world, the United Sates is in a powerful position to influence market forces. In 2019, New Zealand exported NZ $2.024 billion (USD $1.21 billion) in seafood globally. The United States is the recipient of much of these exports and is, in fact, New Zealand's second largest seafood export market behind China. This high trade volume with the United States makes New Zealand susceptible to United States economic pressure and, thus, highly likely to respond to a trade ban.

81.     In assessing the potential economic effect of the trade ban requested by Plaintiffs, New Zealand has officially evaluated its exposure to be in the range of $2 to $200 million USD. New Zealand bases the $200 million USD figure on the fact that its fisheries suffer from a serious lack of traceability. In other words, New Zealand does not have an adequate system in place to track fish from the fishing vessel to the seafood exporter. As a consequence of this traceability problem, New Zealand has stated that it cannot segregate seafood exports from fisheries with incidental mortality of Māui dolphins from seafood exports originating in fisheries that do not impact Māui dolphins. The result is that that the trade ban may affect all seafood exports from New Zealand to the United States until New Zealand is able to establish a traceability and

certification program sufficient to prove that fish and fish products did not originate in fisheries using gillnets and trawls in the Māui dolphin's range.

82.     New Zealand has further expressed concern about the damage to its international reputation from Plaintiffs' requested trade ban: "a US import ban would undermine the reputation of New Zealand's fisheries management regime, including the TMP [Threat Management Plan] process, and our wider environmental credentials." This is a significant concern for New Zealand, which deeply values its international reputation for high-quality, safe, and sustainably produced seafood, underpinned by an internationally recognized "clean and green" ethos. This reputation provides New Zealand with a distinct competitive edge in the global seafood market.

83.     Given the substantial economic impact and international reputational damage that will flow from Plaintiffs' requested relief, New Zealand will likely respond by taking measures necessary to increase protections for the critically endangered Māui dolphin, including by bringing such protections in line with United States standards.

### FIRST CLAIM FOR RELIEF

**Violation of the APA, 5 U.S.C. § 706(1)**
**Failure to Ban Imports as Required by the Marine Mammal Protection Act**

84.     Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs.

85.     The MMPA provides that Defendants "shall ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of U.S. standards." 16 U.S.C. § 1371(a)(2).

86.     Despite the fact that New Zealand fisheries export to the United States fish caught with technology that results in the incidental killing or serious injury of Māui dolphins in excess

of U.S. standards, Defendants have not banned the importation of fish and fish products from those fisheries, in violation of MMPA section 1371(a)(2). *Id.*

87.     An import ban is a final agency action that can be compelled under the APA, 5 U.S.C. § 706(1).

88.     Defendants' failure to act constitutes "agency action unlawfully withheld or unreasonably delayed," for which this Court may order relief under the APA. 5 U.S.C. § 706(1).

## SECOND CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Denial of Petition Was Arbitrary, Capricious, an Abuse of Discretion,**
**or Otherwise Not in Accordance with Law**

89.     Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs.

90.     On February 6, 2019, Plaintiffs filed a Petition asking Defendants to perform their nondiscretionary duties under the MMPA to engage in emergency rulemaking to ban the import of fish and fish products from New Zealand that result in the incidental killing or serious injury of Māui dolphins in excess of U.S. standards.

91.     On July 10, 2019, Defendants denied Plaintiffs' Petition.

92.     Defendants' denial of Plaintiffs' Petition is a "final agency action for which there is no other adequate remedy in a court" within the meaning of the APA, 5 U.S.C. § 704.

93.     Defendants' denial of the Petition was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A), for at least the following reasons:

        a.      The science and evidence are clear that the use of gillnets and trawling in the Māui dolphin range is having an "immediate and significant adverse impact" on the

Māui dolphin population, which is a "very small population[] where any incidental mortality could result in increased risk of extinction.";

    b.    New Zealand has not provided reasonable proof of the effects on Māui dolphins of commercial fishing technology in use for fish or fish products exported to the United States;

    c.    New Zealand's regulatory program is insufficient to reduce Māui dolphin bycatch and does not meet U.S. standards;

    d.    Documents on which NMFS heavily relied, including New Zealand's 2019 draft TMP, are significantly flawed and do not adequately assess the risk to the survival of the Māui dolphin from commercial fisheries bycatch;

    e.    There is uncertainty as to what, if any, additional regulatory measures New Zealand might implement as a result of the ongoing, and delayed, TMP process, and whether those measures would be adopted and implemented in a timely manner;

    f.    Even the most protective potential measures included by New Zealand in the 2019 draft TMP do not meet U.S. standards, do not adequately reduce Māui dolphin bycatch, and would not stop the commercial fisheries in Māui dolphin habitat from having an immediate and significant adverse impact on Māui dolphins and resulting in the incidental kill and/or serious injury of Māui dolphins in excess of U.S. standards; and

    g.    Defendants' reasoning is based largely on the MMPA Imports Rule and ignores the mandatory statutory language of the MMPA.

94.    For at least these reasons, the Court should hold unlawful and set aside Defendants' denial of the Petition pursuant to APA section 706(2), 5 U.S.C. § 706(2).

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      Declare that Defendants unlawfully withheld or unreasonably delayed the banning of fish and fish-product imports from New Zealand commercial fisheries that use gillnets and/or trawl fishing within the Māui dolphin range;

2.      Enter an injunction requiring Defendants to ban the import of fish or fish products that are caught in, or derived from, New Zealand commercial fisheries that use gillnets and/or trawls which result in the incidental kill or incidental serious injury of Māui dolphins;

3.      Declare that Defendants' denial of Plaintiffs' Petition was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law under APA, 5 U.S.C. § 706(2)(A);

4.      Hold unlawful and set aside Defendants' denial of Plaintiffs' Petition;

5.      Award Plaintiffs the costs of this action, including reasonable attorneys' fees; and

6.      Grant any other relief this Court finds just and proper.


Dated: May 21, 2020

Respectfully submitted,

/s/ Brett Sommermeyer                    Catherine Pruett
Sea Shepherd Legal                        Sea Shepherd Legal
2226 Eastlake Avenue East #108           2226 Eastlake Avenue East #108
Seattle, WA 98102                         Seattle, WA 98102
(206) 504-1600                            (206) 504-1600
brett@seashepherdlegal.org               catherine@seashepherdlegal.org

Lia Comerford
Earthrise Law Center at Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland, OR 97236
(503) 768-6823
comerford@lclark.edu