# EXHIBIT A

February 6, 2019

# PETITION TO BAN IMPORTS OF FISH AND FISH PRODUCTS FROM NEW ZEALAND THAT RESULT IN THE INCIDENTAL KILL OR SERIOUS INJURY OF MĀUI DOLPHINS IN EXCESS OF UNITED STATES STANDARDS PURSUANT TO MARINE MAMMAL PROTECTION ACT SECTION 101

BEFORE THE DEPARTMENT OF HOMELAND SECURITY, THE DEPARTMENT OF THE TREASURY, AND THE DEPARTMENT OF COMMERCE

Sea Shepherd Legal

Sea Shepherd New Zealand Ltd

Sea Shepherd Conservation Society

# NOTICE OF PETITION

Kirstjen Nielsen, Secretary
Department of Homeland Security
Washington, DC 20528

Steven Mnuchin, Secretary
Department of the Treasury
1500 Pennsylvania Ave.,
NW Washington, DC 20220

Wilbur Ross, Secretary
Department of Commerce
1401 Constitution Ave., NW
Washington, DC  20230

Kevin McAleenan, Commissioner
Customs and Border Protection
Department of Homeland Security
1300 Pennsylvania Ave., NW
Washington, DC 20229

Chris Oliver
Assistant Administrator
National Marine Fisheries Service
National Oceanographic and Atmospheric
Administration
1315 East-West Highway
Silver Spring, MD  20910

## PETITIONERS

Sea Shepherd Legal
2226 Eastlake Avenue East, #108
Seattle, WA 98102
Tel: +1 (206) 504-1600

Sea Shepherd New Zealand Ltd
PO Box 90437
Victoria Street West
Auckland 1142
New Zealand
Tel: +64 (0) 22 1501817

Sea Shepherd Conservation Society
209 E. Alameda Avenue, Suite 205
Burbank, CA 91502
Tel: +1 (818) 736-8357

**About the Petitioners**

Sea Shepherd Legal is a nonprofit environmental law firm committed to saving marine wildlife and habitats by enforcing, strengthening, and developing protective laws, treaties, policies, and practices worldwide. Sea Shepherd Legal is concerned with the conservation of marine mammals and the effective implementation of the Marine Mammal Protection Act ("MMPA"). www.seashepherdlegal.org

Sea Shepherd New Zealand Ltd is a nonprofit conservation organisation whose mission is to end the destruction of habitat and slaughter of wildlife in the world's oceans in order to conserve and protect ecosystems and species. Sea Shepherd New Zealand Ltd uses innovative direct-action tactics to investigate, document and take action when necessary to expose and confront illegal activities in the oceans. By safeguarding the biodiversity of our delicately balanced oceanic ecosystems, Sea Shepherd New Zealand Ltd works to ensure their survival for future generations. Sea Shepherd New Zealand Ltd is especially concerned with the Māui dolphin, as this iconic species, endemic to New Zealand, is on the brink of extinction. www.seashepherd.org.nz

Sea Shepherd Conservation Society is an international nonprofit, marine wildlife conservation organization. Established in 1977, Sea Shepherd Conservation Society's mission is to end the destruction of habitat and slaughter of wildlife in the world's oceans in order to conserve and protect ecosystems and species. Sea Shepherd Conservation Society uses innovative direct-action tactics to investigate, document, and take action when necessary to expose and confront illegal activities on the high seas. By safeguarding the biodiversity of our delicately balanced ocean ecosystems, Sea Shepherd Conservation Society works to ensure their survival for future generations. www.seashepherd.org

**Action Requested**

Sea Shepherd Legal, Sea Shepherd New Zealand Ltd, and Sea Shepherd Conservation Society (collectively, "Petitioners") request the Secretaries of Homeland Security, the Treasury, and Commerce (collectively, "Agencies") to perform their non-discretionary duties established by section 101(a)(2) of the MMPA, 16 U.S.C. § 1371(a)(2) ("Imports Provision"), to "ban the importation of commercial fish or products from fish" sourced using fishing activities that "result[] in the incidental kill or incidental serious injury" of Māui dolphins (*Cephalorhynchus hectori maui*) "in excess of United States standards." Contrary to the MMPA, the United States, through the actions and omissions of the Agencies, currently allows the importation of fish and fish products from New Zealand fisheries that kill and injure critically endangered Māui dolphins in excess of United States standards.

Therefore, the Petitioners request that the Agencies immediately ban imports of all fish and fish products from New Zealand that do not satisfy the requirements of the Imports Provision as applied to the incidental killing or serious injury of Māui dolphins. As explained below, this ban must cover all export fisheries that operate within Māui dolphin habitat using set nets or trawls. Emergency rulemaking banning such imports is warranted to avoid immediate, ongoing, and unacceptable risks to Māui dolphins. **This letter is a formal petition under 5 U.S.C. § 553(e). Given the emergency nature of the situation, we request that you provide a substantive response within 60 days.**

Dated: February 6, 2019

/s/Brett Sommermeyer
Brett Sommermeyer
Legal Director
Sea Shepherd Legal
brett@seashepherdlegal.org

# INTRODUCTION

Sea Shepherd Legal, Sea Shepherd New Zealand Ltd, and Sea Shepherd Conservation Society (collectively, "Petitioners") request that the Department of Homeland Security, the Department of the Treasury, and the Department of Commerce (collectively, "Agencies") carry out their non-discretionary duties under section 101(a)(2) ("Imports Provision") of the Marine Mammal Protection Act ("MMPA") to "ban the importation of commercial fish or products from fish" harvested in a manner that "results in the incidental kill or incidental serious injury" of Māui dolphins (*Cephalorhynchus hectori maui*) "in excess of United States standards."[1]  Specifically, we request that, pursuant to the Imports Provision, the Agencies immediately ban all fish and fish products originating from fisheries in the Māui dolphin's range, along the west coast of New Zealand's North Island, that employ either gillnets or trawls — the fishing gear responsible for the near extinction of the Māui dolphin.  As detailed more fully below, the situation for the Māui dolphin is **dire**, and the Agencies must take **immediate action** to prevent the extinction of the species.

Incidental capture (a.k.a. bycatch) is the leading cause of injury and death of marine mammals around the world.[2]  Annual global bycatch of marine mammals is estimated to be in the hundreds of thousands.[3]  In the case of the Māui dolphin, a species listed as endangered under the Endangered Species Act ("ESA")[4] and depleted under the MMPA,[5] bycatch has reduced population numbers to the point that it is the most endangered marine dolphin in the world.[6]  Māui dolphins have declined from approximately 2,000 individuals in 1971, to 111 in 2004,[7] to 55 in 2011.[8]  The 2018 report of the Scientific Committee of the International Whaling Commission ("IWC") contained an abundance estimate of 57 individuals, but the same report noted that there could be as few as 44 individuals remaining.[9]  In a 2012 study published by the New Zealand Ministry for Primary Industries and Department of Conservation, Currey *et al.* estimated that

---

[1] 16 U.S.C. § 1371(a)(2).

[2] Marine Mammal Commission, *Marine Mammal Bycatch*, *available at* https://www.mmc.gov/priority-topics/fisheries-interactions-with-marine-mammals/marine-mammal-bycatch/ ("Bycatch is the greatest direct cause of marine mammal injury and death in the United States and around the world.").

[3] Andrew J. Read, et al., *Bycatch of Marine Mammals in U.S. and Global Fisheries*, 20 CONSERVATION BIOLOGY 163 (2006).

[4] *Endangered and Threatened Wildlife and Plants: Final Rule To List the Maui Dolphin as Endangered and the South Island Hector's Dolphin as Threatened Under the Endangered Species Act*, 82 Fed. Reg. 43701 (Sept. 7, 2017).

[5] Milena Palka & Aimee Leslee, *Addressing Gaps in Management Approach and Protection of the World's Rarest Marine Dolphin, Cephalorhynchus hectori maui* (WWF-New Zealand 2014), *available at* https://www.researchgate.net/publication/316155117_Addressing_gaps_in_management_approach_and_protection_of_the_world%27s_rarest_marine_dolphin_Cephalorhynchus_hectori_maui.

[6] Christopher Pala, *Endangering the World's Rarest Dolphins*, THE INVESTIGATIVE FUND (Feb. 27, 2017), *available at* https://www.theinvestigativefund.org/investigation/2017/02/27/endangering-worlds-rarest-dolphins/.

[7] Elisabeth Slooten, et al., *A New Abundance Estimate for Maui's Dolphin: What Does It Mean for Managing This Critically Endangered Species?*, 128 BIOLOGICAL CONSERVATION 576 (2006).

[8] Rebecca M. Hamner, et al., *Genetic Differentiation and Limited Gene Flow Among Fragmented Populations of New Zealand Endemic Hector's and Māui's Dolphins*, 13 CONSERVATION GENETICS 987 (2012).

