**Analysis of the Government of New Zealand's Program to Reduce the Intentional and Incidental Mortality and Serious Injury of Māui Dolphin for the Purpose of Making a Comparability Finding Determination**

*A. Analysis of the New Zealand Government's (GNZ) Regulatory Program to Reduce the Intentional and Incidental Mortality and Serious Injury of Māui Dolphin*

## 1. Summary of Regulatory Requirements of the Plan

On June 24, 2020, the Minister of Conservation and Minister of Fisheries announced new fishing restrictions to reduce the risk of Māui dolphin bycatch in set-net and trawl fisheries. The fishing restrictions, which took effect on October 1, 2020 include: a nationwide ban on recreational and commercial drift netting; an extension of current set-net closures and the creation of new areas closed to set-netting in the North and South Islands; an extension of the existing area closed to trawling off the west coast of the North Island; implementation of a management review trigger, which allows the Minister of Fisheries to immediately impose additional fishing restrictions if a single Maui/Hector's dolphin is caught[1] in the Māui dolphin habitat zone (Cape Reinga to Cape Egmont) within the West Coast of the North Island (See Section 8 for discussion); and an authorization to use commercial ring nets in set-net prohibition areas within west coast North Island harbors (which is a fishing method that does not pose a risk to the dolphins).[2]

The planned fishing restrictions would cover the potential habitat and transition area of Māui dolphins. For the west coast North Island, from Cape Reinga down to Wellington the new fishery restrictions are as follows:
- The areas between Cape Reinga and Maunganui Bluff and between Hawera and Wellington will be closed to commercial and recreational set-net use out to 4 nautical miles (see Figure 1 below).
- Between Maunganui Bluff and the Waiwhakaiho River (New Plymouth), the set-net closures will be extended from 7 nautical miles to 12 nautical miles offshore.
- Between the Waiwhakaiho River and Hawera, the set-net closure will be extended from 2 nautical miles to 7 nautical miles offshore.
- Set-net closures within the Manukau Harbor will be extended to Taumatarea Point in the north and Matakawau Point in the south within the harbor.
- Recreational fishers are prohibited from fishing with set-nets in the areas outlined above.
- The area between Maunganui Bluff and Pariokariwa Point and extending south to the Waiwhakaiho River (New Plymouth) will be closed to commercial trawl fishing out to 4 nautical miles offshore. This falls within the central Māui dolphin habitat zone

---

[1] The GNZ defines caught or capture broadly to include near miss capture; capture (released alive); capture (resulting in death); or beachcast incident (where necropsy confirms death was a result of fishing). See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 31. The intent of this provision is to prevent mortality from exceeding PBR.
[2] https://www.doc.govt.nz/news/media-releases/2020-media-releases/new-protection-for-dolphins-and-support-for-changes-to-fishing-methods/

(see trawl map below).



| Figure 1. West Coast North Island Set Net Fishing Restrictions | Figure 2. West Coast North Island Trawl Fishing Restrictions |
| --- | --- |

## 2. Procedures and Conditions for a Comparability Finding Determination.

A comparability finding for an export or exempt fishery is a determination by NMFS that the harvesting nation has met the applicable procedure[s] and conditions specified in the MMPA Import Provisions at 50 CFR 216.24(h)(6).

To receive a comparability finding for an exempt or export fishery operating within the harvesting nation's exclusive economic zone (EEZ) and territorial sea, the harvesting nation must demonstrate it has prohibited the intentional mortality or serious injury of marine mammals in the course of commercial fishing operations in the fishery unless the intentional mortality or serious injury of a marine mammal is imminently necessary in self-defense or to save the life of a person in immediate danger.[3]

---

[3] 50 CFR 216.24 (h)(6)(iii)(A)(1) and 50 CFR 216.24 (h)(6)(iii)(A)(2) Alternatively, the harvesting nation must demonstrate that it has procedures to reliably certify that exports of fish and fish products to the United States are not the product of a fishery that permits the intentional killing or serious injury of a marine mammal unless that mortality or serious injury is imminently necessary in self-defense or to save the life of a person in immediate danger.

The harvesting nation must also demonstrate that it has adopted and implemented a regulatory program governing the incidental mortality and serious injury of marine mammals in the course of commercial fishing operations of its export fishery that is comparable in effectiveness to the U.S. regulatory program.[4] To determine whether a harvesting nation maintains a regulatory program that is comparable in effectiveness to the U.S. regulatory program for a fishery, NMFS examines whether the harvesting nation maintains a regulatory program that includes certain conditions as specified in 50 CFR 216.24 (h)(6)(iii),[5] or effectively achieves comparable results to the U.S. regulatory program.[6] The conditions specified in paragraph (h)(6)(iii) equate to elements of the U.S. regulatory program.[7] The MMPA Import Provisions do not require a nation to implement each condition so long as the harvesting nation's regulatory program is comparable in effectiveness to the U.S. regulatory program, meaning that the regulatory program effectively

---

[4] The U.S. regulatory program governing the incidental mortality and serious injury of marine mammals in the course of commercial fishing operations is specified in the MMPA (*e.g.,* 16 U.S.C. 1386 and 1387) and its implementing regulations. See also 1371 *et seq.* and its implementing regulations.

[5] For export fisheries operating within the EEZ or territorial waters of the nation, the requirements are a regulatory program that is comparable in effectiveness to the U.S. regulatory program and includes, or achieves comparable results as, the following elements:

- Marine mammal stock assessments estimating population abundance for marine mammal stocks that are caught as bycatch in the export fishery in waters under its jurisdiction;
- An export fishery register containing a list of all vessels participating in the export fishery under the jurisdiction of the nation, including the number of vessels participating, information on gear type, target species, fishing season, and fishing area;
- Regulatory requirements *(e.g.,* including copies of relevant laws, decrees, and implementing regulations or measures) that include:
  - A requirement for the owner or operator of vessels participating in the fishery to report all intentional and incidental mortality and injury of marine mammals in the course of commercial fishing operations; and
  - A requirement to implement measures in export fisheries designed to reduce the total incidental mortality and serious injury of a marine mammal stock below the bycatch limit. Such measures may include: Incidental mortality and serious injury limits; careful release and safe-handling of marine mammals and gear removal; gear marking; bycatch reduction devices or avoidance gear *(e.g.,* pingers); gear modifications or restrictions; or time-area closures; and
  - For transboundary stocks or any other marine mammal stocks interacting with the export fishery, any measures to reduce the incidental mortality and serious injury of that stock that are the same or are comparable in effectiveness to measures the United States requires its domestic fisheries to take with respect to that transboundary stock or marine mammal stock in the United States.
- Implementation of monitoring procedures in export fisheries designed to estimate incidental mortality and serious injury of marine mammals in each export fishery under its jurisdiction, as well as estimates of cumulative incidental mortality and serious injury for marine mammal stocks in waters under its jurisdiction that are incidentally killed or seriously injured in the export fishery and other export fisheries with the same marine mammal stock, including an indication of the statistical reliability of those estimates;
- Calculation of bycatch limits for marine mammal stocks in waters under its jurisdiction that are incidentally killed or seriously injured in an export fishery;
- Comparison of the incidental mortality and serious injury of each marine mammal stock or stocks that interact with the export fishery in relation to the bycatch limit for each stock; and comparison of the cumulative incidental mortality and serious injury of each marine mammal stock or stocks that interact with the export fishery and any other export fisheries of the harvesting nation showing that these export fisheries:
  - Do not exceed the bycatch limit for that stock or stocks; or
  - Exceed the bycatch limit for that stock or stocks, but the portion of incidental marine mammal mortality or serious injury for which the exporting fishery is responsible is at a level that, if the other export fisheries interacting with the same marine mammal stock or stocks were at the same level, would not result in cumulative incidental mortality and serious injury in excess of the bycatch limit for that stock or stocks.

[6] Note the Comparability Finding determination is also subject to additional evaluation considerations specified in paragraph 50 CFR 216.24 (h)(7) of the MMPA Import Provisions

[7] The U.S. Regulatory Program means the regulatory program governing the incidental mortality and serious injury of marine mammals in the course of commercial fishing operations as specified in the Marine Mammal Protection Act and its implementing regulations.

achieves comparable results to the U.S. regulatory program.[8] For example, if a nation eliminates any risk of bycatch by implementing fishery measures (*e.g.*, time/area closures) and can demonstrate the effectiveness of such measures, that regulatory program may be considered comparable in effectiveness.[9]

In implementing the U.S. regulatory program for a marine mammal stock in which incidental mortality and serious injury from commercial fisheries exceeds the potential biological removal level, the take reduction plan forms the basis for the regulatory program for that species.[10] The plan must recommend regulatory or voluntary measures for the reduction of incidental mortality and serious injury that NMFS expects will reduce, within six months of the plan's implementation, such mortality and serious injury to a level below the potential biological removal level.[11] Likewise, when evaluating a regulatory program in order to make a comparability finding, NMFS considers whether the measures adopted or proposed for adoption by the harvesting nation for its export fishery have reduced or will likely reduce the cumulative incidental mortality and serious injury of each marine mammal stock below the bycatch limit, and the progress of the regulatory program toward achieving its objectives.[12] NMFS will use this standard to evaluate New Zealand's Threat Management Plan (TMP) and the "Fisheries (Hector and Māui Dolphin) Amendment Regulations of 2020" amending the Fisheries Act of 1996, published on August 20, 2020, and which came into effect on October 1, 2020.[13]

Finally, while the MMPA Import Rule includes a five-year exemption period to allow nations time to develop their regulatory programs, nations may request a comparability finding prior to the end of the exemption period. On July 15, 2020, the GNZ, acting through the Ministry for Primary Industries, requested that the National Oceanic and Atmospheric Administration (NOAA) and NMFS perform a comparability assessment of the GNZ's TMP and regulations as they relate to Māui's dolphins and GNZ's Fisheries (Hector and Māui Dolphin) Amendment Regulations of 2020.

---

[8] §216.24 (h)(6)(iii)(B)
[9] Compliance Guide—Marine Mammal Protection Act Import Provisions To Reduce Marine Mammal Bycatch
https://www.fisheries.noaa.gov/foreign/marine-mammal-protection/noaa-fisheries-establishes-international-marine-mammal-bycatch-criteria-us-imports
[10] 16 U.S.C. 1387(f)
[11] 16 U.S.C. 1387(f)(5)(A)
[12] §216.24 (h)(7)(iii)
[13] http://www.legislation.govt.nz/regulation/public/2020/0199/latest/LMS382891.html?src=qs

### 3. Analysis of Legislation that Prohibits the Intentional Killing of Marine Mammals.

According to the MMPA Import Provisions, to receive a comparability finding for an exempt or export fishery operating within the harvesting nation's EEZ and territorial sea, the harvesting nation must demonstrate it has prohibited the intentional mortality or serious injury of marine mammals in the course of commercial fishing operations in the fishery, unless the intentional mortality or serious injury of a marine mammal is imminently necessary in self-defense or to save the life of a person in immediate danger.[14]

***New Zealand meets this comparability finding condition.*** Under Section 4(1) of New Zealand's Marine Mammals Protection Act of 1978, "no person shall—(a) hold a marine mammal in captivity; or (b) take[15] any marine mammal, whether alive or dead, in or from its natural habitat or in or from any other place—without first obtaining a permit to do so from the Minister or from any person or persons authorized on that behalf by the Minister." This provision is comparable to the U.S. Marine Mammal Protection Act, which also has a prohibition on the taking of marine mammals.[16]

Under Section 2 of New Zealand's Fisheries Act of 1996, all marine mammal species are designated as protected species.[17] Section 15 of the Fisheries Act allows for accidental and incidental death of protected species but not the intentional death.[18] This section also directs the Minister of Fisheries to "take such measures as he or she considers are necessary to avoid, remedy, or mitigate the effect of fishing-related  mortality on any protected species, and such measures may include setting a limit on  fishing-related mortality."

