IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

|  |  |
|---|---|
| SEA SHEPHERD NEW ZEALAND and SEA SHEPHERD CONSERVATION SOCIETY,<br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES, *et al.*,<br>    Defendants. | Ct. No. 20-00112 |

## DEFENDANT'S POST-HEARING BRIEF

Defendant, the United States, respectfully submits this post-hearing brief in response to the Court's direction at oral argument.

**I.  Plaintiffs Incorrectly Analyze "Success Factors" For New Export Fisheries Receiving Their First Comparability Findings**

Sea Shepherd cites in a vacuum the comparability finding factor directing NMFS to consider whether a harvesting nation has successfully implemented measures in the "export fishery" to reduce marine mammal bycatch for an export fishery's comparability finding at 50 C.F.R. § 216.24(h)(7)(ii). In so doing, Sea Shepherd fails to examine the MMPA Import Rule (50 C.F.R Part 216) as a whole, including its temporal nature.

First, "export fisheries" are creatures of the rule that exist only for the purpose of issuing comparability findings. 50 C.F.R. § 216.3. An "export fishery" does not exist before its listing on the List of Foreign Fisheries (LOFF) under the process set forth at 50 C.F.R. § 216.24(h)(4).

Second, the MMPA Import Rule presumes that harvesting nations lack regulatory programs that meet United States standards at the time of promulgation of the rule, and that is why it allowed all harvesting nations a five-year exemption from the rule to implement new

regulatory programs that will meet U.S. standards.  This exemption was extended by one extra year due to the COVID-19 global pandemic.  In the preamble to the MMPA Import Rule, NMFS states, "Harvesting nations are expected to *develop* regulatory programs to comply with the requirements to obtain a comparability finding during this time period."  81 Fed. Reg. 54,390, 54,391 (NOAA Aug. 15, 2016) (emphasis added).  Under NOAA's construction, the "success" factor at 50 C.F.R. § 216.24(h)(7)(ii) applies only once a harvesting nation's regulatory program is in place, given that the regulation only envisions the development of regulations shortly before the first comparability finding.  Before the LOFF, and ultimately GNZ's application for comparability finding, there existed no "export fishery" that met United States standards.

Indeed, for the New Zealand set-net and trawl fisheries on the LOFF, GNZ applied early for a comparability finding before the exemption period ends, waiving the regulation's five-year grace period.  Because the fisheries are new "export fisheries," there are no success factors yet to review.  As a result, the true nature of Sea Shepherd's argument is a perverse attempt to penalize the GNZ for implementing United States regulatory standards *before* nearly all other harvesting nations – which may currently export to the United States notwithstanding the MMPA.  The MMPA Import Rule further supports this analysis by also allowing provisional approval for new "export fisheries" in the four years between the publication of LOFFs, which are published every four years, before the new "export fishery" is evaluated for a comparability finding.  50 C.F.R. §§ 216.24(h)(8)(vi) (provisional comparability findings), 216.24(h)(4)(i) (quadrennial publication of LOFF).  These new fisheries in between LOFFs are listed provisionally because they have no prior history of meeting U.S. standards.

Accordingly, the purpose of the success factors is to analyze export fisheries that have already received their initial comparability findings.  This analysis is supported by the MMPA

Import Rule's provision governing the initial exemption period and for listing new fisheries provisionally between LOFFs, which assume that a harvesting nation did not have a prior regulatory program that met United States standards.  Furthermore, NOAA's regulatory construction finds additional support in Congress's allowance to its own domestic commercial fisheries of a five-year exemption period to implement the MMPA's new standards to reduce bycatch.  16 U.S.C. § 1383a.  In sum, NOAA's interpretation of its rule is eminently reasonable, and the Court should give the agency due deference.  *See Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1363–64 (Fed. Cir. 2005) ("Deference to an agency's interpretation of its own regulations is broader than deference to the agency's construction of a statute, because in the latter case the agency is addressing Congress's intentions, while in the former it is addressing its own.").

## II.     Māui Dolphin Population Distribution Including at the 50-Meter Depth Contour

Sea Shepherd incorrectly contends that the Māui dolphin habitat extends to the 100-meter depth contour and all set net and trawl fishing must be prohibited within that 100-meter depth contour to achieve effective bycatch reduction.

First, Māui dolphins are not evenly distributed from the coastline out to the 100-meter depth contour.  Indeed, 94 percent of Māui dolphins live within the 50-meter depth contour as demonstrated in Figures 3 and 4 of the Decision Memorandum.  Decision Mem. at 10.  To facilitate enforcement of its regulations, the GNZ used miles offshore rather than depth contours to define its fishing exclusion zones.  In translating depth contours to miles from shore, the best available science indicates that Māui dolphins are concentrated within two to four nautical miles (nm) (7.4 km) from shore and only occasionally occur as far as seven nm (13.0 km) offshore.