[9] International Whaling Commission, Report of the Scientific Committee, IWC/67/Rep01, at Table 16 (2018) [hereinafter "2018 Report of the IWC Scientific Committee"]("Abundance estimates, CVs and 95% confidence intervals for estimates agreed at the 2018 meeting.").

fishing-related threats, particularly the indiscriminate use of set gillnets and commercial trawling, are responsible for killing 4.97 Māui dolphins annually — which equates to 95.5% of the total human-associated deaths.[10]  These numbers stand in stark contrast with estimates that the Māui population can sustain only *one* human-caused death every 10 to 23 years based on the U.S. potential biological removal ("PBR") method.[11]  With this grim reality in mind, the IWC's Scientific Committee has repeatedly stated that "[t]he human-caused death of even one individual would increase the extinction risk."[12]

The dangers of bycatch were central to Congress' analysis when it enacted the MMPA.  The MMPA not only bans the intentional killing of marine mammals, but also strictly limits the degree to which U.S. fishermen may incidentally harm or kill marine mammals in association with legal (and illegal) fisheries.[13]  Yet, far from erecting rules that focus only on U.S. waters or U.S. vessels fishing abroad, Congress embraced a global vision.  Recognizing that the U.S. could shape policy in foreign nations as a result of its import market for fisheries products — the U.S. was the world's largest importer of seafood by value in 2016[14] — Congress chose to prohibit imports from foreign fisheries that fail to prevent bycatch of marine mammals to an adequate degree.[15]  Accordingly, the Imports Provision requires administrative authorities to "ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards."[16]

Unfortunately, for want of implementing regulations, Congress' command in the Imports Provision collected dust for over 40 years.  In 2016, following litigation, the National Marine Fisheries Service ("NMFS") finally issued a rule implementing the Imports Provision ("Imports Rule").[17]  Although the Imports Rule contains a default five-year exemption period that finds no support in the statute, NMFS nevertheless stated that it would entertain "emergency rulemaking to ban imports of fish and fish products from an export or exempt fishery having or likely to have an immediate and significant adverse impact on a marine mammal stock."[18]  Like the vaquita, the

---

[10] Rohan J.C. Currey, et al., *A Risk Assessment of Threats to Maui's Dolphins*, at Table 3 (2012), *available at* https://www.doc.govt.nz/Documents/conservation/native-animals/marine-mammals/maui-tmp/mauis-dolphin-risk-assessment.pdf.

[11] P.R. Wade, et al., *The Potential Biological Removal (PBR) and Probability of Decline for Maui Dolphin* (2012), reproduced as Appendix 1 in Rohan J.C. Currey, et al., *A Risk Assessment of Threats to Maui's Dolphins*.

[12] 2018 Report of the IWC Scientific Committee, *supra* note 9, at p. 69.

[13] *See* 16 U.S.C. § 1371(a)(2) ("In any event it shall be the immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate."); *see also Pac. Ranger, LLC v. Pritzker*, 211 F. Supp. 3d 196, 215-216 (D.D.C. 2016) ("The MMPA proceeds from the premise that takes of marine mammals (broadly defined) are taboo, which corresponds with the principle that, when in conflict, the wellbeing of marine mammals takes precedence over fishing interests.") (internal citations omitted).  *See also, NRDC, Inc. v. Ross*, 331 F. Supp. 3d 1381, 1386 (Ct. Int'l Trade, July 26, 2018) ("Altogether, the Imports Provision ban applies to legal and illegal fisheries whose 'fish or fish products [] have been caught with commercial fishing technology which results in the incidental kill . . . of ocean mammals in excess of United States standards.'").

[14] FAO, *USA Fisheries Statistics: Production, Consumption and Trade*, *available at* http://www.fao.org/in-action/globefish/market-assets/countries/usa/usa-trade/en/?page=7&ipp=5&tx_dynalist_pi1%5Bpar%5D=YToxOntzOjE6IkwiO3M6MToiNyI7fQ%3D%3D.

[15] 16 U.S.C. § 1371(a)(2).

[16] *Id.*

[17] *See* 81 Fed. Reg. 54390 (Aug. 15, 2016).

[18] *Id.* at 54395 (col. 2); *see also* 16 U.S.C. § 1387(g).

plight of the Māui dolphin plainly authorizes emergency rulemaking to ban imports from fisheries contributing to its rapid decline.

While there may be some reluctance to impose an import ban, we remind the Agencies that the federal courts are on guard. As the Agencies know, in *NRDC, Inc. v. Ross*, the U.S. Court of International Trade ("CIT") recently granted a preliminary injunction requiring the Agencies to ban the importation of all fish and fish products from Mexican commercial fisheries that use gillnets within the vaquita's range.[19] The similarities between the plight of the vaquita and the plight of the Māui dolphin are striking — and they compel the same result. If the Agencies decline to immediately act and litigation is required, we are confident that the courts will have little difficulty reaching the same result — one that favors protecting the Māui dolphin from otherwise inevitable extinction.

# DISCUSSION

## I.  Governing Law

### A. The MMPA Prohibits Imports from Foreign Fisheries that Deficiently Regulate Marine Mammal Bycatch

When enacting the MMPA, Congress mandated that conservation, including maintaining healthy populations of marine mammals, is of highest priority. The legislative history of the MMPA makes it clear that the precautionary principle must be applied and that any bias must favor marine mammals.[20] The courts have agreed. In *Comm. For Humane Legislation v. Richardson*, the court observed that any action subject to the MMPA must "proceed knowledgeably and cautiously"[21] and that the MMPA must be interpreted and applied for the benefit of marine mammals "and not for the benefit of commercial exploitation."[22]

One of the key manifestations of the precautionary principle in the MMPA is the so-called Zero Mortality Rate Goal ("ZMRG"), which is to reduce the incidental mortality or serious injury of marine mammals in the course of commercial fishing operations to insignificant levels approaching zero.[23] The MMPA achieves this goal through implementation of specific standards governing and restricting the incidental catch (or "bycatch") of marine mammals.[24]

The MMPA standards apply both to domestic commercial fisheries and to foreign fisheries that export their products to the United States. With respect to the latter, the Imports Provision in section 101(a)(2) calls for a ban of imports associated with foreign fisheries that have failed to institute sufficient regulations preventing marine-mammal bycatch. This provision, which expressly incorporates the ZMRG, states as follows:

---

[19] *NRDC, Inc. v. Ross*, 331 F. Supp. 3d 1338 (Ct. Int'l Trade July 26, 2018); *see also NRDC, Inc. v. Ross*, 331 F. Supp. 3d 1381, *supra* note 13 (clarifying the terms of the injunction).
[20] H.R. REP. NO. 92-707, at 24 (1971); 118 CONG. REC. S15680 (daily Ed. Oct. 4, 1971) (statement of Sen. Packwood).
[21] 414 F. Supp. 297, 310 n.29 (D.D.C. 1976), *aff'd*, 540 F.2d 1141 (D.C. Cir. 1976).
[22] *Id.* at 24.
[23] 16 U.S.C. § 1371(a)(2).
[24] *See id.* §§ 1386–87.

> In any event it shall be the immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate. The Secretary of the Treasury[25] **shall ban** the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards.[26]

The Imports Provision further requires the Secretary to "insist on reasonable proof" from the exporting nation's government "of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products" exported to the United States.[27] As noted by the court in *NRDC, Inc. v. Ross*, this statutory provision "only requires that the Government request information from foreign governments when determining whether to *exempt* fishery operations" from a trade ban under the Imports Provision.[28]

## B. A Mandatory Trade Ban Is Triggered When Marine Mammal Bycatch Exceeds United States Standards

As made clear by the above-emphasized language, the Imports Provision calls for a **mandatory ban** when bycatch in the foreign fishery exceeds "United States standards." Although not defining this phrase, the applicable "United States standards" are found within the MMPA. For example, the MMPA directs NMFS to issue marine mammal stock assessments documenting the population's abundance, trend, and net productivity; describing the fisheries that interact with the stock; and estimating the level of mortality by fishery.[29] As part of this stock assessment process, NMFS must also assess the PBR level for each stock to effectuate the ZMRG.[30]

Notably, PBR is the primary metric through which NMFS determines the bycatch limit for any given marine mammal stock.[31] More specifically, PBR is the "maximum number of animals . . . that may be removed . . . while allowing that stock to reach or maintain its optimum sustainable population."[32] Additionally, for any commercial fishery that causes mortality of a marine mammal population in excess of PBR, NMFS **must** develop a "take[ ] reduction plan" to reduce fishery-related mortality to "less than the potential biological removal level" within six months.[33]

---

[25] Although the statutory text directs the Secretary of Treasury to impose the import ban, Congress subsequently transferred a portion of Treasury's authority to the Department of Homeland Security and its sub-agency, Customs and Border Patrol. *See* 6 U.S.C. §§ 203; 212(a)(1), (2); *see also* 19 C.F.R. § 0.1, Appx. 1; 68 Fed. Reg. 28,322 (May 23, 2003). Separately, NMFS has confirmed that it is the Secretary of Commerce that bears the duty to "insist on reasonable proof" from foreign nations. 75 Fed. Reg. 22,731 (Apr. 30, 2010).

[26] 16 U.S.C. § 1371(a)(2).

[27] *Id.*

[28] *NRDC, Inc.*, 331 F. Supp. 3d, *supra* note 19, at 1356 (emphasis added).

[29] 16 U.S.C. § 1386(a).

[30] *Id.* § 1386(a)(6).