This information is adequate evidence that the GNZ has regulations in place that prohibit the intentional mortality or serious injury of marine mammals in the course of commercial fishing operations that are comparable in effectiveness to U.S. standards.

### 4. Analysis of a Population Abundance Estimate and Distribution of Māui Dolphin

Māui dolphins (*Cephalorhynchus hectori Māui*) are the northernmost distinct subpopulation of the Hector's dolphin species (*Cephalorhynchus hectori*). Māui and South Island Hector's dolphins were recognized as two distinct subspecies in 2002, reflecting evidence of genetic differentiation and accompanying slight differences in morphology.[19]

---

[14]50 CFR 216.24 (h)(6)(iii)(A)(1)

[15] The definition of take includes actions that harm, harass, injure, and attract.

[16] 16 U.S.C. 1371. Take means to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal.

[17] "protected species means—(a) any marine wildlife as defined in section 2 of the Wildlife Act of 1953 that is absolutely protected under section 3 of that Act: (b) any marine mammal as defined in section 2(1) of the Marine Mammals Protection Act of 1978"

[18] "fishing-related mortality means the accidental death or incidental death of any protected species that occurs in the course of fishing."

[19] Baker, A.N.; Smith, A.N.H.; Pichler, F.B. (2002). Geographical variation in Hector's dolphin: recognition of a new subspecies of Cephalorhynchus hectori. Journal of the Royal Society of New Zealand 32: 713–727.

*4.1 West Coast*

4.1.1 Population Abundance Estimate

The MMPA Import Provisions require, as a condition for a comparability finding, marine mammal assessments that estimate population abundance for marine mammal stocks in waters under the harvesting nation's jurisdiction that are incidentally killed or seriously injured in the export fishery.[20]

***New Zealand meets this comparability finding condition.*** The Māui dolphin (*Cephalorhynchus hectori Māui*)[21] is endemic to the west coast of the North Island of New Zealand and is listed by International Union for Conservation of Nature (IUCN) as Critically Endangered,[22] as well as listed as an endangered species under the U.S. Endangered Species Act (16 U.S.C. § 1531 et seq.). In 1970, scientists estimated that the Māui dolphin population numbered approximately 200 animals.[23] The Māui dolphin is currently estimated at 63 individuals[24] (95% CI 57–75); with the population declining at the rate of 3–4% per year over the period 2001–2016.[25] Māui dolphin demographic models now estimate that the population may have stabilized or begun to increase in recent years following a decline in the past 20 to 30 years.[26] Contrary to claims by the petitioners of an estimated 14-17 reproductive-aged females, scientists place these estimates at 20 - 35 adult females.[27]

4.1.2 Alongshore Distribution

Māui dolphins were once distributed along the west and northern portion of the south coasts of

---

[20] 50 CFR 216.24(h)(6)(iii) (C)(1).

[21] Baker, A.N.; Smith, A.N.H.; Pichler, F.B. (2002). Geographical variation in Hector's dolphin: recognition of a new subspecies of *Cephalorhynchus hectori*. Journal of the Royal Society of New Zealand 32: 713–727.

[22] Reeves, R.R.; Dawson, S.M.; Jefferson, T.A.; Karczmarski, L.; Laidre, K.; O'Corry-Crowe, G.; Rojas-Bracho, L.; Secchi, E.R.; Slooten, E.; Smith, B.D.; Wang, J.Y.; Zhou K. (2013). Cephalorhynchus hectori ssp. maui. The IUCN Red List of Threatened Species 2013: e.T39427A44200192. http://dx.doi.org/10.2305/IUCN.UK.2013-1.RLTS.T39427A44200192.en.

[23] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at Appendix B

[24] Baker, C.S.; Steel, D.; Hamner, R.M.; Hickman, G.; Boren, L.; Arlidge, W.; Constantine, R. (2016). Estimating the abundance and effective population size of Māui dolphins using microsatellite genotypes in 2015–16, with retrospective matching to 2001–16. Department of Conservation, Auckland. 70 p.

[25] Cooke, J.G.; Constantine, R.; Hamner, R.M.; Steel, D.; Baker, C. S. (2019). Population dynamic modelling of the Māui dolphin based on genotype capture-recapture with projections involving bycatch and disease risk. New Zealand Aquatic Environment and Biodiversity Report No. 216. 38 p.Martien, K.K., Taylor, B.L., Slooten, E., Dawson, S., 1999. A sensitivity analysis to guide research and management for Hector's dolphin. Biol. Conserv. 90, 183–191.; P.R. Wade, R.M. Hamner, R. Constantine, C.S. Baker The Potential Biological Removal (PBR) and probability of decline for Maui's dolphin Appendix 1 of Currey, R. J. C., L. J. Boren, B. R. Sharp, and D. Peterson. 2012 A Risk Assessment of Threats to Maui's Dolphins, Ministry for Primary Industries and Department of Conservation (2012)www.doc.govt.nz/getting-involved/consultations/current/threat-management-plan-review-for-mauis-dolphin/; C.S. Baker, R.M. Hamner, J. Cooke, D. Heimeier, M. Vant, D. Steel, R. Constantine Low abundance and probable decline of the critically endangered Maui dolphin estimated by genotype capture–recapture Anim. Conserv., 16 (2013), pp. 224-233

[26] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 6.

[27] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at Appendix A, see also. Cooke, J.G.; Constantine, R.; Hamner, R.M.; Steel, D.; Baker, C. S. (2019). Population dynamic modelling of the Māui dolphin based on genotype capture-recapture with projections involving bycatch and disease risk. New Zealand Aquatic Environment and Biodiversity Report No. 216. 38 p.

New Zealand's North Island.[28] The subspecies has undergone a historical range contraction. Now, according to the distribution map[29] below, the Māui dolphin's distribution extends from Cape Reinga in the north to Cape Egmont, Taranaki off the West Coast North Island.[30] The GNZ refers to the area between Maunganui Bluff and Pariokariwa Point as the core distribution, based on where Māui and/or Hector's dolphins are most frequently sighted, and within which live dolphins have been genetically sampled. The 'core' range is estimated to include approximately 83% (summer) and 76% (winter) of the dolphin distribution (excluding harbors). In the summer, the dolphins frequent a near-shore area approximately 139 km in length from Kaipara Harbor in the north to Raglan Harbor or Kawhia Harbor in the south.[31]

Within this core area, Māui dolphins are only occasionally found in the outer portions of harbors such as Manukau, Kaipara, Raglan harbors.[32] Māui dolphins occasionally enter the mouth of the Manukau and Kaipara harbors. There are no validated public sightings further in the interior of these harbors, despite high levels of public presence and activity in the harbors. Habitat models estimate that approximately 2.7% (summer) and 1.2% (winter) of the dolphin distribution falls within the harbors.[33] These models predict even lower dolphin densities further inside the harbors.

In addition to the core area, the area from Maunganui Bluff north to Cape Reinga is referred to as the "northern tail" of Māui dolphin distribution; covering approximately 7.3% (summer) and 6.4% (winter) of the estimated distribution. The area from Pariokariwa Point to Cape Egmont is referred to as the "southern tail" of the distribution; covering[34] approximately 3.5% (summer) and 3.9% (winter) of the estimated distribution. The GNZ considers this area as suitable habitat for Māui dolphins, but the actual frequency that the dolphins may use this area is unknown. Below the "southern tail" is a transition zone that extends from Cape Egmont to Wellington. The GNZ confirms that there is no evidence of a current resident Cephalorhynchus spp. population in this area, but historical evidence suggests there may have been a small resident population in the past. Recently, DNA samples from that area also confirm that Hector's dolphins are dispersing northward from the South Island and intermittent public sightings and acoustic detections from moored hydrophones indicate the presence of Hector's and/or Māui dolphins.

4.1.3 Offshore Distribution

Māui dolphins are concentrated within 2 - 4 nautical miles (nmi) (7.4 km) of the coast but do

---

[28] S. Du Fresne Distribution of Maui's Dolphin (*Cephalorhynchus hectori maui*) 2000–2009 DOC Research & Development Series (2010), p. 322; S. Dawson, F. Pichler, E. Slooten, K. Russell, C.S. Baker The North Island Hector's Dolphin Is Vulnerable To Extinction Mar. Mamm. Sci., 17 (2001), pp. 366-371

[29] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 8,9.

[30] S. Du Fresne Distribution of Maui's Dolphin (*Cephalorhynchus hectori maui*) 2000–2009 DOC Research & Development Series (2010), p. 322

[31] M. Oremus, R.M. Hamner, M. Stanley, P. Brown, C.S. Baker, R. Constantine Distribution, group characteristics and movements of the Critically Endangered Maui's dolphin *Cephalorhynchus hectori maui* Endanger. Species Res., 19 (2012), pp. 1-10

[32] Id.; Rayment W., Dawson S., Scali S., Slooten E., (2011) Listening for a needle in a haystack: passive acoustic detection of dolphins at very low densities. Endang Species Res 14: 149-156.

[33] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 14.

[34] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 11.

occasionally occur as far as 7 nmi (13.0 km) offshore.[35] After 4 nmi offshore, Māui dolphin density steadily declines with only occasional sightings further offshore.[36] Passive acoustic monitoring using deployed hydrophones revealed a similar pattern at the core of the Māui dolphin range, with most *Cephalorhynchus* spp. dolphin detections occurring within 4 nmi, with occasional detections further offshore to a maximum distance of 10 nmi.[37] Dolphin densities beyond 7 nmi are very low, but validated sightings and acoustic detections confirm that dolphins do venture this far offshore, at least occasionally.

The petitioners' assertion that dolphin distributions extend to the 100m depth contour, and therein so must all mitigation measures, is unsupported by empirical evidence.[38] The figure below shows that dolphin densities are highest in shallow water (*e.g.*, 10-20 m) and decline to a very low value at some intermediate depth (*e.g.*, 30-50 m), beyond which a uniformly low 'background density' persists even to much greater depths. In summer, dolphin observations are mostly confined to the 20 m depth contour, and there is only a single observation deeper than 30 m depth. In winter the observations are mostly confined to the 30 m depth contour, and there is only a single observation deeper than 50 m.[39] If a depth contour were used as a risk reduction management tool to ensure that any selected mitigation measures encompass the largest proportion of the population and, in so doing, the risk, a contour in the range of 20-30 m would be most appropriate (in summer) or 40-50 m (in winter).[40] Generally, according to population surveys, 59.2% of Māui dolphins are distributed between zero and 25 meters, 34.7% of Māui dolphins are distributed between 25 and 50 meters, and only 6.1% of Māui dolphins are distributed between 50 to 100 meters.[41] Therefore, any management measure that closes the fishery out to 50 meters protects 96% of the Māui dolphin population, eliminating the greatest bycatch risk for the largest proportion of the population.