Decision Mem. at 7-8. Beyond four nm, Māui dolphin density steadily declines with only occasional sightings further offshore. *Id*.

Second, like Māui dolphins, fisheries are not evenly distributed from the coastline. Fisheries are conducted largely nearshore within the areas most frequented by Māui dolphins (*e.g.*, within four nm). The objective of the GNZ bycatch reduction regime is to eliminate Māui dolphin bycatch in commercial set-net and trawl fisheries by moving fisheries out of the areas most frequented by Māui dolphins, thereby reducing overlap with commercial fishing operations. Likewise set-net and trawl fisheries do not pose the same level of bycatch risk to Māui dolphins and need not be addressed in an equivalent manner. Set-nets are responsible for 77 percent of the bycatch, whereas trawls are only responsible for 23 percent of Māui dolphin bycatch. *Id*. at 24. Based on the risk and the overlap of each fishery with Māui dolphins, in the core Māui dolphin habitat, the GNZ prohibits set-nets within 12 nm of shore (this encompasses the 100 meter depth contour) and prohibits trawl fishing within four nm of shore. *Id*. at 29-31. In short, set-net and trawl fisheries have been displaced from Māui dolphin core habitat.

The GNZ regulations virtually eliminate the risk of bycatch in the Māui dolphin habitat. In the set-net fisheries, the closed areas have virtually eliminated fishing in the Māui dolphin core habitat area and the northern and southern extremes of Māui dolphin distribution. Decision Mem. at 31. The closed areas for the trawl fisheries are now estimated to have reduced the likelihood of Māui dolphin bycatch to one animal every 137 years. These estimates are based on the worst case scenario, or what Sea Shepherd refers to as cryptic mortality (a doubling of the mortality to account for unseen bycatch). In short, under the GNZ regulatory regime, bycatch is below the limit allowed under United States standards, including potential biological removal and zero mortality rate goal.

### III. Population Trend And Likelihood Of Recovery

The Court asked Sea Shepherd about the current population trend, number of females currently in the population, and the likelihood of recovery of the Māui dolphin. Sea Shepherd stated that it had no information on the number of females currently in the population and claimed that our assertions that the population is recovering are unsubstantiated. The Māui dolphin is currently estimated at 63 individuals, with a 95 percent confidence interval of between 57 and 75 animals. *Id*. at 6. Māui dolphin demographic models now estimate that the subspecies may have stabilized or begun to increase in recent years following a decline in the past 20 to 30 years. *Id*. These models also indicate that roughly half of the subspecies (20 - 35 animals) are adult females, a ratio typical of other marine mammal populations. *Id*.

GNZ has also established clear objectives or outcomes for its regulatory program governing the bycatch of the critically endangered Māui dolphins. The outcome for Māui dolphins is to manage all human-related effects so the population will "increase to a level at or above 95 percent of the maximum number of dolphins the environment can support." *Id*. at 20. The management objective is to "effectively restrict the allowable level of fisheries related mortality to zero given the high risk of extinction." *Id*. The GNZ also includes in its objectives to prevent localized depletion of the subspecies, avoid the creation of barriers to the expansion of the subspecies, and rebuild the subspecies as quickly as possible. *Id*. at 21. In short, the GNZ regulatory program is designed to ensure that Māui dolphins are "protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management and that the primary objective of their management should be to maintain the health and stability of the marine ecosystem. Whenever consistent with this primary objective, it

should be the goal to obtain an optimum sustainable population keeping in mind the carrying capacity of the habitat." 16 U.S.C. § 1361(6).

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | BRIAN M. BOYNTON<br>Acting Assistant Attorney General |
|  | JEANNE E. DAVIDSON<br>Director |
|  | /s/ PATRICIA M. McCARTHY<br>Assistant Director |
| OF COUNSEL:<br>JASON S. FORMAN<br>Office of General Counsel<br>National Oceanic & Atmospheric Admin.<br>Silver Spring, MD | /s/ STEPHEN C. TOSINI<br>Senior Trial Counsel<br>Department of Justice<br>Civil Division<br>Commercial Litigation Branch<br>P.O. Box 480, Ben Franklin Station<br>Washington, DC 20044<br>Tel.: (202) 616-5196 |
| July 9, 2021 | Attorneys for Defendants |

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 1,458 words, excluding any materials excluded from those Procedures' requirements, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Stephen C. Tosini