[31] *See* 50 C.F.R. § 216.3 (as revised) ("Bycatch limit means the calculation of a potential biological removal level for a particular marine mammal stock, as defined in § 229.2 of this chapter, or comparable scientific metric established by the harvesting nation or applicable regional fishery management organization or intergovernmental agreement.").

[32] 16 U.S.C. § 1362(20).

[33] *Id.* §§1387(f)(1)-(2),(5); 1362(19).

It is these standards — the calculation of PBR and the institution of a take reduction plan when fisheries-related mortality exceeds the PBR — that constitute "United States standards" under the Imports Provision.  Thus, New Zealand **must** employ such standards (among others detailed in the MMPA) in its regulatory scheme to satisfy the Imports Provision.  Significantly in this regard, as the Agencies are aware, in *NRDC v. Ross*, the CIT confirmed the validity of this interpretation of "United States standards" — holding that the "PBR level is . . . a marker of 'United States standards' for the purposes of the Imports Provision" and that the "immediate goal" of a take reduction plan is to reduce mortality below the PBR.[34]  The court further held that "the long-term goal shall be to reduce bycatch levels 'to insignificant levels approaching a zero mortality and serious injury rate' within five years."[35]  There is no evidence demonstrating New Zealand's compliance with these standards despite the perilous status of the Māui dolphin.

### C.  A Trade Ban Is Not Precluded by the Five-Year Moratorium Imposed by the Imports Rule

Section 118(g) of the MMPA provides that the Secretary of Commerce "shall" undertake emergency rulemaking actions if he or she "finds that the incidental mortality and serious injury of marine mammals from commercial fisheries is having, or is likely to have, an immediate and significant adverse impact on a stock or species."[36]  Although section 118(g) applies to domestic fisheries, in its publication of the final Imports Rule, NMFS referenced this statutory section as support for extending a similar emergency rulemaking regime to the foreign fisheries context.[37]  As discussed below, where required (as here), this emergency rulemaking provision is an exception to the five-year moratorium inappropriately imposed by the Imports Rule.

Inconsistent with its express recognition of the urgency of the bycatch problem in its notice of proposed rulemaking for the Imports Rule,[38] NMFS unjustifiably gave nations half a decade to achieve compliance.  Significantly in this regard, NMFS opened its discussion of MMPA requirements with the acknowledgment that the "'biggest threat to marine mammals worldwide is their accidental capture or entanglement in fishing gear (bycatch), which kills hundreds of thousands of them each year.'"[39]  Yet, how did NMFS respond to this "biggest" of threats?  By giving importing nations — nations that supply the vast majority of seafood consumed in the United States — *five years* to achieve bycatch rates comparable to the U.S. before imposing any trade restrictions.[40]

NMFS' decision to include this generous allowance is not only arbitrary and capricious but also finds no support in the underlying statute.  The Imports Provision speaks in unequivocal terms: the government "**shall ban** the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious

---

[34] *NRDC, Inc.*, *supra* note 19, at 1363.
[35] *Id.* at 1364.
[36] *Id.* § 1387(g)(1) (emphasis added).
[37] *See* 81 Fed. Reg. 54390, 54395 (col. 2 & 3) (Aug. 15, 2016).
[38] 80 Fed. Reg. 48172 (Aug. 11, 2015).
[39] *Id.* at 48172 (col. 3).
[40] 81 Fed. Reg. at 54414 (col. 1) (setting forth new provision codified at 50 C.F.R. § 216.24(h)(2)(ii)).

injury of ocean mammals in excess of United States standards."[41]   The statute does *not* contemplate a phase-in period, much less one so generous as five years (on top of the 43 years that passed with no implementing regulation in place).   While Congress may have chosen to include such a time period on the policy grounds offered by NMFS (*i.e.*, that nations need additional "time to assess marine mammal stocks, estimate bycatch, and develop regulatory programs to mitigate that bycatch"[42]), that is for *Congress* to decide, not NMFS.

Of note, it is not just environmental groups that have drawn attention to the legal problems with the five-year exemption period.   In its recent decision granting a temporary injunction in the vaquita case, the CIT found the exemption period to be in violation of the MMPA, holding:

> The Government cannot give itself a five year exemption from compliance with the MMPA, which dictates that the Secretary of the Treasury 'shall ban' offending imports in order to meet the 'immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate.[43]

Thus, in accord with the plain language of the Imports Provision (providing that the government "shall ban" non-complying imports), **the MMPA demands immediate action** in situations like the matter at hand.

In the Imports Rule, NMFS has itself acknowledged an exception for emergency situations.[44]   Referencing section 118(g), NMFS stated that it "would likewise consider an emergency rulemaking for an export or exempt fishery having or likely to have an immediate and significant adverse impact on a marine mammal stock interacting with that fishery."[45]   As the name implies, emergency rulemaking "allow[s] for timely treatment of cases where the usual process and timeframe could result in unacceptable risks to the affected marine mammal stock or species."[46]   More to the point, **NMFS recognized that emergency rulemaking would be appropriate in the case of a "very small population[] where any incidental mortality could result in increased risk of extinction."[47]   The instant petition presents precisely this scenario.**

In short, under the Imports Provision, the Agencies have a statutory obligation to immediately prohibit imports of fish and fish products from foreign commercial fisheries associated with marine mammal bycatch in excess of U.S. standards.   Notably, the MMPA does not require the United States to prove that foreign fisheries are substandard prior to blocking imports.   Rather, the burden of proof rests with foreign nations wishing to access the U.S. market.[48]   Such nations must furnish

---

[41] 16 U.S.C. § 1371(a)(2) (emphasis added).

[42] 81 Fed. Reg. at 54397 (col. 3).

[43] *NRDC, Inc.*, *supra* note 19, at 1354 (citing 16 U.S.C. § 1371(a)(2)).

[44] *See* 81 Fed. Reg. at 54395 (col. 2).

[45] *Id.*

[46] *Id.* at 54395 (col. 2-3).

[47] *Id.* at 54395 (col. 3).

[48] *NRDC, Inc.*, *supra* note 19, at 1356 ("[T]he Government's position again gets the requirements of the statute backwards: the statute only requires that the Government *request* information from foreign governments when determining whether to *exempt* fishery operations from a potential ban arising from bycatch in excess of United States standards.   In this case, it is undisputed that because of bycatch in the gillnet fishing technology, the vaquita is

"reasonable proof" that their fisheries meet U.S. bycatch standards as a condition precedent to lawful exports to the U.S. Thus, the default rule is *not* that imports are allowed absent proof (by the U.S.) of non-compliance. To the contrary, the default rule is that imports are *prohibited absent proof (by the importing nation) of compliance.*[49]

In the case of the Māui dolphin, the Agencies have violated this rule. Far from a "technical" breach, the Agencies' failure to prohibit imports of fisheries products is contributing to the disappearance of the Māui dolphin. Contrary to congressional intent, U.S. consumers are facilitating the Māui dolphin's rapid slide toward extinction by purchasing products from harmful New Zealand fisheries.

## II.   The Māui Dolphin

### A.  The Dire Conservation Status of the Māui Dolphin

The Māui dolphin's precarious status at the hands of New Zealand fisheries clearly qualifies as a case warranting immediate action under the Imports Provision and emergency rulemaking under the Imports Rule. The scientific literature establishes that there is but a "very small population" of Māui dolphins remaining, such that "any incidental mortality could result in increased risk of extinction."[50]

Of direct relevance here, NMFS has itself recognized this exigent situation. On September 19, 2017, NMFS listed the Māui dolphin as endangered under the ESA.[51] In its analysis of the statutory listing criteria, NMFS made a candid assessment of the risks facing the Māui dolphin, writing as follows:

> The present estimated abundance of Maui dolphins is critically low, and the subspecies faces additional demographic risks due to greatly reduced genetic diversity and a low intrinsic population growth rate. **Past declines, estimated to be on the order of about 90 percent** (Martien et al., 1999, Slooten 2007a), **are considered to have been driven largely by bycatch in gillnets** (Currey et al., 2012). **Maui dolphins continue to face threats of bycatch**, disease, and mining and seismic disturbances; and, it is considered unlikely that this subspecies will recover unless sources of anthropogenic mortality are eliminated (Slooten et al.,

---

being killed and is on the verge of extinction—a result which perforce contravenes United States standards. Countenancing a regulations-imposed delay until 2022 for consultations with the Mexican government (a posture endorsed by the Government), while the vaquita goes extinct, would be inconsistent with the MMPA's general moratorium on marine mammal takings and the Imports Provision's direction that the Secretary of the Treasury 'shall ban' offending imports in order to meet the 'immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate.'") (internal citations omitted) (emphasis in original).

[49] *See id.*
[50] *Id.*
[51] 82 Fed. Reg. 43701 (Sept. 19, 2017).