---

[35] The most reliable aerial survey sightings that included areas beyond four nautical miles offshore observed five separate occurrences of *Cephalorhynchus* spp. dolphins between four and seven nautical miles offshore. See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 12.

[36] S. Du Fresne Distribution of Maui's Dolphin (*Cephalorhynchus hectori maui*) 2000–2009 DOC Research & Development Series (2010), p. 322M. Oremus, R.M. Hamner, M. Stanley, P. Brown, C.S. Baker, R. Constantine Distribution, group characteristics and movements of the Critically Endangered Maui's dolphin *Cephalorhynchus hectori maui* Endanger. Species Res., 19 (2012), pp. 1-10;Slooten, E;  Dawson, S M; Rayment, W J; Childerhouse, S J (2005) Distribution of Maui's dolphin, *Cepahalorhynchus hectori māui*. New Zealand Fisheries Assessment Report 2005/28. 22 p.

[37] Nelson, W; Radford, C (2019) Acoustic monitoring of *Cephalorhynchus hectori* off the West Coast North Island, New Zealand. (Unpublished report prepared for the Department of Conservation.) 28p.
https://www.doc.govt.nz/globalassets/documents/conservation/native-animals/marinemammals/
mauis/nelson-radford-2019-maui-dolphin-acoustics-report.pdf

[38] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at Appendix C.

[39] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at Appendix C.

[40] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at Appendix C.

[41] M de Jager, GM Hengeveld, WM Mooij, E Slooten 2019. Modelling the spatial dynamics of Maui dolphins using individual-based models Ecological Modelling 402, 59-65

Māui dolphin movements can range between 0.88 km over 372 days to 80.43 km over 375 days with the average distance traveled of 35.5 km.[42] Rare long-distance movements (*e.g.*, over 400 km) are considered exceptional behavior, consistent with transient animals outside of their normal range.[43]

4.1.4 Conclusion

The GNZ, in the 2019 Progress Report and its 2020 Comparability Finding application, indicated that a revised abundance survey of the population is currently in progress (in 2020–21). In its application for a comparability finding, the GNZ includes an abundance estimate for Māui dolphin. Based on information provided in the application, NMFS concludes that the GNZ follows a scientifically sound process to estimate abundance, is undertaking a stock assessment survey to update the abundance estimate, and has previously collected and is updating detailed information about the distribution of the subspecies. ***Therefore, the GNZ meets the condition to have an abundance estimate for marine mammal stock, and we find their system for Māui dolphin abundance estimation comparable in effectiveness to U.S. standards.***[44]

---

[42] M. Oremus, R.M. Hamner, M. Stanley, P. Brown, C.S. Baker, R. Constantine Distribution, group characteristics and movements of the Critically Endangered Maui's dolphin *Cephalorhynchus hectori maui* Endanger. Species Res., 19 (2012), pp. 1-10; S. Du Fresne Distribution of Maui's Dolphin (*Cephalorhynchus hectori maui*) 2000–2009 DOC Research & Development Series (2010), p. 322

[43] Hamner, R M; Constantine, R; Oremus, M; Stanley, M; Brown, P; Baker, C S (2014a) Long range genetic movement by Hector's dolphins provides potential genetic enhancement for critically endangered Māui's dolphin. Marine Mammal Science 30: 139–153.

[44] 16 USC 1386 outlines the stock assessment report requirements including a description of the geographic range of the affected stock, including any seasonal or temporal variation in such range; an minimum population estimate, current and maximum net productivity rates, and current population trend, including a description of the information upon which these are based. The Guidelines for Assessing Marine Mammal Stocks provide additional guidance. https://www.fisheries.noaa.gov/national/marine-mammal-protection/guidelines-assessing-marine-mammal-stocks. While the MMPA stock assessment requirements are more prescriptive, the MMPA Import Provisions only require that the nation provide an estimate of population abundance. Nations are not required to produce a marine mammal stock assessment report that is equivalent to the provisions under 16 USC 1386.





**Figure 3**. Estimated (summer) spatial distribution of Māui dolphins from Cape Reinga to Cape Egmont. Locations of all reported public sightings of Māui/Hector's dolphins across the estimated Māui dolphin distribution. Yellow = validated summer sighting; Blue = validated winter sighting; Grey cross = unvalidated sighting. The 50-metre and 100-metre depth contours are also shown.

**Figure 4**. Estimated (winter) spatial distribution of Māui dolphins from Cape Reinga to Cape Egmont. Locations of all reported public sightings of Māui/Hector's dolphins across the estimated Māui dolphin distribution. Yellow = validated summer sighting; Blue = validated winter sighting; Grey cross = unvalidated sighting. The 50-metre and 100-metre depth contours are also shown.

*4.2 East Coast*

Māui and South Island Hector's dolphins are similar in appearance with only small morphological differences. Genetic markers are the only way to identify as to which subspecies an individual belongs. Dolphins sighted off the West Coast North Island are commonly assumed to be Māui dolphins based on the prevalence of the distinct Māui dolphin genotype in that location. Without a genetic identification, however, dolphin sightings (and acoustic detections) there and elsewhere in the North island, including the east coast of the North Island, cannot be identified any further than 'Māui/Hector's dolphins' or *Cephalorhynchus* spp.

Occasionally the public reports sightings of *Cephalorhynchus* spp. from all around the North Island, including validated sightings.[45] The New Zealand Department of Conservation (DOC) administers a database for sightings of Māui and Hector's dolphins. It contains data from 1970 to the present but also includes one sighting from 1922.[46] In 2009, DOC developed a Māui's dolphin sightings validation system and interview process. The DOC sightings validation system uses a 5-point scale where validation categories 1-3 are the most reliable[47] and categories 4 and 5 are the least reliable.[48]

Using the petitioners' map and DOC's sighting database, we analyzed each sighting listed on the petitioner's map as well as additional sightings in the database. In the table in Attachment B, we recorded the species (or subspecies) associated with each sighting and the confidence level of the species identification for sightings listed as occurring on the east coast of the North Island. The petitioners' map identifies 39 Māui dolphin sightings (of individual or multiple animals). However, we found the petitioners' map to be misleading. After we inspected the Māui dolphin sighting database, none of the sightings listed in the table in Attachment B have been genetically verified as Māui dolphins. The east coast sighting data is poor and often opportunistic. Most sightings were recorded by surfers, kayakers, and the public. These sightings were not generated through a systematic abundance survey nor were the subspecies confirmed through genetic

---

[45] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at Appendix C, specifically C1.1

[46] https://www.doc.govt.nz/our-work/protecting-species/protecting-marine-species/our-work-with-maui-dolphin/maui-dolphin-sightings/#:~:text=From%201921%20to%20December%202017,Zealand's%20West%20Coast%20North%20Island.&text=There%20are%20also%20confirmed%20sightings,a%20South%20Island%20Hector's%20dolphin.

[47] Category 1 is the most reliable of sightings, and must satisfy at least one of the following criteria: i. The sighting is from a person or source of known reliability. This might include university researchers or certain DOC field staff. ii. The sighting is accompanied by a photograph which includes a known landmark consistent with the report; and which clearly identifies the species as a Maui's dolphin. iii. The report is accompanied by an identifying photo that has no landmarks but is provided with additional details such as a detailed location description or GPS position. iv. The report has been provided by someone familiar with Maui's dolphins. This might include people who have previously reported sightings that were classed as categories 1, 2 or 3 Category 2 includes reports that are not accompanied by a photo (or the photo is poor quality and it is not clear what the species is); the description of the dolphin is consistent with Maui's dolphins and the location is within the known current range of Maui's dolphin.. For Category 3 these reports are not accompanied by a photo (or the photo is poor quality and it is not clear what the species is; the description of the dolphin is consistent with Maui's dolphins but the location is not within the known current range of Maui's dolphin; or the location is too vague to be certain.

[48] For Category 4 the description of the animal(s) provided during the standardized interview is not consistent with a Maui's dolphin. For Category 5 reports fall into this category when they fit one of the following criteria: i. The description provided of the animal(s) during the standardized interview is consistent with Maui's dolphin, but the location description (or GPS location) is from the South Island (i.e. the animals were Hector's dolphin). ii. The report is incomplete and does not allow a full assessment. Upon completion of a standardized interview, it is not possible to score the sighting in any of the other four categories. iii. The sighting may fall into one of the other categories, but a standardized interview is not able to be conducted and the report cannot be independently verified. iv. The report is probably of another dolphin species.

analysis. The database often records these sightings as "outside of current range" and with only moderate confidence in the species identification (*e.g.*, in some cases other dolphin species could not be ruled out). Finally, this database has been available to the public and experts for decades and was considered in the development of the TMP (in 2012 and 2019). The review of the TMP and supporting documents included wide participation by New Zealand dolphin scientists (including some of the declarants) and invited international expert reviewers. During these international reviews, no scientists interpreted this database to suggest that there may be a resident population of Māui dolphins on the east coast of the North Island.[49]

While public sightings of presumably non-resident dolphins off the east coast North Island (and north coast North Island) cannot be unambiguously assigned to one subspecies or the other, it is considered highly unlikely that these sightings would be of Māui dolphins (and more likely to be Hector's dolphins), based on proximity and numerical considerations. To illustrate, Hawke's Bay on the east coast North Island is roughly 180 nautical miles from the nearest resident population of Hector's dolphins on the east coast South Island (a source population of more than 9,000 animals), but more than 400 nautical miles from the area of the resident Māui dolphin population (a source population of roughly 63 animals).[50]

From this database, East Coast North Island sightings in locations outside the known core Māui dolphin area are likely transient animals from other locations. No *Cephalorhynchus* spp. dolphins have ever been genetically sampled outside of the West Coast in the North Island. The southernmost occurrence of a Māui dolphin, in Wellington Harbor, is from a museum sample from approximately 1873. Scientists believe that Māui dolphin movements over 100 km are probably rare.

Finally, according to the risk assessment model, the bycatch risk estimates for transient/recolonizing or hypothetical dolphins off the East Coast North Island are low. The combined risk estimate is so low that models estimate that a resident population in this area would be expected to recover to and stabilize at a level roughly 94% of the unimpacted population size (using the mean impact estimate).[51] The fishing effort is not sufficiently concentrated in these locations to prevent dolphins from recolonizing and inhabiting these locations *if* they were present and inclined to do so.[52]

To date there is no evidence of a resident dolphin population (of either subspecies) in any North Island location outside of the recognized core range of Māui dolphins (i.e. there have been no verified sightings of breeding aggregations or newborn calves, and the sightings do not conform to any predictable seasonal pattern). ***The literature, the absence of far-ranging migratory movements by Māui dolphins, and the sighting data (submitted by the petitioners) clearly shows the absence of confirmed sightings of Māui dolphin on the East Coast of the North Island, and does not support the existence of either a resident or "transient" population of Māui dolphins. In addition, the risk of bycatch on the East Coast of the North Island is low and would not impede recolonization of the area. In the absence of either a resident or***

---

[49] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at Appendix C.
[50] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at Appendix C.
[51] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at Appendix G
[52] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at Appendix G

*transient population of Māui dolphin interacting with any other commercial fishing operation exporting fish and fish products to the United States, no further regulatory action is required and no comparability finding is needed.*

## 5. Analysis of a Vessel Register System for Export Fisheries

The MMPA Import Provisions require, as a condition of a comparability finding, an export fishery register containing a list of all fishing vessels participating in the export fishery, including information on the number of vessels participating, the time or season and area of operation, gear type and target species.[53] Likewise, the MMPA provisions,[54] which governs and authorizes the incidental taking of marine mammals in the course of commercial fishing operations, apply only to persons using vessels of the United States or vessels that have valid fishing permits.[55] Owners of such vessels must have an authorization from NMFS to incidentally take marine mammals.