2006; MFish and DOC 2007b, Baker et al., 2010).   Based on the best available scientific and commercial information . . . and after consideration of protective efforts, we find that the Maui dolphin (*Cephalorhynchus hectori maui*) is in danger of extinction throughout its range.[52]

Commenting on NMFS' proposal to list the Māui dolphin as endangered, the Marine Mammal Commission ("MMC") wholeheartedly agreed.[53]   After citing a 2010–2011 population estimate of 55 individuals over one year of age, the MMC noted that the primary threat to the Māui dolphin, fisheries bycatch, persisted despite New Zealand's regulatory measures.[54]

Like the vaquita, the total population of Māui dolphins has declined rapidly in recent years.   The estimated population has declined from approximately 2,000 individuals in 1971, to 111 in 2004,[55] to 55 in 2011.[56]   In its most recent report (2018), the IWC Scientific Committee reported an abundance estimate of 57 individuals, with a 95% confidence interval ("CI") of 44 to 75 individuals.[57]   The following figure shows the steady decline of an already depleted population, from 1985 to 2016.



**Māui Dolphin Population Trend**

**Figure 1:** Linear regression of log-transformed population estimates for Māui dolphins, back-transformed to original scale.).   Figure published in Elisabeth Slooten & Stephen Dawson, *Updated Population Viability Analysis, Population Trends and PBRs for Hector's and Maui Dolphin* (2016).

---

[52] *Id.* at 43708 (col. 2-3) (emphasis added).
[53] Marine Mammal Commission, *Comments on Proposal to List Hector's Dolphin and Maui Dolphin Under ESA* (Nov. 18, 2016) (on file with Petitioners).
[54] *Id.* at 1.
[55] Elisabeth Slooten, et al., *A New Abundance Estimate for Maui's Dolphin*, *supra* note 7.
[56] Rebecca M. Hamner, et al., *supra* note 8.
[57] 2018 Report of the IWC Scientific Committee, *supra* note 9, at Table 16.

The above figure shows a decline from about 138 Māui dolphins in 1985 to 56 individuals in 2016. This equates to an average decline of 2% every year and a total decline of 59% over the 31-year period from 1985 to 2016.[58]  This alarming trend, coupled with the incredibly low number of estimated remaining dolphins, led the IWC Scientific Committee to conclude that "[t]he human-caused death of even one individual would increase the extinction risk."[59]

The decline of the Māui dolphin is overwhelmingly the result of bycatch in set gillnets and trawls. For this reason, the IWC Scientific Committee has recommended "closures of any fisheries within the range of Māui dolphins that are known to pose a risk of bycatch to dolphins (*i.e.*, set net and trawl fisheries)."[60]  To date, New Zealand has ignored this critical recommendation.

**B.**    **Gillnet and Trawl Fisheries on the West Coast of New Zealand's North Island Do Not Meet U.S. Standards, and Emergency Rulemaking Is Required To Ban Imports**

**1.**    **New Zealand export fisheries using gillnets and trawls exceed the Māui dolphin bycatch limit by many orders of magnitude**

Given the Māui dolphin's precarious status, any fishery using gillnets or trawls in the Māui dolphin's range necessarily runs afoul of U.S. standards for marine mammal protection.  Among other possible shortcomings, New Zealand is clearly out of step with respect to bycatch limits, as calculated using PBR, and monitoring procedures.

In the case of the Māui dolphin, it is clear that New Zealand export fisheries using gillnets and trawls are exceeding the bycatch limit.  In a 2017 study prepared for the IWC Scientific Committee, Slooten and Dawson estimated PBR of Māui dolphins at 0.12 (when using an Rmax of 4%, the default value of 4% for cetaceans) and 0.05 (when using a 1.8% Rmax, the tailored estimate for Hector's and Māui dolphins).[61]  In contrast, the authors estimated "current bycatch of Maui dolphins at 2.4–3.8 individuals per year."[62]  The New Zealand government does not dispute this phenomenon.  In fact, the most recent New Zealand government risk assessment estimates that fishing activities are responsible for 4.97 Māui dolphin deaths per year.[63]  "In comparison, non-fishing-related threats . . . were estimated to contribute 0.27 (95% CI: 0.05–0.90) Maui's dolphin mortalities per annum, or 4.5% of total threat-associated mortalities."[64]

While the precise numbers may be unknown (as is the nature of estimates for such small populations), there is no dispute that bycatch exceeds PBR several times over.  As the New Zealand

---

[58] Elisabeth Slooten & Stephen Dawson, *Updated Population Viability Analysis, Population Trends and PBRs for Hector's and Maui Dolphin*, at p. 13 (2016) (on file with Petitioners).

[59] 2018 Report of the IWC Scientific Committee, *supra* note 9, at p. 69.

[60] *Id.*

[61] Elizabeth Slooten & Stephen Dawson, *Bycatch and PBRs for Maui and Hectors Dolphin*, SC/67A/HIM/07, at Table 3 (2017).

[62] *Id.* at 12.

[63] Rohan J.C. Currey, et al., *A Risk Assessment of Threats to Maui's Dolphins*, *supra* note 10, at Table 3.

[64] *Id.* at 14.

government candidly observed, fisheries present a "100% likelihood of exceeding PBR."[65]  Thus, two facts are clear: (1) bycatch is the leading threat to Māui dolphins; and (2) "[c]urrent estimates of . . . Maui dolphin bycatch far exceed PBRs."[66]

It is undisputed that bycatch is occurring in both set gillnet and trawling fisheries.  According to an expert panel convened by the New Zealand government, "[c]ommercial set net, commercial trawl and recreational/customary set net fisheries were the threats estimated to have the greatest impact on Maui's dolphins."[67]  As shown in the figure below, the panel estimated 2.33 Māui dolphin mortalities per year from commercial set gillnets, 1.13 mortalities per year from commercial trawls, and 0.88 mortalities per year from recreational/customary set gillnet fisheries.



**Figure 2:** Estimated Māui dolphin mortalities per year for each threat, as scored by an expert panel of domestic and international specialists in marine mammal science and ecological risk assessment, convened by New Zealand.  Image published in Rohan J.C. Currey, et al., *A Risk Assessment of Threats to Maui's Dolphins* (2012).

Comparing these mortality numbers to PBR (0.05 or, at most, 0.12), it becomes clear that bycatch from commercial set gillnets (2.33 fatalities per year) and commercial trawls (1.13 mortalities per year) far exceeds the PBR.  To the extent that these fisheries export fish and fish products to the

[65] Ministry of Primary Industries, *Aquatic Environment and Biodiversity Annual Review 2016: A Summary of Environmental Interactions Between the Seafood Sector and the Aquatic Environment*, at Table 6.3 (2016), *available at* www.openseas.org.nz/wp-content/uploads/2017/06/MPI_AEBAR_2016.pdf.
[66] Elizabeth Slooten & Stephen Dawson, *Bycatch and PBRs for Maui and Hectors Dolphin*, *supra* note 61, at 12.
[67] Rohan J.C. Currey, et al., *A Risk Assessment of Threats to Maui's Dolphins*, *supra* note 10, at 15.

U.S. (which is demonstrated below), New Zealand has clearly failed to satisfy the requirement that they "not exceed the bycatch limit for that stock or stocks."[68]

### 2. New Zealand's gear and method restrictions and observer coverage are grossly inadequate to the task of reducing Māui dolphin bycatch

While New Zealand has taken some steps to reduce bycatch of Māui dolphins, it has not done nearly enough. In essence, New Zealand has attempted to address the bycatch problem by (1) restricting set gillnets and trawls in certain areas, and (2) increasing observer coverage and other monitoring mechanisms. However, both efforts are half-measures at best.

In the case of gear and method restrictions, trawling has been banned in approximately 5% of the habitat of Māui dolphin, while gillnets are banned in an additional 14% of that habitat.[69] According to one study, extensions to protected areas in 2012 and 2013 appeared to reduce the number of deaths from 4.97 to between 3.25 and 4.16 in 2014.[70] However, this number of mortalities in fishing nets still eclipses PBR by between 27-fold (if we use the conservative PBR estimate of .12 and the lower figure of 3.25 fatalities per year) and 83-fold (if we use the alternative PBR estimate of .05 and the higher figure of 4.16 fatalities per year). Hence, it should come as no surprise that the IWC Scientific Committee has repeatedly urged New Zealand to take "immediate management actions to eliminate bycatch of Maui dolphins, including closures of any fisheries within the range of Maui dolphins that are known to pose a risk of bycatch to dolphins (*i.e.* set net and trawl fisheries)."[71] So far, this has not happened. Set gillnets and trawl fisheries continue to operate in the majority of the Māui dolphin's habitat. New Zealand continues to allow such operations despite its acknowledgement that "creation of spatial closures where harmful activities are restricted or regulated[] is the *only* management approach for which there has been an apparent associated improvement in a vital rate for Hector's and Māui dolphins."[72]

As for observer coverage and other monitoring efforts, New Zealand has failed to ensure that fisheries operating in Māui dolphin habitat are adequately monitored. In recognition of the key role that monitoring plays in determining bycatch, the Imports Rule provides that robust monitoring is, by itself, an indispensable element to a positive comparability finding. Although the Imports Rule does not go into effect until 2022, adequate monitoring of marine mammal bycatch should be considered a "United States standard" for purposes of the Imports Provision, as domestic fisheries are required to monitor marine mammal bycatch under section 118 of the MMPA.[73]

---

[68] 50 C.F.R. § 216.24(h)(6)(iii)(C)(6)(i).
[69] Elisabeth Slooten & Stephen Dawson, *Updated Population Viability Analysis*, *supra* note 58, at 4.
[70] Elisabeth Slooten, *Effectiveness of Extensions to Protected Area for Maui's Dolphin in 2012 and 2013*, Paper SC-65b-SM08 (2014) (presented at the 2014 IWC Scientific Committee meeting in Bled, Slovenia).
[71] 2018 Report of the IWC Scientific Committee, *supra* note 9, at 69.
[72] Ministry of Primary Industries, *Aquatic Environment and Biodiversity Annual Review 2016*, *supra* note 65, at 148 (emphasis added).
[73] *See, e.g.,* 16 U.S.C. §§ 1387(d), 1387(f)(9)(D).