*New Zealand meets these conditions.* The primary legislation governing the GNZ's fisheries management system, including the effects of fishing on the aquatic environment, is the Fisheries Act of 1996. To commercially fish in New Zealand waters, vessels must be registered as a New Zealand ship (flagged to New Zealand) and be on the Fishing Vessel Register. Section 013 of the Fisheries Act of 1996 requires that all vessels used to take fish, aquatic life, or seaweed for sale from New Zealand waters must be registered. Vessels are registered under one of the following categories: (1) fishing vessel 28 meters and under in length; (2) fishing vessel over 28 meters in length; and (3) foreign owned vessel. A vessel must be registered to an operator who has lawful possession and control of the vessel because of ownership, lease, sublease, charter, subcharter, etc. Once a vessel is registered, the vessel is given a "vessel registration number" and the vessel details are placed on the public vessel register. Once a vessel has been issued a registration number, that vessel retains its number while it is a commercial vessel and the operator is issued a Certificate of Registration (COR) for the vessel.[56]

---

[53] 50 CFR 216.24 (h)(6)(iii)(C)(2)

[54] 16 U.S.C 1387(a)

[55] The provisions of 16 U.S.C. 1387(a) govern the incidental taking of marine mammals in the course of commercial fishing operations by persons using vessels of the United States or vessels which have valid fishing permits issued by the Secretary in accordance with section 204(b) of the Magnuson-Stevens Fishery Conservation and Management Act (16 U. S.C. 1824(b)).

[56] https://www.mpi.govt.nz/growing-and-harvesting/fisheries/operating-as-a-fisher/vessel-registration/

## 6.  Analysis of Reporting and Monitoring Programs to Estimate Marine Mammal Incidental Mortality and Serious Injury.

*6.1 Self-reporting*

The MMPA Import Provisions require that harvesting nations require the owner or operator of a vessel participating in an export fishery to report all intentional and incidental mortality and injury of marine mammals in the course of commercial fishing operations.[57] The MMPA Import Provisions also require harvesting nations implement a monitoring program to estimate incidental mortality or serious injury in an export fishery, and to estimate the cumulative incidental mortality and serious injury of marine mammal stocks in their waters resulting from the all export fisheries interacting with those marine mammal stocks.

The GNZ requires any person who injures or kills a marine mammal to report such interactions to the Ministry for Primary Industries and Department of Conservation. Section 16 of New Zealand's Marine Mammals Protection Act of 1978: requires any person fishing under a permit, license, or permission granted under the Fisheries Act of 1978 to report the accidental or incidental capture, killing, or injury of any marine mammal. The operator must record the event in the vessel's log and report the event in writing to an officer or a fishery officer[58] not later than 48 hours after the arrival of the vessel in port; and in any other case, report the event in writing to an officer or a fishery officer as soon as practicable. Reports must include the time and location of the area where the event took place; the species (if known) of the marine mammal killed or injured, or a general description of the mammal; and a description of conditions and the circumstances of the event.[59] Under the Fisheries (Reporting) Regulations of 2017, a commercial permit holder must provide marine mammals [protected species] catch, which must be reported on the same day. An automated report of protected species captures is notified to officials daily, enabling fishery managers to assess the information and undertake a response if required. These catch reports include: (1) the species and quantities caught; (2) the fishing method that resulted in the catch; (3) the date, time, and location of the fishing; and (4) any additional information specified by the GNZ. Failure to report such events is an offense under New Zealand's Marine Mammal Protection Act of 1978.

***The GNZ's self-reporting requirements meet the comparability finding conditions for reporting incidental mortality and serious injury, and are comparable in effectiveness to the U.S. MMPA.***  The MMPA requires the owner or operator of a commercial fishing vessel to report all incidental mortality and injury of marine mammals in the course of commercial fishing operations to the Secretary of Commerce by mail (or other means stipulated in the implementing regulations) within 48 hours after the end of each fishing trip. The vessel owner or operator must provide the vessel name, and Federal, State, or tribal registration

---

[57] 50 CFR 216.24 (h)(6)(iii)(C)(3)(i)

[58] as defined in section 2(1) of the Fisheries Act 1996

[59] The Fisheries (Reporting) Regulations 2017 impose mandatory electronic catch reporting of commercial fisheries information. The Fisheries (Reporting) Regulations 2017 modernized the former paper-based commercial fisheries reporting system under the Fisheries (Reporting) Regulations 2001. The reporting regulations provided a standardized means for commercial fishers to meet the protected species reporting requirements set out in the Marine Mammals Protection Act 1978 and the Wildlife Act 1953.

numbers of the registered vessel; the name and address of the vessel owner or operator; the name and description of the fishery; the species of each marine mammal incidentally killed or injured; and the date, time, and approximate geographic location of such occurrence.[60] The GNZ confirms fishermen self-reports by using electronic and position reporting, on-board cameras, and observers.

*6.2 On-board camera monitoring*

The GNZ will monitor the regulations for compliance and effectiveness toward achieving the objectives of the TMP, compliance with the fisheries closures, and whether there is illegal fishing activity in the closed areas. The GNZ achieves compliance monitoring through a combination of electronic reporting and a global positioning reporting system or vessel monitoring system on all commercial fishing vessels. These systems provide timely reporting of catch and incidental capture of protected species, and provide the location and activity of commercial fishing vessels.

Since November 1, 2019, on-board cameras are required on any set-net or trawl vessel (≥8 m and ≤29 m in registered length).[61] The area where on-board cameras are required covers the coastal area of the Māui dolphin habitat zone, except for a small portion in the far north (estimated to have a low density of dolphins), and extends into the northern portion of the southern transition zone (see Figure 5). According to the GNZ, the requirement applies to 28 vessels, of which 20 have opted into the on-board camera requirement; the other eight vessels subject to the regulatory requirement are currently not operating in the defined area.[62] Thus, fishing vessels currently operating in the core Māui dolphin habitat zone have 100% coverage of electronic monitoring.

Camera footage records catch, time, and position. The GNZ reviews all camera footage within the defined camera monitoring area within four to eight weeks of each fishing event. The objective of this camera program is to verify fisher-reporting, rather than real-time monitoring. The on-board camera program alone is not the primary tool to gather data on mortality and injury to estimate bycatch. The GNZ will use the combination of observers and on-board camera monitoring programs to ground truth on-board cameras as a tool to estimate marine mammal bycatch and verify compliance with fishery management measures. In 2021, the GNZ will review the implementation of the use of on-board cameras throughout the

---

[60] (e) REPORTING REQUIREMENT. — The owner or operator of a commercial fishing vessel subject to this Act shall report all incidental mortality and injury of marine mammals in the course of commercial fishing operations to the Secretary by mail or other means acceptable to the Secretary within 48 hours after the end of each fishing trip on a standard postage paid form to be developed by the Secretary under this section. Such form shall be capable of being readily entered into and usable by an automated or computerized data processing system and shall require the vessel owner or operator to provide the following: (1) The vessel name, and Federal, State, or tribal registration numbers of the registered vessel. (2) The name and address of the vessel owner or operator. (3) The name and description of the fishery. (4) The species of each marine mammal incidentally killed or injured, and the date, time, and approximate geographic location of such occurrence. 16 U.S.C 1387(e)

[61] New Zealand regulations for on-board cameras on commercial fishing vessels are contained in the Fisheries (Electronic Monitoring on Vessels) Regulations 2017.

[62] However, according to the GNZ, should the operators of these vessels decide to operate in the future, they will be required to have on-board cameras installed before they enter the area to fish using set-net or trawl gear. See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 34.

entire Māui dolphin habitat zone and will determine whether to further supplement and/or replace the use of fisheries observers where feasible.

No U.S. Take Reduction Plans currently require any fishery covered by the plan to use on-board cameras as a monitoring device.  U.S. fisheries under a Take Reduction Plan only require observers onboard at pre-determined levels to document, report, and estimate bycatch of the covered marine mammal.  The GNZ is requiring on-board cameras, observers, and a combination of observers and on-board cameras to detect and estimate Maui dolphin bycatch. ***The GNZ's on-board cameras exceed any current U.S. regulatory standards under the MMPA.***



**Figure 5**. West Coast North Island on-board camera monitoring area (in yellow).

*6.3 On-board Observers*

The GNZ uses fisheries observers to monitor interactions between fishing vessels and protected species, including Māui dolphins, and to collect data used to estimate annual bycatch (captures and mortality). Given the small size of the Māui dolphin population,

and low encounter rate, observer coverage within the Māui dolphin distribution is primarily used as a means of ensuring any interaction is detected so that any management response can occur quickly (i.e. the use of the fishing-related mortality limit, see Section 8). As the likelihood of interactions is very low, the level of monitoring coverage must be high enough to reliably detect any non-zero capture rate. In the last three complete fishing years, the percent of observed fishing days on fishing vessels in the target set-net area has averaged 95%, and 90% in the target trawl coverage area.[63]

Under the new regulations that went into effect October 1, 2020, the GNZ will be prohibiting set-net activity throughout most of the coastal area. The new trawl and set-net regulations will cover a revised Māui dolphin habitat zone that is much broader than the previous target observer coverage areas and is estimated to cover approximately 96.3% (summer) and 87.8% (winter) of the Māui dolphin distribution (including harbors); and approximately 93.7% (summer) and 86.6% (winter) of the Māui dolphin distribution (excluding harbors).[64] The GNZ will seek to maintain the combination of observer coverage and electronic monitoring (on-board cameras) at levels above 90% in the Māui dolphin habitat zone.

The GNZ's observer program coverage is comparable to the recommendations in the U.S. 2016 Revision to the Guidelines for Preparing Stock Assessment Reports Pursuant to the 1994 Amendments to the MMPA.[65] The GNZ has a sufficiently high level of observer coverage to detect interactions or bycatch and obtain an unbiased statistically- reliable bycatch estimate from a small population with a low encounter rate.[66]

***In conclusion, the GNZ's self-reporting and fisheries observer monitoring program is comparable in effectiveness to U.S standards. The GNZ's on-board camera monitoring program exceeds U.S. standards.***

## 7.  Analysis of New Zealand's Bycatch Limit

The MMPA Import Provisions include, as a condition for a comparability finding, that the harvesting nation calculates a bycatch limit for marine mammal stocks in their waters that are incidentally killed or seriously injured in an export fishery.[67] The MMPA Import Provisions define bycatch limit to mean "the calculation of a potential biological removal level[68] for a particular marine mammal stock or comparable scientific metric established by the harvesting nation or applicable regional fishery management organization or intergovernmental agreement."