It is true that New Zealand has instituted some monitoring procedures.  However, for the reasons discussed below, these procedures are woefully inadequate to the critical task of "estimate[ing] . . . incidental mortality and serious injury"[74] of Māui dolphins by associated fisheries.

First, New Zealand does not maintain adequate observer coverage of fisheries in Māui dolphin habitat.  "Observer coverage in Maui dolphin habitat off the west coast of the North Island is 14.6% for trawling vessels[.]"[75]  Meanwhile, observer coverage for gillnetting vessels in Māui dolphin habitat is 12.7% for vessels greater than six meters in length.[76]  Smaller craft (*i.e.*, less than six meters in length) have no observer coverage at all.[77]  Yet, commercial gillnetters commonly use these craft in the large harbors of the North Island's west coast.[78]  Māui dolphins inhabit these harbors.[79]  If these low observer numbers are aggregated into a single dataset for all gillnet vessels fishing in Māui dolphin habitat, overall observer coverage adds up to only 2% for all such vessels.[80]

Second, New Zealand's extremely limited observer coverage fails to adequately estimate incidental mortality or serious injury of Māui dolphins via bycatch.  While overall bycatch can be extrapolated from a smaller sample, uncertainty increases as sample size decreases.  In the case of the Māui dolphin, "low and sporadic observer coverage in New Zealand's inshore fisheries results in a high level of uncertainty of the level of fisheries mortality in gillnet and in particular trawl fisheries."[81]  Moreover, "low levels of observer coverage . . . can also cause a negative bias in the catch rate estimate."[82]  Slooten and Dawson demonstrated this phenomenon in the context of the Hector's dolphin, where 1,000 observer days were needed to produce a distribution curve centered around the expected value — and where fewer days produced progressively skewed results implying unrealistically low levels of bycatch.[83]

Third, while New Zealand has proposed introducing video camera monitoring for all inshore gillnet and trawling vessels,[84] this proposal is hardly the panacea that it purports to be.  The effectiveness of video monitoring depends on several factors, including image quality, the "view" furnished by the camera, reliability of the system, and, perhaps most importantly, the extent to which authorities actually review the recordings.[85]  Moreover, even if all these factors are addressed, there is still a need for physical observers to detect drop-out (*i.e.*, capture of dolphins

---

[74] *Id.* § 1386(a)(4)(B).

[75] Elizabeth Slooten & Stephen Dawson, *Bycatch and PBRs for Maui and Hectors Dolphin*, *supra* note 61, at 10.

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*; *see also* New Zealand Dep't of Conservation, *Facts About Māui Dolphin*, *available at* https://www.doc.govt.nz/nature/native-animals/marine-mammals/dolphins/maui-dolphin/facts/ ("Māui dolphins' use of harbours and their close inshore distribution means that the same waters we use for fishing and recreation are also their home.").

[80] Elisabeth Slooten & Stephen Dawson, *Bycatch and PBRs for Maui and Hectors Dolphin*, *supra* note 61, at 10.

[81] *Id.* at 12.

[82] *Id.* at 6.

[83] *Id.* at 6-7.

[84] *Id.* at 13.

[85] *Id.*

that, despite being caught in a net, drop out of the net prior to, or during, retrieval).[86]  Regardless, video monitoring has not yet been instituted for gillnet and trawling vessels operating in Māui habitat.  It remains but a proposal.[87]

Finally, even if New Zealand had the best observer program imaginable, this fact alone would not save the Māui dolphin from extinction.  Without more substantive protections, monitoring would, in this case, simply serve as a witness to an extinction event.  As Slooten and Dawson recently concluded, "the very low statistical power for detecting Māui dolphin population trends makes it impractical to monitor the population in the hope of determining whether the current, partial protection is effective."[88]  Instead, "improved protection has a better chance of avoiding extinction of this population[.]"[89]

In sum, the Agencies must immediately ban imports of fish and fish products from New Zealand's gillnet and trawl fisheries inside the Māui dolphin's range, as those fisheries do not comport with U.S. standards for marine mammal protection.  New Zealand's failure to protect the Māui dolphin is well-known at the international level.  For example, the IWC Scientific Committee has repeatedly highlighted New Zealand's neglect in this regard.  In its most recent statement on the matter, the Scientific Committee offered the following assessment, which bears quoting in full:

> The Committee notes that no new management action regarding the Māui dolphin has been enacted since 2013.  It therefore concludes, as it has repeatedly in the past, that existing management measures in relation to bycatch mitigation fall short of what has been recommended previously and expresses continued grave concern over the status of this small, severely depleted subspecies. The human-caused death of even one individual would increase the extinction risk. In addition, the Committee:
>
> (1) re-emphasizes that the critically endangered status of this subspecies and the inherent and irresolvable uncertainty surrounding information on most small populations point to the need for precautionary management;
>
> (2) reiterates its previous recommendation that highest priority should be assigned to immediate management actions to eliminate bycatch of Māui dolphins including closures of any fisheries within the range of Māui dolphins that are known to pose a risk of bycatch to dolphins (*i.e.* set net and trawl fisheries);

---

[86] *Id.*

[87] We note that at least two major fishing firms ostensibly support this policy, although it is unclear whether the firms have made the shift.  *See* Moana New Zealand & Sanford Limited, Maui Dolphin Protection Plan, at 5 (2016), *available at* https://www.sanford.co.nz/assets/Sanford-and-Moana-Maui-Protection-Plan-2016.pdf ("We support full transparency during the transition process and will work towards delivering video monitoring of coastal fishing (trawl and coastal set netting) within the Māui dolphin habitat on Sanford and Moana New Zealand linked vessels and on trawl fishers' landing into our markets as soon as possible, aiming for April 2017.").

[88] Elizabeth Slooten & Stephen Dawson, *Bycatch and PBRs for Maui and Hectors Dolphin*, *supra* note 61, at 2.

[89] *Id.*

(3) notes that the confirmed current range extends from Maunganui Bluff in the north to Whanganui in the south, offshore to 20 n. miles, and it includes harbours — within this defined area, fishing methods other than set nets and trawling should be used;

(4) welcomes the update on Māui dolphins provided and looks forward to receiving the species-specific, spatially explicit, multi-threat risk assessment in 2019;

(5) respectfully encourages the New Zealand Government to commit to specific population increase targets and timelines for Māui dolphin conservation;

(6) respectfully requests that reports be provided on progress towards the conservation and recovery goals as updates become available.[90]

Unfortunately, the IWC Scientific Committee has issued similar statements on multiple occasions, to little avail.  The Agencies have an opportunity — and a legal obligation — to affirmatively use the Imports Provision to incentivize New Zealand to finally take the steps required to save the Māui dolphin from otherwise inevitable extinction.  Additionally, New Zealand's strong economic profile and social stability eliminate any excuse for non-compliance.  Where Mexico's fight to save the vaquita is arguably complicated by the presence of armed poachers linked to drug cartels[91] (not to mention difficult economic conditions), New Zealand's failure to protect a similarly-situated marine mammal seems to be the result of little more than a lack of resolve.  An import ban would provide the needed economic pressure to encourage New Zealand to alter its approach.

### 3.  A trade ban would strongly encourage proactive efforts by New Zealand to finally adequately address Māui dolphin bycatch

Under the facts at issue, there is no question that an import ban would have the desired effect of strongly encouraging New Zealand to take the critical steps needed to align its management of the fisheries driving the Māui dolphin to extinction with U.S. standards.  On this point, it is indisputable that, as one of the largest importers of seafood products, the United States is in a powerful position to influence market forces.  In fact, as concluded in a recent study, the United States market "is one of the world's biggest seafood markets, whose purchasing power has a significant impact on patterns of fishing and trade."[92]  On the flip-side, as one of the twenty largest seafood exporters to the United States market,[93] New Zealand is susceptible to United States economic pressure and, thus, highly likely to respond to a trade ban.  These circumstances give

---

[90] 2018 Report of the IWC Scientific Committee, *supra* note 9, at 69.

[91] *See, e.g.,* Kate Morrisey, *Totoaba Trafficker's Arrest Offers Faint Hope for Vaquita*, San Diego Union Tribune (Sept. 19, 2018), *available at* https://www.sandiegouniontribune.com/news/border-baja-california/sd-me-oscar-parra-20180919-story.html.

[92] Ganapathiraju Pramod et al., *Estimates of Illegal and Unreported Fish in Seafood Imports to the USA*, MARINE POL'Y 102, 112 (2014).