When a bycatch limit is available, an evaluation of whether the regulatory program is comparable in effectiveness includes an assessment of the likelihood that the regulatory program would reduce mortality below the bycatch limit or its U.S. equivalent, the potential biological

---

[63] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 47 and Appendix F.
[64] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at Appendix F.
[65] Also referred to as the Guidelines for Assessing Marine Mammal Stocks
[66] https://www.fisheries.noaa.gov/national/marine-mammal-protection/guidelines-assessing-marine-mammal-stocks; see Table 6
[67] 50 CFR 216.24 (h)(6)(iii)(C)(5)
[68] As defined in 50 CFR 229.2

removal" ("PBR").[69]  In its domestic implementation of the MMPA, NMFS has determined a fisheries bycatch limit by calculating the PBR which is the "maximum number of animals…that may be removed…while allowing that stock to reach or maintain its optimum sustainable population."[70]  PBR is calculated as a function of the population size, stock productivity and a recovery factor according to this formula: $N_{min}$ * $R_{max}$ * 0.5 *$F_r$.  $N_{min}$ is the 20th percentile estimate for population size.  $R_{max}$ is the maximum net productivity estimate.  $F_r$ is a recovery factor.

Were this subspecies within U.S. waters, the single remaining unit of Māui dolphins would be considered a stock. Because the stock is listed as endangered under the U.S. Endangered Species Act, the stock would receive added protections to promote more rapid recovery.  Since fewer than 100 individuals of the subspecies remain, the recovery factor would be the most protective value allowed ($F_r$ = 0.1). The most recent abundance estimate is 63 individuals (CV = 0.11) making the minimum abundance estimate ($N_{min}$) 58.95. There are few cases that have changed the default maximum growth rate of a marine mammal stock from 0.04, and those cases have involved direct evidence that the population grew at a higher value or in a few cases, a reduced value because of special life history factors that lie outside the norm (*e.g.*, killer whales with long interbirth intervals). **Using these values the PBR for Māui dolphin would be 0.11** (58.96*(0.04/2)*0.1). This would allow at a maximum, 1 death every 8 years. In its comparability finding application, the GNZ has adopted this estimate of PBR as its bycatch limit.

Under its procedures, New Zealand calculates the Population Sustainability Threshold (PST) instead of PBR. The PST is the maximum number of dolphin deaths per year that can occur while still allowing the population outcome to be achieved (see discussion under section 8 about population outcome). The PST differs in using N (estimated mean population) rather than $N_{min}$ and φ as a general policy parameter for population recovery instead of $F_r$. The choice for the policy parameter is left to the GNZ managers. In the case of Māui dolphins, the GNZ uses 0.1 for φ. The other value used in both PBR and PST calculations is the maximum growth rate ($R_{max}$).The assessment uses both a life-history-based estimation method coupled with simulations to account for small population size to arrive at a growth rate value of 0.045, though a plausible sensitivity simulation of 0.04 was also presented. Because the abundance estimate is quite precise (CV = 0.11), the difference between the mean N (63) and $N_{min}$ (~59) is not great. Likewise the difference between an $R_{max}$ of 0.04 and 0.045 is negligible. **The GNZ calculated a PST for Māui dolphin of 0.14** (63*(0.045/2)*0.1). This would allow approximately 1 death every 7 years. The GNZ nonetheless adopted PBR of 0.11 for the bycatch limit in its comparability finding application, although the PST estimate (1 death in 7 years) is close to the PBR estimate (1 death in 8 years).

In contrast to the GNZ's PBR and the NMFS calculation for PBR for Māui dolphin, the petitioners advocate for a more conservative calculation of PBR because of the Māui dolphins' restricted range and limited prey availability within that range. The petitioners use a two percent maximum growth to calculate PBR.[71] In fact, the petitioners further reduce this rate arguing that

[69] 50 CFR 216.24 (h)(6)(iii)(C)(5)(6)

[70] 16 U.S.C. § 1362(20)

[71] Cooke, J.G.; Constantine, R.; Hamner, R.M.; Steel, D.; Baker, C. S. (2019). Population dynamic modelling of the Māui dolphin based on genotype capture-recapture with projections involving bycatch and disease risk. New Zealand Aquatic

the PBR for Māui dolphin should be based on the maximum net productivity rate of 0.018[72] and a minimum population of 54. The petitioners use the same recovery factor for the Māui dolphin of 0.1, based on its endangered status and its small (i.e., <1,500) and declining population abundance. Therefore, the petitioners' more conservative formula (based on the lower minimum population estimate and maximum net productivity rate estimate) results in a PBR of 0.049 or 1 mortality or serious injury every 20.6 years.[73]

The petitioners' calculation does not conform to the U.S. "Guidelines for Preparing Stock Assessment Reports Pursuant to the 1994 Amendments to the MMPA," which states: "Substitution of other values [of $R_{max}$] should be made with caution, and only when reliable stock-specific information is available on $R_{max}$ (*e.g.*, estimates published in peer-reviewed articles or accepted by review groups such as the MMPA Scientific Review Groups or the Scientific Committee of the International Whaling Commission)."[74] The calculation relies on dated estimates for $R_{max}$, is inconsistent with the known age at first reproduction of Māui dolphins, underestimates maximum age for this species, and is contrary to more recent estimates of $R_{max}$ in the literature.[75] Moreover, the Māui dolphin demographic models now estimate that the population may have stabilized or begun to increase[76] in recent years following a decline in the past 20 to 30 years.[77] As a result, the petitioners' PBR estimate is flawed, is contrary to the scientific guidance NMFS uses to calculate PBR, and would not be used as a PBR in the United States.

*The GNZ PST as calculated in the final TMP is a comparable scientific metric to PBR. Regardless of the differences in the PBR/PST calculations, the GNZ, for the purpose of this comparability finding application, is using and has calculated a PBR for Māui dolphins of 0.11 as its biological threshold or bycatch limit. Therefore, the standard used by the GNZ is PBR and is comparable to U.S. standards*.

## 8.  Analysis of a Regulatory Plan to Reduce Bycatch below the Bycatch Limit

The MMPA Import Provisions require that the harvesting nation implement measures in an export fishery to reduce the total incidental mortality and serious injury of a marine mammal

---

Environment and Biodiversity Report No. 216. 38 p.

[72] E. Slooten, F. Lad Population biology and conservation of hector dolphin Can. J. Zool.-Revue Canadienne De Zoologie, 69 (1991), pp. 1701-1707

[73] PBR = 54 X (0.5 X 0.018) X 0.1

[74] https://www.fisheries.noaa.gov/national/marine-mammal-protection/guidelines-assessing-marine-mammal-stocks

[75] P.R. Wade, R.M. Hamner, R. Constantine, C.S. Baker The Potential Biological Removal (PBR) and probability of decline for Maui's dolphin Appendix 1 of Currey, R. J. C., L. J. Boren, B. R. Sharp, and D. Peterson. 2012 A Risk Assessment of Threats to Maui's Dolphins, Ministry for Primary Industries and Department of Conservation (2012) www.doc.govt.nz/getting-involved/consultations/current/threat-management-plan-review-for-mauis-dolphin/

[76] The most recent 2015–2016 abundance estimate is higher than the previous estimate from 2011 of 55 individuals greater than 1 year of age (with a 95 percent confidence that the population was between 48 and 69 individuals). These figures are encouraging; however, any change in population status remains uncertain between these two surveys because, while the mean population size estimate has increased, the confidence intervals still overlap.See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 7.

[77] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 6.

stock below the bycatch limit.[78] Such measures may include incidental mortality and serious injury limits; careful release and safe-handling of marine mammals and gear removal; gear marking; bycatch reduction devices or avoidance gear (*e.g.*, pingers); gear modifications or restrictions; or time-area closures.[79]

Section 15 of the GNZ Fisheries Act of 1978 interlinks with processes under the its Marine Mammal Protection Act of 1978, and in the absence of a specific GNZ Population Management Plan[80] enables the Minister of Fisheries (after consultation with the Minister of Conservation) to take such measures he or she considers necessary to avoid, remedy, or mitigate the effects of fishing-related mortality on any protected species. Measures can include setting a limit on fishing-related mortality on any protected species and recommending the making of regulations to prohibit all or any fishing or fishing methods in an area.

*8.1 The Objectives and Outcomes of the Regulatory Measures*

The GNZ has established clear objectives or outcomes for their regulatory program governing the bycatch of the critically endangered Māui dolphins. The outcome for Māui dolphins is to manage all human-related impacts so the population will "increase to a level at or above 95 percent of the maximum number of dolphins the environment can support."[81] The management objective is to "effectively restrict the allowable level of fisheries related mortality to *zero* given the high risk of extinction."[82] This objective is comparable in effectiveness to the U.S. standard of the MMPA that "the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a *zero* mortality and serious injury rate."[83]

To achieve the population outcomes, the GNZ sets as its second management objective to ensure that dolphin deaths arising from fisheries bycatch do not:
- exceed population sustainability thresholds (in this case PBR) set to achieve the applicable population outcome with 95% certainty;
- cause localized depletion; or
- create substantial barriers to dispersal or connectivity between subpopulations.

---

[78] 50 CFR 216.24 (h)(6)(iii)(C)(6), Requires a comparison of the incidental mortality and serious injury of each marine mammal stock or stocks that interact with the export fishery in relation to the bycatch limit for each stock; and comparison of the cumulative incidental mortality and serious injury of each marine mammal stock or stocks that interact with the export fishery and any other export fisheries of the harvesting nation showing that these export fisheries: (i) Do not exceed the bycatch limit for that stock or stocks; or (ii) Exceed the bycatch limit for that stock or stocks, but the portion of incidental marine mammal mortality or serious injury for which the export fishery is responsible is at a level that, if the other export fisheries interacting with the same marine mammal stock or stocks were at the same level, would not result in cumulative incidental mortality and serious injury in excess of the bycatch limit for that stock or stocks.

[79]  50 CFR 216.24 (h)(6)(iii)(C)(3)(iii)

[80] Section 3E of the Marine Mammal Protection Act of 1978 provides for the approval and implementation of Population Management Plans, which can limit the level of fishing-related mortality for any marine mammal species. These can include setting maximum-allowable levels of fishing-related mortality for threatened species.

[81] https://www.fisheries.govt.nz/news-and-resources/consultations/hectors-and-maui-dolphins-threat-management-plan-review/ Cabinet paper: Hector's and Māui dolphin threat management plan review – fisheries measures

[82] Id. at 5

[83] 16 U.S.C. 1371(a)(2) In any event it shall be the immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate.

The GNZ's objectives for Māui dolphins would mean that, with 95 percent confidence, the west coast North Island Māui dolphin population is able to recover to and/or maintain a level that is no more than five percent lower than what it would be in the absence of any fisheries impact.

***The objectives and outcomes are comparable to the MMPA:***
- ***They are cautious where information on impacts, population size, and distribution remains uncertain.***
- ***They acknowledge, given the small number of Māui dolphins, the importance of maintaining their long-term viability and rebuilding the population as quickly as possible.***

*8.2 Fisheries Seeking a Comparability Finding and their Characteristics*

Based on the 2020 List of Foreign Fisheries, we have determined that the following export fisheries have more than a remote likelihood of incidental mortality or serious injury of Māui dolphin within their range on the west coast of the North Island:

- West coast, North Island multi-species set-net fishery;[84] and
- West coast, North Island multi-species trawl fishery.[85]

As applied within the LOFF, these fisheries were designated based on inshore vessels operating within Fishery Management Areas 8 (Central) and 9 (Auckland West) and are differentiated from deepwater vessels operating off the West Coast North Island. The West Coast North Island set-net and trawl LOFF fisheries overlap the Māui dolphin distribution and the lower West Coast North Island (i.e. the transition zone).