[93] *Notice of Availability: Fish and Fish Product Import Provisions of the Marine Mammal Protection Act List of Foreign Fisheries*, 83 Fed. Reg. 11703, 11710 (Table 1) (March 16, 2018).

rise to a strong presumption that New Zealand would comply with a demand that its export fishery be brought in line with United States law protective of marine mammals.[94]

### 4. A trade ban must not await New Zealand's development of a new threat management plan for the Māui dolphin

Despite the foregoing, the Agencies might claim that an import ban would be imprudent pending the release of New Zealand's a new Threat Management Plan ("TMP"). New Zealand claims that the new TMP will be designed to improve protections for the Māui dolphin.[95] Any such argument should be disregarded for three primary reasons.

First, and to repeat, the Import Provision does not, by its express language, authorize this delay. It prohibits imports of fish and fish products associated with bycatch in violation of U.S. standards. The statute is unambiguous; it requires immediate action when triggered.

Second, New Zealand's poor track record in developing past TMPs for the Māui dolphin undermines any confidence that it will implement reforms sufficient to satisfy the MMPA now. As the above-quoted IWC assessment demonstrates, New Zealand has for years assured the international community that it is working on the issue. Yet evidence of genuine progress has been wanting, as "existing management measures in relation to bycatch mitigation fall short of what has been recommended previously."[96] In fact, New Zealand has touted its work on a TMP — and characterized the same as the species' savior – *since 2007*.[97] There is simply no reason to believe that New Zealand will finalize an adequate TMP in short order (absent the incentive provided by an import ban).

Third, there is already strong evidence that New Zealand's current efforts are far from sufficient to address the significant bycatch threats facing the Māui dolphin. More to the point, during a July 2018 workshop to review and discuss the draft TMP and underlying risk assessment, an invited international expert panel was highly critical of the direction taken by the New Zealand government.[98] Among other points, the expert panel noted the following issues that undercut the TMP's effectiveness:

---

[94] *See Earth Island Inst. v. Christopher*, 913 F. Supp. 559, 570 (1995), *appeal dismissed*, 86 F.3d 1178 (Fed. Cir. 1996) (holding in a case concerning inaction regarding imports of shrimp harvested in a manner that harmed sea turtles that it was "safe to presume that the exporting countries do (and would) attempt to comply with U.S. law" due to the size of the United States seafood export market).

[95] *See* New Zealand Department of Conservation, Draft Hector's and Māui Dolphin Threat Management Plan, *available at* https://www.doc.govt.nz/about-us/science-publications/conservation-publications/native-animals/marine-mammals/draft-hectors-and-mauis-dolphin-threat-management-plan/.

[96] 2018 Report of the IWC Scientific Committee, *supra* note 9, at 69.

[97] New Zealand Department of Conservation, Timeline of Research and Protection Events for Māui Dolphin, *available at* https://www.doc.govt.nz/nature/native-animals/marine-mammals/dolphins/maui-dolphin/timeline-of-research-and-protection-events/.

[98] Hector's and Māui Dolphin Threat Management Plan Review, Risk Assessment Workshop, 9-13 July 2018: Panel Recommendations (Aug. 2, 2018), *available at* https://www.doc.govt.nz/our-work/our-work-with-maui-dolphin/hectors-and-maui-dolphin-threat-management-plan/review/workshops-and-stakeholder-forums/.

- problems in modeling (*e.g.*, the untenable assumption "that beach-cast carcasses are representative (or even a rough approximation) of the actual proportions of causes of death");[99]

- a failure to account for recreational and illegal fishing as additional sources of bycatch;[100]

- a failure to incorporate or otherwise utilize all relevant "previously collected data";[101]

- a failure to provide population status "relative to historical numbers," which would in turn facilitate managerial efforts to focus on populations with a "very low abundance and therefore . . . greater risk of being extirpated";[102]

- an under-emphasis of the fact "that many areas have little to no observer coverage and even in those that do, observer coverage is low and often from some time ago."[103]

Significantly, Dr. Barbara Taylor, a NMFS scientist and leader of NMFS' Marine Mammal Genetic Program, was a member of this panel.

On balance, New Zealand's track record and progress to date do not inspire confidence. Regardless, the MMPA does not authorize a "wait-and-see" approach.  To the contrary, the statute commands immediate action, based on the very premise that a trade ban will prompt serious efforts to reduce bycatch below PBR.

### 5.  There is a critical need for emergency rulemaking

As explained above, the CIT recently held that "[t]he Government cannot give itself a five-year exemption from compliance with the MMPA[.]"[104]  It is a fundamental principle of administrative law that a regulation cannot contradict the hierarchically superior terms of a governing statute.  An agency "has no power to correct flaws that it perceives in the statute it is empowered to administer.  Its rulemaking power is  limited to adopting regulations to carry into effect the will of Congress as expressed in the statute."[105]  Thus, notwithstanding the regulation's attempt to create a five-year exemption period, the Agencies have a statutory duty to immediately ban imports from offending fisheries as required by the Imports Provision.

Yet, even if the five-year exemption period were valid — and it is not — this petition qualifies for emergency rulemaking under the MMPA.  As NMFS explained in its rulemaking, the MMPA authorizes emergency rulemaking when the status of a marine mammal stock demands immediate

---

[99] *Id.* at 2; *see also id.* at 12 (elaborating on the point).
[100] *Id.* at 2; *see also id.* at 10-11 (elaborating on the point).
[101] *Id.* at 4.
[102] *Id.* at 5.
[103] *Id.* at 9.
[104] *NRDC, Inc.*, *supra* note 19, at 1354.
[105] *Board of Governors of Federal Reserve System v. Dimension Financial Corp.*, 474 U.S. 361, 374 (1986).

action.[106]  More specifically, NMFS stated that it would entertain "emergency rulemaking to ban imports of fish and fish products from an export or exempt fishery having or likely to have an immediate and significant adverse impact on a marine mammal stock."[107]  New Zealand export fisheries are having precisely this sort of impact on the Māui dolphin.  As with the vaquita, the Māui dolphin demands emergency action under NMFS' own standard.  Like the vaquita, the Māui dolphin is now limited to a "very small population[] where any incidental mortality could result in increased risk of extinction."[108]

In addition, emergency rulemaking that dispenses with notice and comment is authorized under the Administrative Procedure Act ("APA").  Although the APA normally requires notice and comment prior to issuance of a final rule of the type requested, notice and comment in this case is neither appropriate nor required.  In emergency situations, the APA contemplates that agencies may bypass notice and comment for "good cause."[109]  Specifically, the APA exempts legislative rules from notice and comment if "the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."[110]  In such scenarios, agencies will frequently issue an "interim final" rule — a rule that is effective on an interim basis, to be replaced with a permanent rule following notice and comment in due course.[111]

Here, an interim final rule issued without notice and comment is warranted because notice and comment would be both "impracticable" and "contrary to the public interest."  It is impracticable because the Agencies "cannot both follow section 553 and execute [their] statutory duties" under the MMPA.[112]  As explained above, the MMPA requires an *immediate* ban to prevent offending imports.  Further, the courts have recognized that notice and comment may be excused as impracticable when "necessary to stave off any imminent threat to the environment[.]"[113]  Similarly, notice and comment is contrary to the public interest because this time-intensive process would "impede[] timely implementation of a statute"[114] and exacerbate an existential risk to an endangered species.  Finally, given the urgency of the situation and Congress' clear statutory command in the MMPA, the Agencies should invoke their power under section 553(d)(3) of the APA to dispense with the normal 30-day waiting period for a published rule to take effect.[115]  In

---

[106] 81 Fed. Reg. at 54395 (col. 2).
[107] *Id.*; *see also* 16 U.S.C. § 1387(g).
[108] 81 Fed. Reg. at 54395 (col. 3).
[109] 5 U.S.C. § 553(b)(B).
[110] *Id.*
[111] *See, e.g., American Federation of Government Employees v. Block*, 655 F.2d 1153, 1158 (D.C. Cir. 1981) ("Therefore, once an emergency situation has been eased by the promulgation of interim rules, it is crucial that the comprehensive permanent regulations which follow emerge as a result of the congressionally-mandated policy of affording public participation that is embodied in section 553.").
[112] *Riverbend Farms, Inc. v. Maddigan*, 958 F.2d 1484-85 & n.2 (9th Cir. 1992); *see also North Carolina Growers' Ass'n*, 702 F.3d 755, 766 (4th Cir. 2012) (stating that the normal process "may be found to be impracticable when the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings") (quoting *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (internal quotation marks omitted).
[113] *North Carolina Growers' Ass'n*, 702 F.3d at 766.
[114] *United States v. Johnson*, 652 F. Supp. 2d 720, 729 (S.D. Miss. 2009).
[115] 5 U.S.C. § 553(d)(3).

short, the Agencies should publish the rule as soon as possible, and the rule should take effect immediately upon publication.

In light of the above and other evidence regarding the plight of the Māui dolphin, any fishery using gillnets or trawls that interacts with Māui dolphins in its habitat along the west coast of New Zealand's North Island does not meet U.S. standards under the MMPA.  According to the best available data, including NMFS' List of Foreign Fisheries[116] — a document developed by NMFS under the new regulation to identify export fisheries that interact with marine mammals — the following fisheries meet the above criteria and currently export fish or fish products to the United States:

- Snapper (*Pagrus auratus*) — trawl

  New Zealand's commercial snapper fisheries are managed under six fishery management areas.[117]  As the following government image and table illustrate, the Māui dolphin's habitat is contained within SNA8, the second largest snapper management area.