The West Coast North Island set-net fishery comprises two main sub-fleets: coastal set-net vessels, and harbor set-net vessels. Coastal set-net vessels (≥ 6m registered length) operate within the deeper offshore waters and primarily target species such as common warehou, spotted estuary smooth-hound, and tope shark. The harbor set-net vessels (predominantly < 6m registered length) primarily operate in the upper reaches of the West Coast North Island harbors (i.e. Herekino, Whangape, Hokianga, Kaipara, Manukau, Raglan, and Kawhia) targeting species such as flatfishes nei, flathead grey mullet, and spotted estuary smooth-hound. In both fleets, Australian salmon and white trevally are occasionally targeted and caught as associated species, while bluefin gurnard and silver seabream are harvested primarily as bycatch.[86]

---

[84] The target species of this multi-species fishery are: Australian salmon (*Arripis trutta*), Bluefin gurnard (*Chelidonichthys kumu*), Common warehou (*Seriolella brama*), Flatfishes nei (*Pleuronectiformes*), Flathead grey mullet (*Mugil cephalus*), Silver seabream (*Pagrus auratus*), Spotted estuary smooth-hound (*Mustelus lenticulatus*), Tope shark (*Galeorhinus galeus*), White trevally (*Pseudocaranx dentex*).

[85] The target species of this multi-species fishery are: Australian salmon (*Arripis trutta*), Blue grenadier (*Macruronus novaezelandiae*), Bluefin gurnard (*Chelidonichthys kumu*), Common warehou (*Seriolella brama*), Jack and horse mackerels nei (*Trachurus spp*), John dory (*Zeus faber*), Silver gemfish (*Rexea solandri*), Silver seabream (*Pagrus auratus*), Snoek (*Thyrsites atun*), Spiny dogfish (*Squalus acanthias*), Spotted estuary smooth-hound (*Mustelus lenticulatus*), Tarakihi/jackass morwong (*Nemadactylus macropterus*), Tarakihi/jackass morwong (*Nemadactylus macropterus*), Tope shark (*Galeorhinus galeus*), Warehou nei (*Seriolella spp*), White trevally (*Pseudocaranx dentex*), Yellowtail amberjack (*Seriola lalandi*).

[86] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 40-41.

The West Coast North Island trawl fishery as reported in the LOFF 2020 is shown in the Table 4. The commercial inshore trawl fishery is a mixed fishery with a range of species caught but mainly targets bluefin gurnard, terakihi/jackass morwong, white trevally, and silver seabream. However, target species will vary depending on individual operations, location and season. The table includes finfish species targeted and the predominant associated finfish species caught as bycatch.[87]

*8.3 Bycatch Estimates for Set-net and Trawl Fisheries Interacting with Māui Dolphin on the West Coast of the North Island*

8.3.1 Reported Bycatch

According to the GNZ, there have been no observed bycatch events of Māui or Hector's dolphins off the West Coast North Island by observers on fishing vessels.[88] Since 2012, there have been two sightings of *Cephalorhynchus* spp. by fisheries observers.[89] Both sightings occurred from trawl vessels, in areas closed to set-nets.

There has been one self-reported capture of a *Cephalorhynchus* spp. (Māui/Hector's dolphin) off the west coast North Island. This capture occurred in January 2012 on a commercial set-net vessel fishing off Cape Egmont, Taranaki.[90]

Between 1921 and present there have been five beachcast recovered carcasses of *Cephalorhynchus* spp. dolphins (Māui/Hector's dolphin) off the West Coast North Island (including in the 'transition zone') where fishing was implicated via necropsy in the cause of death.[91]

8.3.2 Estimated Bycatch

Because of these low rates of observed or self-reported mortalities, the GNZ developed a spatially explicit multi-threat risk assessment (the risk assessment) approach that estimates the spatial distribution of the dolphins and the spatial distribution of the threats that may affect them (including bycatch).[92] The rate that dolphins encounter a threat is estimated by the level of spatial overlap between the dolphin distribution and the threat distribution. The probability of death per encounter is estimated from fisheries observer data (for commercial fishery threats) or from cause of death identified by necropsy for beachcast bodies (for lethal non-fisheries threats) of Māui and/or Hector's dolphin mortalities in the North Island.

In the risk assessment, commercial fisheries deaths were estimated to have changed over a five-year period (i.e. 2012-13 to 2016- 17) as follows:

---

[87] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 40-41.

[88] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at Appendix F.

[89] Id.

[90] Id.

[91] Id.

[92] Roberts, J O; Webber, D N; Goetz, K T; Edwards, C T T; Roe, W D; Doonan, I J (2019) Spatial risk assessment of threats to Hector's and Maui dolphins (Cephaloryhnchus hectori). New Zealand Aquatic Environment and Biodiversity Report No. 214. 168 p.

- Commercial set-net fishery deaths declined from a mean of 0.13 deaths per year (i.e. one death every 7 years) in 2012-13 to a mean of 0.08 deaths per year (one death per 12 years) in 2016-17.
- Commercial trawl deaths declined from an estimated mean of 0.024 deaths per year (i.e. one death every 40 years) in 2012-13 to a mean of 0.015 deaths per year (i.e. one death every 67 years) in 2016-17.

**Table 1.** Mean estimate of fisheries deaths for commercial set-net, trawl and combined between the 2012-13 and 2016-17 October fishing years.

| Commercial Fishery | 2012-13 | 2013-14 | 2014-15 | 2015-16 | 2016-17 |
|---|---|---|---|---|---|
| Set net | 0.13 | 0.16 | 0.12 | 0.089 | 0.077 |
| Trawl | 0.024 | 0.022 | 0.020 | 0.017 | 0.015 |
| Combined | 0.15 | 0.18 | 0.14 | 0.11 | 0.09 |

**Table 2.** Estimates of fisheries bycatch (captures and deaths) of Māui dolphins from commercial set- net, commercial trawl, and combined, relative to the potential biological removal (PBR). Estimates include the 95% confidence intervals. Estimates that exceed the PBR are noted in bold text. The second row shows the number of animals that may die from fishing but are not seen (*e.g.*, cryptic mortality) and the upper (95th percentile) estimate of bycatch is used to adopt more conservative management decisions.

| | | Commercial Set net | Commercial Trawl | Combined | PBR |
|---|---|---|---|---|---|
| Pre-October 1, 2020 | Percent mortality by gear type | 77% | 23% | 100% | 0.11 |
| | Mean annual captures (excluding cryptic mortality) (CI 5th to 95th percentile)[93] | 0.044 (0.030-0.063) | 0.013 (0.004-0.028) | 0.057 (0.034-0.090) | |
| | Mean annual deaths (including cryptic mortality) (CI 5th to 95th percentile)[94] | 0.083 (0.049-0.135) | 0.016 (0.005-0.037) | 0.099 (0.054-**0.172**) | |
| | Cook estimate | 1.3-1.8 | 0.414-0.552 | 1.8-2.4 | |

More conservative estimates of risk can include cryptic mortality (animals that die in the net that are not observed). The inclusion of cryptic mortality by the GNZ in its modeling criteria nearly doubles the bycatch estimate resulting in a precautionary, higher estimate of anticipated mortality (Row 2 of Table 2). For set-net fisheries, the cryptic mortality multiplier is highly uncertain, causing the upper bound of the estimate of deaths to be more than double what it is for captures. For trawl cryptic mortality, the factor is even more uncertain and the number of animals dying per capture trawl event is not well estimated. By including cryptic mortality estimates, the GNZ currently assumes that each capture event kills two dolphins on average, effectively doubling the estimate of trawl fisheries risk relative to what was observed.

The GNZ defines its risk reduction targets under the TMP with reference to the upper bound of the deaths estimates rather than with reference to the mean bycatch estimate. Consequently, the GNZ adopted further risk reduction even when the mean estimate was already lower than PBR. ***Even using bycatch estimate that includes cryptic mortality, which nearly doubles the mortality, still results in bycatch below PBR.*** We will discuss this in more detail in the next subsection.

The petitioners claim that "all of the estimates [of annual Māui dolphin deaths from commercial

---

[93] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 19.

[94] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 19.

fishing] by independent scientists are ***much higher*** than those calculated" by the GNZ (see Table 2).  However, Abraham[95] using a multispecies adaptation the GNZ risk assessment model, estimated 0.2 (0.0 – 0.5) Māui dolphin deaths per year in commercial fisheries. Likewise Davies[96] estimated '< 1 bycatch death per year', and specified that "of the four subpopulations, the West Coast North Island [i.e. Māui dolphins] appeared least impacted under the status quo." For comparison, these estimates were made with reference to a time in the early 2000s when the corresponding bycatch estimate from the GNZ's model was 0.25 (0.11 – 0.45) deaths per year.[97] Many of the estimates cited by the petitioners were generated by expert opinion without reference to data or derived by models. Therefore, we conclude that the bycatch estimates generated by other methods are not significantly different from those generated by the GNZ.

The petitioners often cite 1.8 – 2.4 bycatch deaths per year from a paper by Cooke et. al. (2019) that simulates Māui dolphin population trajectories likely to result from impact levels estimated for different threats.[98] These bycatch figures cannot realistically be considered an estimate of actual bycatch. The 'estimate' of 1.8 – 2.4 dolphin deaths per year actually reflects the number of deaths that are required to fit the estimated population trajectory under a specific set of assumptions. The attribution of these deaths to commercial fisheries is an assumption that even the authors of Cooke et al. (2019) acknowledge is implausible. They write: "the plausibility of such a high fisheries risk is doubtful, in the absence of a priori reasons to expect that the catchability per encounter with fishing effort would be higher] for Māui dolphins than for Hector's" [by a factor of 14-20 times].[99] Catchability is an inherent property of the animal in contact with the fishing gear. Except for west coast North Island harbor fisheries (which are likely to have a lower dolphin catchability, rather than higher) there is no basis to hypothesize that an encounter between a Māui dolphin and a set-net or trawl is 14-20x more likely to result in the dolphin's death than would be the case for a Hector's dolphin. The fishing gears are the same, and the dolphins are morphologically indistinguishable (differentiable only by a DNA sequence). Tables 2 and 3 include these bycatch figures to represent an implausible worst case scenario. Nevertheless, Table 3. shows that even the 'bycatch estimates' from Cooke et al. is substantially reduced to  0.951-1.309. As we will demonstrate in the discussion below, this number is likely further reduced by the level of risk reduction achieved in each area.

*8.4 Evaluation of the Estimated Risk Reduction from the GNZ Regulatory Regime*

8.4.1 Overall Estimated Risk Reduction Against PBR

[95] Abraham, E R; Berkenbusch, K; Neubauer, P; Richard, Y (2017) Assessment of the risk to New Zealand marine mammals from commercial fisheries. New Zealand Aquatic Environment and Biodiversity Report No. 189. 123 p.

[96] Davies, N M; Bian, R; Starr, P; Lallemand, P; Gilbert, D J; McKenzie, J R (2008) Risk analysis of Maui's dolphin and Hector's dolphin subpopulations to commercial set net fishing using a temporal-spatial age-structured model. Ministry of Fisheries, Wellington. 113 p.