**Figure 3:** Snapper fishery management areas.  Image published by Ministry for Primary Industries.

---

[116] NOAA Fisheries, Final List of Foreign Fisheries (2018), *available at* https://www.fisheries.noaa.gov/foreign/international-affairs/list-foreign-fisheries.
[117] Ministry for Primary Industries, Snapper, *available at* https://www.mpi.govt.nz/travel-and-recreation/fishing/fish-species/snapper/.

| Area | Total allowable catch | Commercial allowance | Customary allowance | Recreational allowance | Other mortality[2] |
|---|---|---|---|---|---|
| SNA 1 | 8050 | 4500 | 50 | 3050 | 450 |
| SNA 2 | 450 | 315 | 14 | 90 | 31 |
| SNA 3 | -[1] | 32.3 | – | – | – |
| SNA 7 | 306 | 200 | 16 | 90 | – |
| SNA 8 | 1785 | 1300 | 43 | 312 | 130 |
| SNA 10 | – | 10 | – | – | – |

[1] Areas marked '–' have no allowance set (not enough information is available to set catch allowances)
[2] Fishing-related mortality from all sectors such as discarding and poaching.

**Figure 4:** New Zealand's 2016 catch allowances for the snapper fishery.  Image published by Ministry for Primary Industries.

The List of Foreign Fisheries correctly notes that the snapper trawl fleet, containing approximately 59 vessels, operates in the waters of both the North and South Islands.[118] The Ministry for Primary Industries classifies this as an "inshore" fishery.[119]  In contrast to "deepwater" fisheries, "[i]nshore fisheries are found from the waterways within New Zealand through to about 12 nautical miles offshore."[120]  Like the other inshore fisheries discussed below, this places the snapper trawl fishery squarely within the Māui dolphin's habitat.

Incredibly, however, the List of Foreign Fisheries does not acknowledge interactions with Māui dolphins as a characteristic of this fishery (the document identifies only interactions with the bottlenose dolphin, the common dolphin, and the New Zealand fur seal).  This oversight is shocking, as even the fishing industry acknowledges that the trawl fishery for snapper is associated with bycatch of Māui dolphins.[121]  In fact, fishing behemoths Moana New Zealand (Moana) and Sanford Limited (Sanford) have acknowledged that "gillnetting/set-netting is considered the main fishing threat to Māui dolphins, followed by trawling."[122]  As a result of this "conservation emergency," the two companies committed in 2016 to "transition away from conventional trawl fishing methods" within Maui dolphin habitat.[123]  The companies identified the snapper fishery as one of the "[k]ey fish stocks affected by this commitment[.]"[124]

- Snapper (*Pagrus auratus*) — set gillnet

---

[118] Final List of Foreign Fisheries, *supra* note 116, at 136.

[119] Ministry for Primary Industries, Inshore Fisheries, *available at* https://www.mpi.govt.nz/growing-and-harvesting/fisheries/fisheries-management/inshore-fisheries/.

[120] *Id.*

[121] *See* Christopher Pala, *Endangering the World's Rarest Dolphins*, *supra* note 6 ("Sanford [Limited] has pledged to find a dolphin-safe trawl net by 2022 and to continue trawling with its vessels in the Maui habitat until then.").

[122] Moana New Zealand & Sanford Limited, Maui Dolphin Protection Plan, *supra* note 87, at 1.

[123] *Id.* at 4.

[124] *Id.* at 6.

Although the List of Foreign Fisheries does not identify the set gillnet snapper fishery (perhaps on the assumption that this fishery does not export to the U.S.), this fishery uses gear that is known to pose a major threat to Māui dolphins.  As New Zealand's Ministry for Primary Industries recently stated, "[i]t is widely accepted that incidental mortality in coastal fisheries, notably set nets and to a lesser extent trawls, is the most significant threat to Hector's and Māui dolphins."[125]  Snapper caught using set gillnets has no place in the U.S. market under the MMPA.

- Tarakihi (also spelled "Terakihi") (*Nemadactylus macropterus*) — set gillnet and trawl

  The Tarakihi fishery is an inshore fishery[126] that includes 147 vessels using trawls and seven vessels using set nets.[127]  These vessels operate in both the North and South Islands. Although the List of Foreign Fisheries does not identify interactions with Māui dolphins as a concern, Moana and Sanford identify the Tarakihi fishery as one of the "[k]ey fish stocks affected" by their 2016 commitment to take steps to limit bycatch of Māui dolphins.[128]  To the extent that this fishery uses problematic gear (trawls and set gillnets) within Māui dolphin habitat, it remains incompatible with U.S. standards.

- Spotted dogfish (a.k.a. rig) (*Mustelus lenticulatus*) — set gillnet and trawl

  According to the List of Foreign Fisheries, there are 133 vessels engaged in the set gillnet fishery for spotted dogfish and another 25 vessels that target this species using trawls.[129] NMFS recognizes that the set gillnet fishery is associated with bycatch of Māui dolphins.[130] Although NMFS does not identify Māui dolphin bycatch as a known issue with respect to the trawl fishery, the fishery operates in Māui dolphin habitat using gear that is known to take Māui dolphins.[131]  As with snapper and terakihi, Sanford and Moana have identified the fishery for spotted dogfish as one of the key stocks affected by its commitment to make changes to reduce bycatch of Māui dolphins.[132]  Thus, imports of spotted dogfish from both fisheries should be banned under the MMPA.

- Trevally (*Pseudocaranx dentex*) — set gillnet and trawl

  The New Zealand trevally fishery is an inshore fishery[133] that consists of 46 trawl vessels

---

[125] Ministry of Primary Industries, *Aquatic Environment and Biodiversity Annual Review* 2016, *supra* note 65, at 142.
[126] Ministry for Primary Industries, Inshore Fisheries, *supra* note 119.
[127] Final List of Foreign Fisheries, *supra* note 116, at 138.
[128] Moana New Zealand & Sanford Limited, Maui Dolphin Protection Plan, *supra* note 87, at 6.
[129] Final List of Foreign Fisheries, *supra* note 116, at 137.
[130] *Id.*
[131] Moana New Zealand & Sanford Limited, Maui Dolphin Protection Plan, *supra* note 87, at 6.
[132] *Id.*
[133] Ministry for Primary Industries, Inshore Fisheries, *supra* note 119.

and 36 vessels using set gillnets.[134]  However, while the List of Foreign Fisheries seems to acknowledge that this fishery is active in Māui dolphin habitat, it does not identify bycatch of Māui dolphins as a concern.[135]  This is belied by the fact that the trevally fishery is one of the fisheries that Sanford and Moana have identified as in need of change.[136]

- Warehou (*Seriolella brama*) — trawl

    This fishery consists of 13 vessels.[137]  In the List of Foreign Fisheries, NMFS acknowledges that this fishery is associated with bycatch of Māui dolphins.[138]  Likewise, Sanford and Moana Fisheries recognize that this fishery is in need of reform to reduce interactions with Māui dolphins.[139]

- Hoki (*Macruronus novaezelandiae*) — trawl

    Although the List of Foreign Fisheries does not identify interactions with Māui dolphins associated with this fishery, the List of Foreign Fisheries recognizes that the hoki trawl fishery operates within the Cook Strait.[140] Māui dolphins have historically used these waters.[141]

- Barracouta (also spelled "barracoota") (*Thyrsites atun*) — trawl

    Curiously, the List of Foreign Fisheries describes the barracouta trawl fishery as limited to the South Island (and, therefore, outside of Māui dolphin habitat).[142]  However, both the New Zealand government and the fishing industry readily concede that this species is caught in waters coinciding with Māui dolphin habitat.  As the Ministry for Primary Industries states, "[c]ommercial fishing is an important industry for the North Island West Coast region — from set netting inside the harbours and close to shore for rig, school shark, flounder and grey mullet, to trawling further off the coast for snapper, trevally and barracoota[.]"[143]  The fact that this fishery threatens Māui dolphins is confirmed by Sanford and Moana's inclusion of this fishery as one of the key stocks with respect to which change is required "to reduce the risk to Māui dolphins from commercial fishing vessels[.]"[144]

---

[134] Final List of Foreign Fisheries, *supra* note 116, at 138-39.

[135] *See id.*

[136] Moana New Zealand & Sanford Limited, Maui Dolphin Protection Plan, *supra* note 87, at 6.

[137] Final List of Foreign Fisheries, *supra* note 116, at 139.

[138] *Id.*

[139] Moana New Zealand & Sanford Limited, Maui Dolphin Protection Plan, *supra* note 87, at 6.

[140] Final List of Foreign Fisheries, *supra* note 116, at 134.

[141] New Zealand Department of Conservation, *Facts About Māui Dolphin*, *available at* https://www.doc.govt.nz/nature/native-animals/marine-mammals/dolphins/maui-dolphin/facts/.

[142] *Id.* at 132.

[143] Ministry for Primary Industries: Fisheries New Zealand, *Fishery — West Coast North Island Finfish*, *available at* https://fs.fish.govt.nz/Page.aspx?pk=5&fpid=14.