[97] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at Appendix G

[98] Cooke, J G; Constantine, R; Hamner, R M; Steel, D; Baker, C S (2019) Population dynamic modelling of the Māui dolphin based on genotype capture-recapture with projections involving bycatch and disease risk. New Zealand Aquatic Environment and Biodiversity Report No. 216. 38 p. Also Cooke et al. (2019) did not attempt to evaluate the accuracy of these impact estimates (*e.g.*, as asserted in the Ragen declaration paras 49 – 51),

[99] Cooke, J G; Constantine, R; Hamner, R M; Steel, D; Baker, C S (2019) Population dynamic modelling of the Māui dolphin based on genotype capture-recapture with projections involving bycatch and disease risk. New Zealand Aquatic Environment and Biodiversity Report No. 216. 38 p.

For Māui dolphins, the areas where dolphins are commonly found have already been closed to set-net and trawl fisheries, leaving the remaining areas of residual overlap (hence risk of fisheries bycatch) in the periphery of their distribution.

For the purposes of the analysis of bycatch against PBR we consider that the estimates generated by the GNZ represent the best available evidence; we use GNZ bycatch estimates to compare the bycatch risk against PBR. Table 3 and Figure 6 show that for each commercial fisheries method, annual captures and deaths estimated to occur under the regulatory program that entered into force on October 1, 2020, are substantially lower than the PBR.  Adoption of new measures under the TMP represents an approximate reduction in mean annual deaths of 42% from commercial set-net, 52% from commercial trawl, and 44% cumulative based on pre-1 October 2020 bycatch reduction management measures.

**Table 3**. Estimates of fisheries bycatch (captures and deaths) of Māui dolphins from commercial set net, commercial trawl, and combined, relative to the potential biological removal (PBR). Estimates include the 95% confidence intervals. Cooke et.al. estimate and ranges are also included. Estimates that exceed the PBR are noted in bold text.

| | | Commercial Set net | Commercial Trawl | Combined | PBR |
|---|---|---|---|---|---|
| | Percent mortality by gear type | 77% | 23% | 100% | |
| Pre-October 1, 2020 | Mean annual captures (excluding cryptic mortality) (CI 5th to 95th percentile)[100] | 0.044 (0.030-0.063) | 0.013 (0.004-0.028) | 0.057 (0.034-0.090) | 0.11 |
| | Mean annual deaths (including cryptic mortality) (CI 5th to 95th percentile)[101] | 0.083 (0.049-0.135) | 0.016 (0.005-0.037) | 0.099 (0.054-**0.172**) | |
| | Cook et al. (2019) estimate | 1.3-1.8 | 0.414-0.552 | 1.8-2.4 | |
| Post-October 1, 2020 | Mean annual captures (excluding cryptic mortality) (CI 5th to 95th percentile)[102] | 0.026 (0.017-0.037) | 0.006 (0.002-0.013) | 0.032 (0.019-0.050) | |
| | Mean annual deaths (including cryptic mortality) (CI 5th to 95th percentile)[103] | 0.048 (0.028-0.081) | 0.008 (0.002-0.017) | 0.056 (0.030-0.098) | |
| | Cook et al. (2019) estimate | **0.753-1.044** | **0.198-0.265** | **0.951-1.309** | |

---

[100] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 19.
[101] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 19.
[102] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 19.
[103] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 19.



**Figure 7.** Estimated Māui dolphin captures (top) and deaths (including cryptic mortality) (bottom) in relation to the PBR and PST under the current commercial set-net and trawl restrictions (pre 1 October 2020) and following the new spatial closures after 1 October 2020 (labeled "After TMP). Values to the left of the PBR and PST (vertical dotted lines) indicate that the bycatch is below PBR or PST.

8.4.2 Risk Reduction by Region

The GNZ has specific gear requirements (*e.g.*, mesh size, length of net, soak time, gear marking) for both the west coast North Island set-net and trawl fisheries.[104] For the purposes of reducing the bycatch of Māui dolphins below PBR, we will only evaluate the spatial closures and restrictions. Likewise, we are confining our analysis, for purposes of this Comparability Finding, to those regulatory requirements that went into effect on October 1, 2020. Effective October 1, 2020, the GNZ restricted spatially commercial set-net gear, with the spatial boundaries of those restrictions based on the estimated overlap of Māui dolphin distribution and risk of a fishing-related capture. These restrictions are contained in the Fisheries (Auckland and Kermadec Areas Commercial Fishing) Regulations 1986 and Fisheries (Central Area Commercial Fishing) Regulations 1986 and are summarized in Section 1 above.

Commercial set-net fisheries pose a much higher bycatch risk to Māui dolphins than do inshore trawl fisheries, despite considerably higher effort levels in trawl fisheries. A dolphin is roughly 20 times more likely to be killed in 1 km of commercial set-net than in a commercial trawl in the same location.[105] Prior to October 1, 2020, within the Māui dolphin distribution, commercial set-net fisheries were estimated to be responsible for 83.5% of the fisheries risk. Commercial trawling was estimated to be responsible for 16.5% of the fisheries risk.[106]

### *8.4.2.1 Core Area*

The GNZ refers to the area between Maunganui Bluff and Pariokariwa Point as the core distribution, based on where Māui and/or Hector's dolphins are most frequently sighted, and within which live dolphins have been genetically sampled. The 'core' range is estimated to include approximately 83% (summer) and 76% (winter) of the dolphin distribution (excluding harbors) offshore to *seven* nautical miles.[107] Also, approximately 2.7% (summer) and 1.2% (winter) of the dolphin distribution falls within the harbors.[108] The GNZ's regulatory program is most risk averse for this core area.

Set nets are prohibited from Maunganui Bluff and New Plymouth/Waiwhakaiho River out to 12 nautical miles offshore, including with the entrances of the Kaipara, Manukau,[109] and Raglan harbors (core distribution and part of the southern tail). This means that GNZ's regulatory measure has eliminated the bycatch risk for both the offshore and harbor portion of the Māui dolphin distribution. As discussed, according to population surveys, 59.2% of Māui dolphins are distributed between zero and 25 meters, 34.7% of Māui dolphins are distributed between 25 and 50 meters, and only 6.1% of Māui dolphins are distributed between 50 to 100 meters.[110] As shown in Figure 8, the 12 nmi set-net prohibition closes the fishery well beyond the 50 meter

---

[104] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at Appendix E.

[105] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at Appendix G

[106] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 35

[107] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at Appendix F.

[108] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 14.

[109] Manukau Harbour which is the harbour closest to the highest dolphin density; See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 36

[110] M de Jager, GM Hengeveld, WM Mooij, E Slooten 2019. Modelling the spatial dynamics of Maui dolphins using individual-based models Ecological Modelling 402, 59-65

depth contour and in some cases out to the 100 meter depth contour.  The set-net closures are estimated to cover approximately 92.6% (summer) and 83.8% (winter) of the spatial distribution of the dolphins, eliminating the bycatch risk for those proportions of the population.[111]  The mean estimated annual deaths from set-net under these new measures is 0.048, well below the PBR (even when uncertainty of that estimate is considered). Likewise, this bycatch reduction would almost eliminate the estimated bycatch of 0.753-1.044 associated with the Cooke et al. estimate in Table 3.

Within the Māui dolphin distribution (refer Figure 10) no trawling can occur between Maunganui Bluff and New Plymouth/Waiwhakaiho River out to four nautical miles offshore (core distribution and part of the southern tail). No trawling is permitted in any harbors. The GNZ estimated the highest risk (i.e. overlap of trawl effort and dolphin density) to be between Port Waikato and to the south of Kawhia harbor, beyond the limits of the pre-October 1, 2 nautical mile closure. Because the majority (approximately 84%) of the estimated dolphin distribution extends to roughly 4 nautical miles offshore in these locations, clear patterns of trawl fishery overlap are evident in the core of the Māui dolphin distribution.

While trawl risk is low compared to set-net risk, in the context of a very small population, the consequence of a trawl capture event is potentially very high. If an incident occurred like the two multiple-capture events in Pegasus Bay in the South Island in 2018 and 2019, where three Hector's dolphins were captured in each, the consequence to the Māui dolphin population would be significant.[112] Therefore, the GNZ extended the trawl closures offshore to 4 nautical miles within the core area (Maunganui Bluff to Pariokariwa Point) and into the southern tail (to the Waiwhakaiho River). These closures are estimated to cover approximately 73.3% (summer) and 50% (winter) of the spatial distribution of the dolphins, eliminating the bycatch risk to that portion of the population. The mean estimated annual deaths from trawl under these new measures is 0.008, well below the PBR (even when uncertainty of that estimate is considered). Similarly, this bycatch reduction would significantly reduce the estimated bycatch of 0.198-0.265 associated with the Cooke et al. estimate in Table 3.

### 8.4.2.2 Southern Tail

The area from Pariokariwa Point to Cape Egmont is referred to as the "southern tail" of the distribution, covering[113] approximately 3.5% (summer) and 3.9% (winter) of the estimated distribution and offshore to 7 nautical miles. The GNZ considers this area as suitable habitat for Māui dolphins, but the actual frequency that the dolphins may use this area is unknown.

Set nets are prohibited from New Plymouth/Waiwhakaiho River and Cape Egmont out to 7 nautical miles (southern tail of distribution) (see Figures 8 and 9). Therefore, the GNZ has eliminated all set-net bycatch risk to this portion of the Māui dolphin distribution.

For trawls, the GNZ has accounted for the area where the trawl fishery operates and overlaps the greatest proportion of the distribution of Māui dolphin. Additional restrictions in the southern tail

---

[111] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 36.
[112] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 35.
[113] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 11.

are not needed between the Waiwhakaiho River and Cape Egmont.

### 8.4.2.3 Northern Tail

The area from Maunganui Bluff north to Cape Reinga (is referred to as the "northern tail" of Māui dolphin distribution) covers approximately 7.3% (summer) and 6.4% (winter) of the estimated distribution.

From Maunganui Bluff to Cape Reinga and out to 4 nautical miles offshore (northern tail of distribution) set-nets are prohibited (see Figure 8). In low dolphin density areas, the GNZ addressed any residual bycatch risk identified in the northern tail of dolphin distribution from Cape Reinga to Maunganui Bluff by putting in place this restriction.

Within the Māui dolphin distribution (refer to Figure 3), no trawling can occur between Cape Reinga and Maunganui Bluff out to 1 nautical mile offshore (northern tail of distribution) (see Figure 10).

### 8.4.2.4 Transition Zone

Below the "southern tail" is a transition zone that extends from Cape Egmont to Wellington. The GNZ confirms that there is no evidence of a current resident *Cephalorhynchus* spp. population in this area, but historical evidence suggests there may have been a small resident population in the past. Recently, DNA samples from that area also confirm the Hector's dolphins are dispersing northward from the South Island and intermittent public sightings and acoustic detections from moored hydrophones indicate the presence of Hector's and/or Māui dolphins.

In the southern transition zone (lower West Coast North Island, refer Figure 9 ) no set-net fishing can occur between Cape Egmont and Hawera out to 7 nautical miles, and between Hawera and Wellington Harbor out to 4 nautical miles.  There are no restrictions for trawl fisheries. According to the GNZ's model, this area has high commercial and recreational set-net risk. On this basis, the GNZ established these set-net closures, despite the lack of evidence of a current resident population in this area. These closures were established to ensure non-resident dolphins do not encounter too much risk from fisheries preventing them from traversing or recolonizing this area. The GNZ considered protection of potential habitat in this area considered a priority in part because it is adjacent to the Māui dolphin distribution, and in part reflecting historical DNA evidence that Māui dolphins may have occupied this area in the past.