[144] Moana New Zealand & Sanford Limited, Maui Dolphin Protection Plan, *supra* note 87, at 2.

- Flounder (*Rhombosolea* spp.) — trawl and set gillnet

  The trawl and set gillnet fisheries for flounder species are inshore fisheries,[145] operating within the waters of both the North and South Islands.[146]  In the List of Foreign Fisheries, NMFS states that these fisheries are not associated with documented bycatch of marine mammals.[147]  However, Sanford and Moana have recognized that the flounder fisheries pose threats to the Māui dolphin and must be reformed to ward off extinction.[148]

- Mullet (*Mugilidae* spp.) — set net and inshore drift net

  According to the List of Foreign Fisheries, the mullet fishery in New Zealand includes five vessels using inshore drift nets and 136 vessels deploying set nets.[149]  These vessels ply the waters of the North Island's west coast, squarely within Māui dolphin habitat.[150]  Although the List of Foreign Fisheries reports no "documented" interactions with marine mammals,[151] this is yet another fishery that Sanford and Moana identified as in need of change for the sake of the Māui dolphin.[152]

- Gurnard (*Chelidonichthys kumu*) — set net and trawl

  The gurnard fishery is an inshore fishery,[153] with 128 vessels engaged in trawling and five vessels using set nets.[154]  While trawl vessels in this fishery operate in both the South and North Islands,[155] vessels using set nets operate only in the North Island.[156]  The List of Foreign Fisheries indicates that the trawl fleet is associated with bycatch of bottlenose dolphins, common dolphins, and New Zealand fur seals.  However, this, too, is a "[k]ey fish stock[] affected by" Sanford and Moana's public commitment to alter fishing practices on behalf of the Māui dolphin.[157]

Additional information regarding imports from these fisheries is provided immediately below and in the accompanying Appendix.[158]

---

[145] Ministry for Primary Industries, Inshore Fisheries, *supra* note 119.
[146] Final List of Foreign Fisheries, *supra* note 116, at 133.
[147] *Id.*
[148] Moana New Zealand & Sanford Limited, Maui Dolphin Protection Plan, *supra* note 87, at 6 (identifying flounder as one of the "[k]ey fish stocks affected by this commitment").
[149] Final List of Foreign Fisheries, *supra* note 116, at 135.
[150] New Zealand Fisheries, Grey Mullet, *available at* https://fs.fish.govt.nz/Doc/21731/34_GMU_09.pdf.ashx.
[151] Final List of Foreign Fisheries, *supra* note 116, at 135.
[152] Moana New Zealand & Sanford Limited, Maui Dolphin Protection Plan, *supra* note 87, at 6 (identifying the grey mullet as one of the "[k]ey fish stocks affected by this commitment").
[153] Ministry for Primary Industries, Inshore Fisheries, *supra* note 119.
[154] Final List of Foreign Fisheries, *supra* note 116, at 133-34.
[155] *Id.* at 133.
[156] *Id.* at 134.
[157] Moana New Zealand & Sanford Limited, Maui Dolphin Protection Plan, *supra* note 87 at 6.
[158] *See* Appendix I: Import Data from NMFS' Statistics and Economics Division (detailing imports from various fisheries that violate the strictures of the MMPA).

A special note is required on the topic of "highly processed fish products" derived from the above-identified fisheries.  In the draft rule, NMFS defined ''fish and fish products'' in a generally broad manner while carving out a specific exclusion for "fish oil, slurry, sauces, sticks, balls, cakes, pudding and other similar highly processed fish products."[159]  Following comments observing the lack of statutory authority for this exclusion, NMFS reversed course.  In the final Imports Rules, NMFS decided "to remove language excluding highly processed products from the definition of fish and fish products."[160]  Thus, in the case of an offending fishery, "fish and fish products caught or harvested in that fishery will be subject to an import prohibition, including highly processed fish products containing fish caught or harvested in the fishery."[161]

Official NMFS trade data shows that the U.S. imports significant amounts of highly processed fish products from New Zealand — primarily fish sticks and fish meal unfit for human consumption, but also oil and fishmeal fit for human consumption, as well as other items.[162]  Absent clear and convincing evidence to the contrary, it is dangerous to assume that these products do not originate from fisheries operating in Maui dolphin habitat.  Unless U.S. authorities, with the assistance of New Zealand, are able to definitively determine that a given shipment of highly processed fish products is *not* sourced from the above-identified fisheries, such products should likewise be subject to the requested import ban.  With this in mind, we have annotated the attached Appendix to indicate the highly processed fish products that are presumptively subject to the ban.

Finally, it bears noting that NMFS' trade data may significantly underestimate the quantity of imports from New Zealand fisheries.  Seafood New Zealand, a major industry association, compiles monthly reports using New Zealand government data.[163]  These reports break down export flows by species and destination country.  In many cases, the Seafood New Zealand reports indicate quantities of trade in excess of the NMFS reports.  For instance, with respect to snapper exports to the United States in January 2018, Seafood New Zealand indicates exports of 41,994 kilograms worth $485,231 New Zealand Dollars (approx. $328,081 USD).[164]  In contrast, the NMFS trade data indicates that imports of snapper that month amounted to a mere 534 kilograms, worth only $4,495 USD.[165]  Further, whereas Seafood New Zealand reports exports of flounder in January 2018,[166] the NMFS data does not report *any* flounder imports during the same time period.[167]  While these and other divergences may be the result of different categorization methods

---

[159] 80 Fed. Reg. at 41892 (col. 2).

[160] 81 Fed. Reg. at 54396 (col. 1).

[161] *Id.*

[162] *See, e.g.,* Appendix I: Import Data from NMFS' Statistics and Economics Division at p. 18 (showing that, in November 2014, the U.S. imported 56,673 kilos of "STICKS, TYPE PRODUCTS, COATED, NOT COOKED, NOT IN OIL, NOT MINCED").

[163] Seafood New Zealand, Export Information: Export Statistics, *available at* https://www.seafoodnewzealand.org.nz/publications/export-information/.

[164] Appendix II: Sample Export Data from Seafood New Zealand at p. 3 (also available online at https://www.seafoodnewzealand.org.nz/publications/export-information/export-statistics/?tx_ttnews%5Btt_news%5D=1237&cHash=3ddab1c58653753bfc58f834b1f8944a).

[165] Appendix I: Import Data from NMFS' Statistics and Economics Division at p. 81.

[166] Appendix II: Sample Export Data from Seafood New Zealand at p. 1.

[167] *See* Appendix I: Import Data from NMFS' Statistics and Economics Division at p. 80 (containing no data re flounder imports during January 2018).

(*e.g.*, NMFS employs the category of "SNAPPER (LUTJANIDAE SPP.) FRESH," while Seafood New Zealand uses "Snapper, Finfish, Chilled Whole"), a more likely explanation may be that, in whole or in part, the NMFS data contains significant inaccuracies that depict far lower trade volumes than actually prevail in the market.

### C.   Imports from Fisheries Harming the Māui Dolphin Must Be Banned

Any fish or fish product from the above-identified fisheries, or any fish or fish product from any other trawl or gillnet fishery in the Māui dolphin's habitat along the west coast of New Zealand's North Island, does not meet U.S. standards for protection of marine mammals.  Over the past five years, the United States has imported vast quantities of fish and fish products produced by these fisheries.[168]  Pursuant to the MMPA, imports of fish and fish products from these fisheries must be banned.

Notably, as the attached Appendix demonstrates, banning products from the relevant fisheries hardly amounts to a ban of *all* fish and fish products from New Zealand.  The Petitioners are not requesting an overly broad remedy.  Rather, we are simply asking the Agencies to prohibit those products — and only those products — that violate the strictures of the Imports Provision.  **More specifically, we request that the Agencies impose an immediate ban on the importation from New Zealand of all fish and their products caught in gillnets or trawls inside the Māui dolphin's range.  We further request that this ban include all fish and their products sourced from either the west coast of New Zealand's North Island or the Cook Strait, unless affirmatively identified as having been caught with a gear type other than gillnets or trawls or affirmatively identified as caught outside the Māui dolphin's range.**  Invoking the authority of APA sections 553(b)(B)[169] and 553(d)(3),[170] the Agencies should issue an interim rule imposing this ban immediately, without notice and comment.

### CONCLUSION

By an overwhelming margin, the weight of the evidence proves that New Zealand's failure to manage bycatch from gillnet and trawl fisheries is driving the Māui dolphin to extinction.  In fact, without serious changes to fisheries management, the Māui dolphin will likely become the next vaquita — a cetacean whose hopes for survival are in serious question.

As it stands, U.S. consumers are contributing to the Māui dolphin's decline by purchasing imported products from fisheries associated with high levels of bycatch.  Under the MMPA, the Agencies are required to impose an import ban to incentivize New Zealand to finally take the management steps needed to come into compliance with U.S. marine mammal bycatch standards.  Action is required — and it is required now.

---

[168] *See generally* Appendix I: Import Data from NMFS' Statistics and Economics Division.
[169] 5 U.S.C. § 553(b)(B).
[170] 5 U.S.C. § 553(d)(3).