Given that this area is a transition zone with no resident population of Māui dolphins, we believe these restrictions are comparable in effectiveness to U.S. standards, which would concentrate fisheries restrictions in the areas with the greatest overlap between fishing activities and the marine mammal stock while being protective of potential habitat.



**Figure 8.** Commercial and recreational set-net prohibition areas within Māui dolphin distribution



**Figure 9.** Commercial and recreational set-net prohibition areas south of the estimated Māui dolphin distribution with the transition zone.



**Figure 10.** Commercial trawl prohibition areas within Māui dolphin distribution

8.4.3 Conclusion

*In conclusion, the fishery-specific area restrictions are comparable in effectiveness to U.S. standards. The GNZ estimates based on its risk assessment model demonstrate that these measures will, in all likelihood, result in Māui dolphin bycatch below PBR.  Likewise, these measures will significantly reduce bycatch, to levels approaching PBR for even the worst-case scenario, the Cooke et al. estimate.  These measures also concentrate the fisheries restrictions in the areas with the greatest overlap between fishing activities and the Māui dolphin population. These restrictions, which are focused in the core area, represents the greatest density of Māui dolphins, virtually eliminate the bycatch risk from set-nets and significantly reduce the trawl bycatch risk for Māui dolphins in this area. The*

*additional restrictions in the northern and southern tail and the transitory zone reduce the bycatch risk for the tails (small proportion) of the Māui dolphin distribution. The petitioners seek to eliminate 100% of the risk. In selecting the 100m depth contour, their preferred management measure protects areas in the northern and southern tails and the transition zone where there are no Māui dolphin sightings and limited distribution of the subspecies. The GNZ regulatory regime is comparable to U.S. standards, which do not seek to eliminate all the risk, as proposed by the petitioners, but rather the greatest percentage of risk to the population in the areas with the greatest overlap of fishing and the marine mammal distribution to achieve the goal of reducing bycatch to levels below PBR. The GNZ regulatory measures, in all likelihood, will reduce bycatch below PBR and are comparable in effectiveness to U.S. standards.*

*8.5 Additional Measures: Management Review Trigger[114]*

The GNZ has established a management review trigger of one fishing-related capture, which includes captures resulting in release, injury, or death or a beachcast incident (where necropsy confirms death was a result of fishing) of a Māui/Hector's dolphin in the Māui dolphin habitat zone.[115] Although the GNZ's regulations, including the set-net and trawl spatial closures are the principal mechanisms to ensure that the bycatch limit is not exceeded, the management review trigger is a backstop measure in the event of an unforeseen capture.[116] Given the broad definition of capture, the GNZ is not limited to acting only when there is a dolphin death. Even in absence of a death, the GNZ, to ensure PBR is not exceeded, can take proactive management actions. This mechanism therefore provides for more proactive management than a reactive trigger mechanism, which would limit action to respond to a mortality or bycatch limit being reached.

The GNZ may, by notice in the New Zealand Gazette, prohibit all or any fishing or fishing methods in an area for the purpose of ensuring that the PBR is not exceeded. The notice would include the specifics of any closure (the method(s) and area(s) to which it applies) and when it will begin.[117] This closure (*e.g.*, what methods are prohibited and where within the Māui dolphin habitat zone) would be informed by information available about the incident at the time, such as: (1) the method involved in the incident (*e.g.*, set-net, trawl or any other fishing method); (2) whether the incident was a result of commercial, recreational or illegal fishing activity; (3) the location of the incident (*e.g.*, within a harbor or offshore).

The setting of a management review trigger allows the GNZ to quickly put in place (*e.g.*, within a week) additional measures and restrictions. The management review trigger is not an annual limit (i.e. it does not allow for one mortality each year); instead, the management

---

[114] What NMFS refers to as the management review trigger is established as an action forcing mechanism in the GNZ's regulations. , The GNZ's regulations refers to this as the fishing-related mortality limit.

[115] The Māui Dolphin habitat zone extends along the mean high-water mark of the West Coast North Island from Cape Egmont to Cape Reinga, including harbors and offshore to the 12 nautical mile Territorial Sea boundary. The Māui dolphin habitat zone is estimated to cover approximately 96.4% (summer) and 87.8% (winter) of the Māui dolphin distribution. See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 31.

[116] The GNZ defines capture broadly to include near miss capture; capture (released alive); capture (resulting in death); or beachcast incident (where necropsy confirms death was a result of fishing). See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 31.

[117] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 31.

review trigger is not time bound and any prohibitions notified in the New Zealand Gazette would apply until the notice was amended or revoked, unless otherwise specified. This means, in the event of a fishing-related incident or mortality, the measures would likely apply so long as necessary to ensure the PBR/PST is not exceeded.  Once the prohibition is in place, within three months of the incident, the GNZ will undertake a more detailed review of the bycatch incident and will determine what longer-term measures are required.[118] The immediate prohibitions notified in the New Zealand Gazette would remain in place until the notice was amended, revoked, or permanent measures were implemented in regulation. To have confidence in the use of a management review trigger for Māui dolphins, a high level of monitoring (via observers and on-board cameras) of those commercial vessels that pose a residual risk is necessary because of the very low likelihood of interaction (see section below).

The management review trigger is comparable in effectiveness to section 118 of the MMPA's requirement to monitor the effectiveness of bycatch reduction measures and amend, if necessary, the measures if monitoring indicates a failure to reduce bycatch to meet the bycatch limit goal.  An example of monitoring effectiveness is the harbor porpoise consequence closure. In 2010, NMFS established a particular bycatch rate trigger based on the number of observed harbor porpoises caught per metric tons of fish landed between 1999 and 2007. When this bycatch rate trigger was met it meant that the overall bycatch of harbor porpoise was above PBR. NMFS would then implement additional closed areas to prevent further harbor porpoise bycatch.[119] The GNZ's regulatory program, including the fishery-specific area restrictions are the principal mechanisms to ensure that the bycatch limit is not exceeded.  ***In addition, the GNZ's management review trigger is a further measure to prevent bycatch from exceeding PBR.  Therefore, the GNZ management review trigger is comparable in effectiveness to the U.S. regulatory program's Take Reduction Plan process by further evaluating unexpected bycatch and taking action to reduce the unexpected bycatch, such as the harbor porpoise consequence closure, as a means to prevent further bycatch and modify the fishery management measures to reduce or prevent bycatch from exceeding PBR.***

Finally, in as much as NMFS reconvenes a Take Reduction Team if the incidental mortality and serious injury of the particular marine mammal stock continues to exceed PBR, the GNZ is proposing triggers that will result in its revisiting and reconsidering its TMP if its objectives are not being met. The GNZ will review the TMP every five years. It can undertake revisions sooner if information indicates that the existing management measures are not meeting the objectives of the TMP. Evidence supporting a review may include:

- New information on the abundance and distribution of the dolphin population;
- New necropsy information indicating changes to human-induced deaths;
- New information on the distribution and intensity of human-induced threats;
- New information on the vulnerability and/or susceptibility of the dolphins to human-induced threats;
- The level of human-induced deaths exceeds the level that would allow the population outcomes and/or fisheries objectives to be achieved;

---

[118] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at 33.
[119] 78 FR 61821 October 4, 2013.

- The Māui dolphin are at a greater risk of decline;
- A sudden increase in human-induced mortality; and
- Human-induced mortality in areas where they are unexpected.[120]

***These triggers are comparable to U.S. triggers that could be used to reconvene a Take Reduction Team to revise a Take Reduction Plan.***

*8.6 Stakeholder Advisory Group*

The GNZ has also established a North Island Stakeholder Advisory Group made up of scientific experts and interested stakeholders that are knowledgeable and have expertise on the range of human-induced threats being managed under the TMP. This group will assist in the implementation and oversight of the TMP.

# 9.  Research Recommendations

The GNZ also plans to undertake updated abundance and distribution surveys. Continuation of the genetic mark-recapture census (currently planned every five years) is a high priority for continued monitoring of Māui dolphin abundance and population trends. The GNZ plans to expand this program to monitor pregnancy rates and calving success using biopsies and/or photo-ID, test blood or tissue samples for the presence of disease antibodies, toxins or pollutants. The genetic mark-recapture census will be updated in 2021, with the first of the two sampling seasons having been completed in February 2020.

The GNZ is also looking to increase the percentage of beachcast dolphin carcasses recovered for necropsy. It is also seeking to increase the range of diagnostic tests and to use beachcast dolphin carcasses to estimate the number of deaths from different threats.[121]

The GNZ is seeking to develop spatially resolved estimates of the prevalence of the dolphins' preferred prey species as a means to estimate the dolphins' distribution. This information will improve model assumptions and provide a better understanding of prey limitations, especially for Māui dolphins within the Māui dolphin habitat zone.

The GNZ is also funding novel technologies investigating the use of autonomous Artificial Intelligence-equipped aerial drones to survey and study *Cephalorhynchus* spp. dolphins within the Māui dolphin distribution. With extended autonomous flight time, aerial surveys will be more affordable at higher spatial and temporal resolution than is possible using manned aircraft.

# 10. Conclusion

While scientists (including the petitioners) may disagree about the assumptions that serve as the basis for the risk assessment models that underpin the GNZ bycatch estimates, the

---

[120] https://www.fisheries.govt.nz/news-and-resources/consultations/hectors-and-maui-dolphins-threat-management-plan-review/
Cabinet paper: Hector's and Māui dolphin threat management plan review – fisheries measures
[121] See New Zealand: Māui dolphins: Application for a Comparability Finding. September 2020 at Appendix I.

MMPA Import Provisions do not mandate that the United States (specifically NMFS) arbitrate such scientific debates or disagreements. The MMPA Import Provisions do not require that a nation's approach be identical to the U.S. regulatory program or standards, just comparable in effectiveness to those standards. The MMPA Import Provisions also does not require that we evaluate the implementation of historic bycatch reduction or regulatory programs when making a comparability finding. The standard of the MMPA Import Provisions is that a nation currently has a regulatory program comparable in effectiveness to the U.S. regulatory program. Based on our analysis, the GNZ regulatory program that came into effect on October 1, 2020 is comparable in effectiveness to the U.S. regulatory program. The GNZ prohibits intentional killing and injury of marine mammals; and has a vessel registration, bycatch reporting and monitoring program comparable to the U.S. regulatory program. The GNZ's regulatory program meets the conditions for a Comparability Finding in as much it has calculated bycatch estimates, PBR/PST, and has a bycatch mitigation program to reduce and maintain Māui dolphin bycatch below PBR.  The program also includes a failsafe in the management review trigger, designed to prevent bycatch from exceeding PBR and immediately implementing additional bycatch reduction measures in the event that a capture occurs. The regulatory program, similar to the U.S. Take Reduction process, includes public participation and periodic review and modification to the regulatory program to ensure that it is meeting its targets and objectives. The regulatory program also includes research projects to improve their understanding of Māui dolphins and the threats they face. In conclusion, the GNZ's regulatory program is comparable in effectiveness to U.S. standards.