Slip Op. 22-130

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SEA SHEPHERD NEW ZEALAND and SEA SHEPHERD CONSERVATION SOCIETY<br><br>    Plaintiffs,<br><br>  v.<br><br>UNITED STATES, GINA M. RAIMONDO, *in her official capacity as Secretary of Commerce*, UNITED STATES DEPARTMENT OF COMMERCE, *a United States government agency*, JANET COIT, *in her official capacity as Assistant Administrator of the National Marine Fisheries Service*, NATIONAL MARINE FISHERIES SERVICE, *a United States government agency*, JANET YELLEN, *in her official capacity as Secretary of the Treasury*, UNITED STATES DEPARTMENT OF THE TREASURY, *a United States government agency*, ALEJANDRO MAYORKAS, *in his official capacity as Secretary of Homeland Security*, and UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *a United States government agency*,[1]<br><br>    Defendants,<br><br>  and<br><br>NEW ZEALAND GOVERNMENT,<br><br>    Defendant-Intervenor. | Before: Gary S. Katzmann, Judge<br>Court No. 20-00112 |

## <u>OPINION</u>

[The court grants Defendants' Motion to Dismiss Plaintiffs' First Claim and grants Plaintiffs a preliminary injunction on the remaining second and third claims.]

Dated:  <u>November 28, 2022</u>

---

[1] Per CIT Rule 25(d), named officials have been substituted to reflect the current officeholders.

Lia Comerford, Earthrise Law Center at Lewis & Clark Law, of Portland, OR, argued for Plaintiffs Sea Shepherd New Zealand and Sea Shepherd Conservation Society.  With her on the briefs were Allison LaPlante, Danielle Replogle; and Brett Sommermeyer and Catherine Pruett, Sea Shepherd Legal, of Seattle, WA.

Stephen C. Tosini, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendants United States, Gina M. Raimondo, United States Department of Commerce, National Marine Fisheries Service, Janet Yellen, United States Department of the Treasury, Alejandro Mayorkas, and United States Department of Homeland Security.  With him on the briefs were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director.  Of counsel was Jason S. Forman, Office of the General Counsel, National Oceanic and Atmospheric Administration, of Silver Spring, MD.

Warren E. Connelly, of Trade Pacific PLLC, of Washington, D.C., argued for Defendant-Intervenor New Zealand Government.  With him on the briefs were Robert G. Gosselink and Kenneth N. Hammer.

Katzmann, Judge:  On Earth Day 2020, at the conclusion of litigation concerning the plight of the critically endangered vaquita -- the world's smallest porpoise, endemic to Mexico -- this court took note of "the sobering words of Rachel Carson:  'So delicately interwoven are [ecological] relationships that when we disturb one thread of the community fabric, we alter it all -- perhaps almost imperceptibly, perhaps so drastically that destruction follows.'"[2]  Mindful that every case must be assessed on its own record and facts, the court returns today to the fate of a different critically endangered species, the Māui dolphin -- the world's smallest dolphin, endemic to New Zealand -- which most recent estimates suggest consists of between only forty-eight to

---

[2] See Nat. Res. Def. Council, Inc. v. Ross, 44 CIT __, __, 456 F. Supp. 3d 1292, 1299 (2020) ("NRDC V") (quoting Rachel Carson, Essay on Biological Sciences, in Good Reading (Atwood Townshend & J. Sherwood Weber eds., 1958)).  In the NRDC line of litigation, this court granted plaintiff environmentalists a preliminarily injunction enjoining imports of fish and fish products from certain Mexican commercial fisheries utilizing gillnets within the vaquita's range.  Id. at 1294–95.  Ultimately, the Defendant United States there chose to expand upon the resulting embargo, thus finally resolving that "tortuous" dispute.  See id. at 1298–99; see also infra note 7.

sixty-four remaining individuals.[3]   The court last addressed the Māui dolphin in granting a

voluntary remand to Defendants -- several United States agencies and officials (collectively "the

United States" or "the Government") -- so that the U.S. Department of Commerce ("Commerce")

could reconsider its rejection of Plaintiffs Sea Shepherd New Zealand Ltd. and Sea Shepherd

Conservation Society's (collectively "Plaintiffs")[4] petition for emergency rulemaking to ban

imports of fish and fish products from New Zealand caught using fishing technology that kills or

seriously injures Māui dolphins in excess of U.S. standards under the Marine Mammal Protection

Act ("MMPA").  See Sea Shepherd N.Z. v. United States, 44 CIT __, __, 469 F. Supp. 3d 1330,

1337–38 (2020) ("Sea Shepherd I").  That statute -- the MMPA -- aims to protect marine mammals

by setting forth standards applicable to both domestic commercial fisheries and to foreign fisheries,

like those in New Zealand, that wish to export their products to the United States.  Upon voluntary

remand, Commerce again rejected Plaintiffs' petition for emergency rulemaking and issued

determinations to two New Zealand fisheries certifying their "comparability" with U.S. standards.

Before the court, in a suit asserting three claims for relief, Plaintiffs maintain that New

Zealand gillnet and trawl fisheries are killing Māui dolphins in excess of U.S. standards.

Accordingly, Plaintiffs allege in their first claim that the United States has unlawfully withheld

agency action by failing to ban New Zealand's associated imports of fish and fish products;

---

[3]   See  Facts  About  Hector's  &  Māui  Dolphin,  Dep't  of  Conservation,
www[.]doc[.]govt[.]nz/nature/native-animals/marine-mammals/dolphins/maui-dolphin/facts/
(last visited Nov. 22, 2022).  [Please note, in order to disable links to outside websites, the court
has removed the "http" designations and bracketed the periods within all hyperlinks.  For archived
copies of the webpages cited in this opinion, please consult the docket.]

[4] Sea Shepherd New Zealand Ltd. is a registered New Zealand charity whose purpose is to protect
and preserve New Zealand's ocean environment, see First Suppl. Compl. ¶ 16, Nov. 24, 2020, ECF
No. 46, and Sea Shepherd Conservation Society is a 501(c)(3) international nonprofit corporation
incorporated in Oregon dedicated to safeguarding the biodiversity of the planet's ocean
ecosystems, see id. ¶ 17.

Plaintiffs further allege in their second and third claims, respectively, that the United States acted arbitrarily, capriciously, and otherwise not in accordance with law both by denying Plaintiffs' petition for emergency rulemaking and by granting findings of comparability to New Zealand. Pending final resolution on the merits, Plaintiffs ask the court to preliminarily enjoin New Zealand's implicated imports. By contrast, the United States and the Government of New Zealand -- as Defendant-Intervenor -- ask the court to dismiss Plaintiffs' claim of agency action unlawfully withheld and to otherwise deny Plaintiffs' Preliminary Injunction Motion.

The court grants Defendants' Motion to Dismiss Plaintiffs' First Claim of agency action unlawfully withheld because Commerce "acted" by denying Plaintiffs' petition for emergency rulemaking and by granting comparability findings to New Zealand; as to Plaintiffs' second and third claims alleging that such agency action was arbitrary, capricious, or otherwise not in accordance with law, the court grants Plaintiffs a preliminary injunction -- the scope of which is defined herein -- pending final resolution on the merits because the factors that guide the court's grant of injunctive relief favor Plaintiffs.

## BACKGROUND

### I.    *Legal Background*

The court begins by setting out the overarching statutory and regulatory frameworks necessary to contextualize Plaintiffs' challenge; in the forthcoming discussion of specific issues, infra pp. 32–56, the court will expand upon certain legal provisions as relevant and necessary.

#### A.    *The Marine Mammal Protection Act*

Congress enacted the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361 et seq., to protect marine mammal species that "are, or may be, in danger of extinction or depletion

as a result of man's activities," id. § 1361(1), from "diminish[ing] below their optimum sustainable

population," id. § 1361(2).

     Accordingly, Congress imposed -- with limited exceptions -- a "moratorium on the taking[5]

and importation of marine mammals and marine mammal products," id. § 1371(a) (footnote not in

original), so that "the incidental kill or incidental serious injury of marine mammals permitted in

the course of commercial fishing operations [may] be reduced to insignificant levels approaching

. . . zero," id. § 1371(a)(2) (hereinafter "the Zero Mortality Rate Goal").  As part of the Zero

Mortality Rate Goal, paragraph 1371(a)(2) further instructs that "[t]he Secretary of the Treasury[6]

shall ban the importation of commercial fish or products from fish which have been caught with

commercial fishing technology which results in the incidental kill or incidental serious injury of

ocean mammals in excess of United States standards."  Id. § 1371(a)(2) (hereinafter "Import

Provision") (footnote not in original).

     The MMPA does not otherwise define the phrase "United States standards," 16 U.S.C. §

---

[5] "The term 'take' means to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." Id. § 1362(13).

[6] The MMPA is found within Chapter 31 on Marine Mammal Protection of Title 16 of the U.S. Code.  Subparagraph 1362(12)(A)(i) of 16 U.S.C. establishes, in relevant part, that "for the purposes of this chapter" "the term 'Secretary' means" "the Secretary of the department in which the National Oceanic and Atmospheric Administration ['NOAA'] is operating, . . . with respect to members of the order Cetacea." 16 U.S.C. § 1362(12)(A)(i).  The "order Cetacea" includes "any member of an entirely aquatic group of mammals commonly known as whales, dolphins, and porpoises." See Cetacean, Encyc. Britannica Online, www[.]britannica[.]com/animal/cetacea (last visited Nov. 22, 2022).

     Consistently, NOAA -- which falls within the Department of Commerce -- has interpreted § 1371(a)(2)'s directive that "[t]he Secretary of the Treasury shall ban importation of . . . fish or products from fish . . . caught . . . in excess of United States standards" to apply to it in cooperation with the Departments of the Treasury and Homeland Security.  See Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act, 75 Fed. Reg. 22,731, 22,731 (Dep't Commerce Apr. 30, 2010); see also Fish and Fish Import Provisions of the Marine Mammal Protection Act, 81 Fed. Reg. 54,390, 54,394 (Dep't Commerce Aug. 15, 2016).

1371(a)(2), but this court has identified certain markers throughout the statute that illuminate the

concept.  See Nat. Res. Def. Council, Inc. v. Ross, 42 CIT __, __, 331 F. Supp. 3d 1338, 1355,

1363 (2018) ("NRDC I").[7]  One such marker of "United States standards" is the "Potential

Biological Removal" level, or "PBR," which is the "maximum number of animals, not including

natural mortalities, that may be removed from a marine mammal stock while allowing that stock

to reach or maintain its optimum sustainable population."  16 U.S.C. §§ 1362(20), 1386(a)(6).

Where commercial fishing causes mortality of a marine mammal population in excess of PBR,

NOAA is required to develop a "Take Reduction Plan" with measures to reduce fishery-related

mortalities to less than PBR within six months and to reduce mortality and/or serious injury of

marine mammals incident to commercial fishing to insignificant levels approaching zero within

five years.  Id. §§ 1387(f)(1)–(2), (5), 1362(19).

In addition to the Zero Mortality Rate Goal, PBR, and Take Reduction Plans, further

statutory markers of "United States standards" include, but are not necessarily limited to,

monitoring of "incidental takes," also referred to as "bycatch," id. § 1387(d), as well as stock

assessments -- which document a marine mammal species' population abundance and the fisheries

that interact with them, see id. § 1386.  For purposes of assessing whether "United States

standards" have been exceeded, the Secretary "shall insist on reasonable proof from the

government of any nation from which fish or fish products will be exported to the United States

---

[7] In proceeding under the MMPA and filing a motion for preliminary injunction to compel the
Secretary of Commerce to implement an import ban, Plaintiffs here are building upon a legal
theory first presented to this court in the aforementioned litigation involving Mexico's vaquita.
See NRDC I, 331 F. Supp. 3d 1338; Nat. Res. Def. Council, Inc. v. Ross, 42 CIT __, 331 F. Supp.
3d 1381 (2018); Nat. Res. Def. Council, Inc. v. Ross, 42 CIT __, 348 F. Supp. 3d 1306 (2018);
Nat. Res. Def. Council, Inc. v. Ross, 774 F. App'x. 646 (Fed. Cir. 2019); NRDC V, 456 F. Supp.
3d 1292.

of the effects on ocean mammals of the commercial technology in use for such fish or fish products." Id. § 1371(a)(2)(A).

### B.    NOAA's Imports Regulation

NOAA supplemented the MMPA's markers of "United States standards" through the promulgation of agency regulations in August 2016. See 50 C.F.R. Part 216 (hereinafter "Imports Regulation"); see also Fish and Fish Product Import Provisions of the Marine Mammal Protection Act, 81 Fed. Reg. 54,390 (Dep't Commerce Aug. 15, 2016).

For example, NOAA's Imports Regulation requires foreign harvesting nations to secure "comparability findings" for their fisheries importing fish and fish products into the United States, see 50 C.F.R. § 216.24(h)(1)(i), and establishes that any fish or fish product harvested in a fishery for which a valid comparability finding is not in effect is in excess of "U.S. standards," and thereby prohibited from import.[8,9]  Receipt of a comparability finding from NOAA signifies that a nation's

---

[8] 50 C.F.R. § 216.24(h)(1)(i) provides in relevant part:

> [T]he importation of commercial fish or fish products which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of U.S. standards or caught in a manner which the Secretary has proscribed for persons subject to the jurisdiction of the United States are prohibited.  For purposes of paragraph (h) of this section, a fish or fish product caught with commercial fishing technology which results in the incidental mortality or incidental serious injury of marine mammals in excess of U.S. standards is any fish or fish product harvested in an exempt or export fishery for which a valid comparability finding is not in effect.

[9] The Regulation further instructs that "[t]he prohibitions of paragraph (h)(1) . . . shall not apply during the exemption period," 50 C.F.R. § 216.24(h)(2)(ii), which is the one-time, seven-year period that commenced on January 1, 2017, id. § 216.3; see also Modification of Deadlines Under the Fish and Fish Product Import Provisions of the Marine Mammal Protection Act, 87 Fed. Reg. 63,955 (Dep't Commerce Oct. 21, 2022) ("Deadline Modification").  As such, in the ordinary case, the exemption period for securing a comparability finding will end on January 1, 2024, after which fish caught in a foreign fishery without a valid comparability finding will be in excess of "U.S. standards" and prohibited from import by operation of the Imports Regulation and the MMPA. See 50 C.F.R. § 216.24(h)(1)(i); see also 16 U.S.C. § 1371(a)(2).

fisheries satisfy the mandatory conditions set out in 50 C.F.R. § 216.24(h)(6)(iii) as well as "the additional considerations . . . in paragraph (h)(7) of th[at] section."[10]  Id. § 216.3.  A foreign harvesting nation seeking a comparability finding bears the burden to submit "reasonable proof" as to the effects of its fisheries on marine mammals.  See 50 C.F.R. § 216.24(h)(6)(i).

### C.    Emergency Rulemaking

Where a fishery is having or is likely to have an immediate and significant adverse impact on a marine mammal stock interacting with that fishery, both the MMPA and NOAA's Imports Regulation provide for emergency rulemaking to curtail such effect.  See 16 U.S.C. § 1387(g)(1) (emergency rulemaking provision covering U.S. domestic fisheries); see also 81 Fed. Reg. at 54,395 (proposal to extend the MMPA's emergency rulemaking provision to foreign fisheries); 50 C.F.R. § 216.24(h)(8)(vii)(A) (empowering NOAA -- upon its own initiative or by request of third parties -- to reconsider a comparability finding where evidence suggests the foreign fishery no longer satisfies the regulatory requirements).

### II.    Factual Background

This case concerns the plight of the Māui dolphin, the world's smallest dolphin,[11] found only in the waters around New Zealand.  See First Suppl. Compl. ¶ 51, Nov. 24, 2020, ECF No.

---

However, "nothing prevents a nation from . . . seeking a comparability finding during the [seven]-year exemption period."  Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act-Notification of Rejection of Petition and Issuance of Comparability Findings, 85 Fed. Reg. 71,297, 71,297 (Dep't Commerce Nov. 9, 2020), P.R. 1 ("Comp. Finding Determ.").  As established, infra, the Government of New Zealand requested early comparability findings for two fisheries, thereby rendering those fisheries "under the full effect of the [Imports Regulation]."  See Mem. from A. Cole to C. Oliver, re: Decision Mem. for the Den. of Pet. for Rulemaking and Issuance of a Comparability Finding for the Gov't of N.Z. at 2, 8 (Dep't Commerce Oct. 27, 2020), P.R. 3104 ("Dec. Mem.").

[10] These regulatory conditions will be examined in greater detail, infra pp. 34–39.

[11] Supra note 3.

46 ("First Suppl. Compl."); see also N.Z. Gov't Answer to Compl. ¶ 39,[12] July 15, 2020, ECF No.

14 ("N.Z. Answer"); Mem. from A. Cole to C. Oliver, re: Decision Mem. for the Den. of Pet. for

Rulemaking and Issuance of a Comparability Finding for the Gov't of N.Z. at 1 (Dep't Commerce

Oct. 27, 2020), P.R. 3104[13] ("Dec. Mem.").    The Māui dolphin is a subspecies of and

morphologically indistinguishable from the more populous Hector's dolphin, differentiable only

by a DNA sequence.  See First Suppl. Compl. ¶ 52; see also Dec. Mem. Attach. A at 25; N.Z. Dec.

Letter re: Hector's and Māui Dolphin Threat Mgmt. Plan at 3 (N.Z. Gov't), P.R. 580 ("N.Z. TMP

Letter").

        In 1999, the New Zealand Minister of Conservation designated the Māui dolphin a

"threatened species." First Suppl. Compl. ¶ 71; N.Z. Answer ¶ 58.  The United States has, likewise,

---

[12] The court notes that the paragraph numbers in the Government of New Zealand's Answer correspond to those in Plaintiffs' Original Complaint. While Plaintiffs amended their Complaint on several occasions, see Compl., May 21, 2020, ECF No. 5 ("Original Compl."); First Am. Compl., July 20, 2020, ECF No. 23; First Suppl. Compl., the Government of New Zealand did not likewise amend its Answer.  As such, the court has cross-checked all factual admissions in New Zealand's Answer against both Plaintiffs' First Supplemental and Original Complaints.  Compare First Suppl. Compl. ¶ 51 ("Māui dolphins, found only in the inshore waters around New Zealand's North Island, are on the verge of extinction." (emphasis added)), with Original Compl. ¶ 39 ("The Māui dolphin is one of two imperiled subspecies of Hector's dolphin, both subspecies being endemic to New Zealand's waters." (emphasis added)), with N.Z. Answer ¶ 39 ("Admits that the [M]āui dolphin is endangered.  Denies that the Hector's dolphin is imperiled.  Otherwise admits." (emphasis added)).

        Defendant United States has not likewise filed an answer because on January 27, 2021, the United States filed a Partial Motion to Dismiss in lieu of an answer.  See U.S. Gov't Mot. to Dismiss Count I of Suppl. Compl., Jan. 27, 2021, ECF No. 58 ("Defs.' Mot. to Dismiss").  See generally 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1346 (3d ed. 2022) (collecting cases illuminating the majority view that filing a partial motion to dismiss stays the time for filing an answer as to other portions of the pleading).  As there is no answer from the Defendant, the court derives the United States' position on factual matters from NOAA's decision memo denying Plaintiffs' petition for emergency rulemaking and granting comparability findings to New Zealand.  See, e.g., Dec. Mem.

[13] The court notes that unless otherwise specified, public record ("P.R.") page numbers reflect those listed in the Supplemental Administrative Record Index, Nov. 23, 2020, ECF No. 44-2, compiled following the August 13, 2020 remand.

listed the Māui dolphin as "endangered" under the Endangered Species Act, 16 U.S.C. § 1531 et seq.  See Endangered and Threatened Wildlife and Plants: Final Rule to List the Māui Dolphin as Endangered and the South Island Hector's Dolphin as Threatened Under the Endangered Species Act, 82 Fed. Reg. 43,701 (Dep't Commerce Sept. 19, 2017).  And the International Union for Conservation of Nature ("IUCN") considers the Māui dolphin to be "critically endangered."  See Dec. Mem. at 1–2; see also The IUCN Red List of Threatened Species: Cephalorhynchus hectori ssp. Māui (2013), P.R. 883.

Beyond its perilous state, remaining points of agreement regarding the Māui dolphin are few:  Parties agree that Māui dolphins have a lifespan of approximately 25 years, low reproductivity, and late onset sexual maturity, see First Suppl. Compl. ¶ 53; see also N.Z. Answer ¶ 40; however, parties hotly contest the population's current abundance, habitat range, and vulnerability to certain threats.

Concerning abundance, Plaintiffs submit that the estimated population of Māui dolphins has declined from 2,000 individuals in 1970 to fifty-seven dolphins in 2016, see First Suppl. Compl. ¶ 51, with only fourteen to seventeen breeding-age females remaining, see Pls.' Renewed Mot. for Prelim. Inj. at 3, Dec. 11, 2020, ECF No. 49 ("Pls.' Ren. PI Mot.").  By contrast, NOAA and the Government of New Zealand assert a less dramatic decline -- they maintain the Māui dolphin population has decreased from around 200 individuals in 1970 to sixty-three individuals today, with twenty to thirty-five adult females remaining, see Dec. Mem. Attach. A at 6; see also Māui Dolphins: Application for a Comparability Finding at 6, app. A at vi, app. B at vii–viii (N.Z. Gov't Sept. 2020), P.R. 94 ("N.Z. Comp. Finding App.").

Concerning the Māui dolphin's habitat range, NOAA and the Government of New Zealand submit that the Māui dolphin's "core range" is concentrated around the west coast of New

Zealand's North Island within the 50-meter[14] contour line from the shore, See Dec. Mem. Attach. A at 7–8; N.Z. Comp. Finding App. at 8–9, 11, which they assess represents "approximately 83% (summer) and 76% (winter) of the dolphin distribution," see Dec. Mem. Attach. A at 7; N.Z. Comp. Finding App. at 11.  Furthermore, both NOAA and the New Zealand Government maintain that the Māui dolphin's range extends to neither the interior of harbors, see Dec. Mem. Attach. A at 7; N.Z. Comp. Finding App. at 14, nor to the east coast of the North Island, see Dec. Mem. Attach. A at 11–13; N.Z. Comp. Finding App. at 12.  For their part, Plaintiffs agree that the largest subpopulation of Māui dolphins exists along the west coast of the North Island, but they maintain that this includes harbors.  Pls.' Ren. PI Mot. at 4.  Moreover, Plaintiffs submit that "smaller subpopulation[s] of [Māui dolphins] exist[] along the northern coastline of the Cook Strait" -- at the southern end of the North Island -- "and along the east coast of the North Island," and that the Māui dolphin's "offshore range extends to at least the 100-meter depth contour."  Id.

Finally, parties agree that commercial fishing poses a threat to Māui dolphins, particularly set net and trawl fishing,[15] see First Suppl. Compl. ¶ 56; Implementation of Fish and Fish Product

---

[14] NOAA and the Government of New Zealand diverge in their assessments of dolphin presence beyond the 50-meter depth contour.  Compare Dec. Mem. Attach. A at 8 ("Generally, according to population surveys, 59.2% of Māui dolphins are distributed between zero and 25 meters, 34.7% of Māui dolphins are distributed between 25 and 50 meters, and only 6.1% of Māui dolphins are distributed between 50 to 100 meters."), with N.Z. Comp. Finding App. at 14 ("References to the 100 m depth contour as a limit for the dolphin distribution are unsupported by evidence . . . [T]he outer limit of higher dolphin density would most closely follow the 30 m depth contour in summer, or the 50 m depth contour in winter.").  Nevertheless, NOAA and the New Zealand Government agree that the Māui dolphin's "core range" falls within the 50-meter contour.

[15] Set nets, also known as gillnets, "are a type of non-selective fishing net that is hung vertically in the water for hours or . . . days . . . to harvest marine fish and other species," First Suppl. Compl. ¶ 56, and "[t]rawl fishing is another type of indiscriminate fishing method whereby . . . boats drag a large net through the water column, catching almost everything in the net's path," id.  Parties disagree somewhat on whether set nets or trawls pose a greater threat to Māui dolphins.  Compare Pls.' Ren. PI Mot. at 6 ("Significantly more trawling occurs than gillnetting, likely making total bycatch from trawling greater than bycatch from gillnets. . . . However, . . . a typical gillnet is

Import Provisions of the Marine Mammal Protection Act-Notification of Rejection of Petition and Issuance of Comparability Findings, 85 Fed. Reg. 71,297, 71,298 (Dep't Commerce Nov. 9, 2020), P.R. 1 ("Comp. Finding Determ."); N.Z. Comp. Finding App. at 16; however, parties disagree as to the scope of the threat posed by commercial fishing, compare First Suppl. Compl. ¶ 99 ("Bycatch of Māui dolphins . . . is the primary threat to the dolphins' survival."), with N.Z. Answer ¶ 79 ("Denie[d]"), and Dec. Mem. at 2 (identifying "other non-fishing threats" to Māui dolphins).

Plaintiffs submit that the annual bycatch of Māui dolphins from fishing is between 1.5 to 2.4 animals per year. See First Suppl. Compl. ¶ 69. By contrast, NOAA and the Government of New Zealand maintain that there have been no documented Māui dolphin mortalities associated with commercial fishing since 2012 and that fishing has only been implicated in five Māui/Hector's dolphins' deaths between 1921 and the present. See Dec. Mem. Attach. A at 22; N.Z. Comp. Finding App. app. F at i–iii. Although the cause of death is indeterminate, parties each report that a female Māui dolphin's carcass was found on a beach along the North Island's west coast on February 25, 2021. See Pls.' Resp. to Ct.'s Qs. at 1, June 29, 2021, ECF No. 73 ("Pls.' OA Subm.") (citing a pathology report from New Zealand's School of Veterinary Science);[16] U.S. Gov't Resp. to Ct.'s Qs. at 1, June 29, 2021, ECF No. 71 ("Defs.' OA Subm.") (citing same); N.Z. Gov't Resp. to Ct.'s Qs. at 1, June 29, 2021, ECF No. 72 ("Def.-Inter.'s OA

---

estimated to be 20 to 30 times more likely to capture or kill a dolphin than a trawl."), with Dec. Mem. Attach. A at 29 ("Commercial set-net fisheries pose a much higher bycatch risk to Māui dolphins than do inshore trawl fisheries"), and N.Z. Comp. Finding App. app. G at v ("[D]olphin vulnerability (i.e. catchability . . .) is substantially higher in set nets than in trawls.").

[16] New Zealand's Department of Conservation posted the pathology report to its website, enabling this court to take judicial notice of it. See Klamath Claims Comm. v. United States, 541 F. App'x. 974, 979 n.8 (Fed. Cir. 2013) (explaining that government records may be "judicially noticed"); see also Pathology Report for Māui Dolphin Found Beachcast at Muriwai on 25 February 2021, Dep't of Conservation, www[.]doc[.]govt[.]nz/globalassets/documents/conservation/native-animals/marine-mammals/hectors-maui-incidents/h291[.]pdf (last visited Nov. 22, 2022).

Subm.") (attaching same).

     Precise mortality numbers and causes aside, because all parties agree that the Māui dolphin's situation is precarious, the Government of New Zealand began imposing certain restrictions on gillnet and trawl fishing to protect the Māui dolphin in 2003. <u>See</u> First Suppl. Compl. ¶ 60; N.Z. Answer ¶ 47. Moreover, in 2007, New Zealand introduced a Threat Management Plan ("TMP") "to effectively manage human-induced threats to Hector's dolphins (including Māui's dolphins)."[17] <u>See</u> Hector's and Māui's Dolphin Threat Mgmt. Plan Draft for Pub. Consult. at 8 (N.Z. Gov't Aug. 29, 2007), P.R. 4614[18] ("2007 Draft TMP"); First Suppl. Compl. ¶ 73; N.Z. Answer ¶ 60.

     In 2017, a group of experts submitted a report to the International Whaling Commission ("IWC")[19] Scientific Committee calculating a PBR that only one Māui dolphin could be removed

---

[17] New Zealand's TMP is not a statutory document. <u>See</u> First Suppl. Compl. ¶ 73; N.Z. Answer ¶ 60 (admitted). This stands in contrast to a Population Management Plan ("PMP"), which if enacted would require the New Zealand Government to facilitate the Māui dolphin's achievement of non-threatened status within twenty years. <u>See</u> Marine Mammals Protection Act 1978, s 3E–F (N.Z.) (instructing, in relevant part, that where a PMP is approved for "any threatened species," the Minister of Fisheries "shall determine a level of fishing-related mortality which should allow the species to achieve non-threatened status as soon as reasonably practicable, and in any event within a period not exceeding 20 years").

     In the draft TMP for Hector's and Māui dolphins made available for public comment in August 2007, the New Zealand Government explained that "[the] Government has a general policy position that threatened species numbers should be increased to reach non-threatened status. However, in the absence of a Population Management Plan issued under the Marine Mammal Protection Act there is no obligation to require such a rebuild to occur." <u>See</u> Hector's and Māui's Dolphin Threat Mgmt. Plan Draft for Pub. Consult. at 11 (N.Z. Gov't Aug. 29, 2007), P.R. 4614 ("2007 Draft TMP"). [Please note, the P.R. number here reflects that listed in the Administrative Record Index, Nov. 23, 2020, ECF No. 44-1.]

[18] <u>See</u> Admin. R. Index, Nov. 23, 2020, ECF No. 44-1.

[19] "The IWC was established in 1946 as the global body responsible for management of whaling and conservation of whales. Today the IWC has 88 member countries," including the United States and New Zealand. <u>See</u> <u>The Int'l Whaling Comm'n – IWC</u>, Int'l Whaling Comm'n, iwc[.]int/en/ (last visited Nov. 22, 2022); <u>see also</u> <u>Membership & Cont. Gov'ts</u>, Int'l Whaling Comm'n, iwc[.]int/commission/members (last visited Nov. 22, 2022).

from the population roughly every 20 years to allow Māui dolphins to reach or maintain their optimum sustainable population. See First Suppl. Compl. ¶ 57; N.Z. Answer ¶ 44 (acknowledging the report). While the Government of New Zealand "[d]enies that the IWC correctly calculated the PBR for the [M]āui dolphin in 2017," N.Z. Answer ¶ 44, New Zealand initiated a process to revise its TMP for Hector's and Māui dolphins in 2018, see First Suppl. Compl. ¶ 80; N.Z. Answer ¶ 67.

### III.  *Procedural Background*

Assessing that bycatch of Māui dolphins had exceeded the PBR calculated for the IWC Scientific Committee -- and thereby contravened "United States standards" for purposes of the MMPA's Import Provision -- on February 6, 2019, Plaintiffs submitted a formal petition to the United States Government asking it to utilize its rulemaking authority[20] to ban the import of fish and fish products originating from New Zealand fisheries in the Māui dolphin's range[21] that employ either gill nets or trawls. See Pls.' Feb. 6, 2019 Māui Dolphin Pet. at 3, 12 (Feb. 6, 2019), P.R. 1[22] ("Pls.' Feb. 2019 Pet.").

On July 10, 2019, NOAA rejected Plaintiffs' February 2019 petition. See Notification of the Rejection of the Petition to Ban Imports of All Fish and Fish Products from New Zealand That

---

[20] Plaintiffs urged the Government to impose the requested ban pursuant to subsection 553(e) of the Administrative Procedure Act ("APA"), which provides: "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e).

[21] In their original petition, Plaintiffs asked the Government to ban imports from fisheries along the west coast of New Zealand's North Island only. See Pls.' Feb. 2019 Pet. at 21. Plaintiffs identified species of fish caught by gill nets or trawls (or both) to be banned, which included: (1) snapper (trawl and set gillnet); (2) tarakihi (set gillnet and trawl); (3) spotted dogfish (set gillnet and trawl); (4) trevally (set gillnet and trawl); (5) warehou (trawl); (6) hoki (trawl); (7) barracouta (trawl); (8) flounder (trawl and set gillnet); (9) mullet (set net and inshore drift net); and (10) gurnard (set net and trawl). See id. at 21–25.

[22] See Admin. R. Index, Nov. 23, 2020, ECF No. 44-1.

Do Not Satisfy the Marine Mammal Protection Act, 84 Fed. Reg. 32,853 (Dep't Commerce July

10, 2019), P.R. 5426.[23]  In so rejecting, NOAA assessed that the Government of New Zealand's

regulatory program was "comparable in effectiveness" to that of the United States because:

> 1. New Zealand has in place an existing regulatory program to reduce Māui dolphin bycatch.
> 2. Through its 2019 risk assessment, New Zealand evaluated the effectiveness of this regulatory program in meeting bycatch reduction targets . . . .
> 3. Based on the 2019 assessment, New Zealand is now proposing additional regulatory measures which, when fully implemented, will likely further reduce risk and Māui dolphin bycatch below Potential Biological Removal level (PBR).

Id. at 32,854.

Plaintiffs responded to NOAA's denial by filing suit against the United States in this court

on May 21, 2020.  See Original Compl.  In their Complaint, Plaintiffs asserted two claims:  First,

that NOAA unlawfully withheld or unreasonably delayed agency action in violation of section

706(1) of the Administrative Procedure Act ("APA"), see 5 U.S.C. § 706(1), by failing to ban the

import of commercial fish and products from fish caught using gillnet and trawls in the Māui

dolphin's range in excess of U.S. standards;[24] and second, that NOAA's denial of Plaintiffs'

petition for emergency rulemaking was arbitrary, capricious, an abuse of discretion, and otherwise

not in accordance with law under section 706(2)(A) of the APA, see 5 U.S.C. § 706(2)(A).  See

Original Compl. ¶¶ 84–88, 89–94.

---

[23] Id.

[24] In their Complaint, Plaintiffs requested a trade ban covering a larger geographic area than the one specified in their original petition.  Compare Pls.' Feb. 2019 Pet. at 21 ("[A]ny fishery using gillnets or trawls that interacts with Māui dolphins in its habitat along the west coast of New Zealand's North Island does not meet U.S. standards under the MMPA." (emphasis added)), with Original Compl. ¶¶ 41–42 (asserting "[t]he Māui dolphin's range extends around the North Island coastline" to "[t]he 100-meter depth contour" (emphasis added)).  Plaintiffs maintain they based this range expansion on Māui dolphin sighting information received under New Zealand's Official Information Act after Plaintiffs had submitted their original petition.  See Pls.' Aug. 27, 2020 Suppl. Māui Dolphin Pet. at 4, 8 (Aug. 27, 2020), P.R. 5 ("Pls.' Suppl. Pet.").

Meanwhile, on June 24, 2020, the Government of New Zealand announced new fishing measures -- derived from its review of the Hector's and Māui dolphins TMP begun in 2018 -- to reduce Māui dolphin bycatch.  See N.Z. TMP Letter at 1.  The New Zealand Government represented that these new rules, effective October 1, 2020, would:

> • extend existing, and create new, areas that prohibit the use of commercial and recreational set-nets in both the North Island and South Island, which will address the main fisheries risk to both Māui and Hector's dolphins;
>
> • extend the closure to trawl fishing within the central Māui dolphin habitat zone;
>
> • put in place a fishing-related mortality limit of one Māui or Hector's dolphin within the Māui dolphin habitat zone;[25]
>
> • prohibit the use of drift nets in all New Zealand waters; and
>
> • enable the use of commercial ring nets in existing set-net prohibition areas within west coast North Island harbours, as this is a fishing method that poses a low risk to these dolphins.

Id.

Plaintiffs moved for a preliminary injunction on their first claim for relief on July 1, 2020.  See Pls.' Mot. for a Prelim. Inj. on First Cl. for Relief, July 1, 2020, ECF No. 11 ("Pls.' Original PI Mot.").[26]  In said motion, Plaintiffs argued that New Zealand's approach to Māui dolphin

---

[25] New Zealand codified this "mortality limit" in its Fisheries (Commercial Fishing) Regulations 2001, s 52D–E (N.Z.) and Fisheries (Amateur Fishing) Regulations 2013, s 155O–P (N.Z.).  See N.Z. Comp. Finding App. at 31.  In its analysis of New Zealand's regulatory program, NOAA refers to this "mortality limit" as New Zealand's "Management Review Trigger."  See Dec. Mem. Attach. A at 34 n.142.

[26] Plaintiffs attached several declarations to their Preliminary Injunction Motion from scientific experts and members of their organizations.  See Decl. of Brett Sommermeyer, July 1, 2020, ECF No. 11-1; Decl. of Prof. Elisabeth Slooten, July 1, 2020, ECF No. 11-2; Decl. of Dr. Glenn Simmons, July 1, 2020, ECF No. 11-3; Decl. of Dr. Timothy Ragen, July 1, 2020, ECF No. 11-4; Decl. of Michael Janisch-Lawry, July 1, 2020, ECF No. 11-5; Decl. of Paul Watson, July 1, 2020, ECF No. 11-6; Decl. James Boshier, July 1, 2020, ECF No. 11-7; Decl. of Sylvia Philcox, July 1, 2020, ECF No. 11-8; Decl. of Jennifer Matiu, July 1, 2020, ECF No. 11-9; Decl. of Richard Hay, July 1, 2020, ECF No. 11-10; Decl. of Aleisha Dockery, July 1, 2020, ECF No. 11-11.  See generally 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2949

conservation was not aligned with U.S. standards, and consequently, that the United States had "illegally failed" for purposes of section 706(1) of the APA "to carry out the[] discrete and mandatory duty to ban imports that threaten the continued existence of the Māui dolphin" under the MMPA's Import Provision, 16 U.S.C. § 1371(a)(2).  Id. at 22–23.  Plaintiffs further argued that New Zealand's newly announced measures only "incrementally extend[ed] gillnet and trawl restrictions along the west coast of the North Island" and "d[id] not go nearly far enough to protect Māui dolphins."  Id. at 16.

By contrast, on belief that the revised TMP and attendant regulations were comparable to U.S standards under the MMPA, on July 15, 2020, the Government of New Zealand requested that NOAA perform a comparability assessment for two gear-based, multi-species fisheries -- referred to as the "West Coast North Island inshore trawl fishery" and the "West Coast North Island inshore set net fishery"[27] -- pursuant to NOAA's Imports Regulation.  See N.Z. Letter re: Comparability Assessment of Hector's and Māui Dolphin Threat Mgmt. Plan (N.Z. Gov't July 15, 2020), P.R. 93; see also N.Z. Comp. Finding App. at 38–41.

In light of certain assessed differences between Plaintiffs' May 21, 2020 Complaint and the February 6, 2019 petition, supra note 24 and accompanying text, as well as New Zealand's June 24, 2020 issuance of new fisheries measures and July 15, 2020 request for a comparability assessment, on July 17, 2020, the United States asked this court for a voluntary remand to

---

(3d ed. 2022) ("Affidavits are appropriate on a preliminary-injunction motion and typically will be offered by both parties." (footnote omitted)).

[27] New Zealand's Application identified target fish species associated with each of these two fisheries, respectively.  See N.Z. Comp. Finding App. at 40–41.  The enumerated target fishes collectively covered all of the species identified in Plaintiffs' petition, compare id., with Pls.' Feb. 2019 Pet. at 21–25, except for flounder, which NOAA associates with fisheries in the east coast of the North Island and South Island, see 2020 Final List of Foreign Fisheries at 163–68 (Dep't Commerce 2020), P.R. 2123.

reconsider the denial of Plaintiffs' petition.  <u>See</u> U.S. Gov't Partial Consent Mot. to Remand Case,

July 17, 2020, ECF No. 17.[28],[29]   The court heard oral argument on the United States' Remand

Motion on August 6, 2020, <u>see</u> Oral Arg. on Defs.' Remand Mot., Aug. 6, 2020, ECF No. 34, and

granted the Government's request on August 13, 2020, <u>see</u> Ct. Order Granting Defs.' Mot. for

Voluntary Remand, Aug. 13, 2020, ECF No. 39.  In so granting, the court afforded Plaintiffs the

opportunity to supplement their petition for emergency rulemaking on remand and ordered NOAA

to file its redetermination results with the court by October 30, 2020.  <u>See</u> <u>Sea Shepherd I</u>, 469 F.

Supp. 3d at 1337–38.

Consistent with the court's order, on August 27, 2020, Plaintiffs submitted a supplemental

petition to NOAA officially broadening its request that the United States "ban the import of all

fish and fish products originating from fisheries in the entirety of the Māui dolphin's current and

historical range, which includes the entire coastline of the North Island out to the 100m depth

contour, that employ either set nets or trawls."  <u>See</u> Pls.' Aug. 27, 2020 Suppl. Māui Dolphin Pet.

at 5 (Aug. 27, 2020), P.R. 5 ("Pls.' Suppl. Pet.").[30]  Plaintiffs argue that per the U.S. PBR approach

-- which they assess allows the loss of 1 animal every 20.6 years, <u>id.</u> at 15 -- banning trawling and

---

[28] Plaintiffs filed an Amended Complaint on July 20, 2020.  <u>See</u> First Am. Compl.

[29] On July 21, 2020, the court granted the New Zealand Government's Motion to Intervene as
Defendant-Intervenor, <u>see</u> N.Z. Unopp. Mot. to Intervene as Def.-Inter., July 15, 2020, ECF No.
13; Ct. Order Granting N.Z.'s Unopp. Mot. to Intervene as Def.-Inter., July 21, 2020, ECF No. 24.
The court deemed New Zealand's earlier submitted Answer to Plaintiffs' Complaint filed that same
day.  <u>See</u> Ct. Order Deeming N.Z.'s Answer Filed, July 21, 2020, ECF No. 25.

[30] In their August 27, 2020 supplemental petition, Plaintiffs explicitly reincorporated the legal and
factual grounds underpinning their February 6, 2019 petition.  <u>See</u> Pls.' Suppl. Pet. at 5.  Moreover,
Plaintiffs enumerated and "incorporate[d] . . . in their entirety as support for the requested trade
ban" the: (1) First Amended Complaint, ECF No. 23; (2) Original Motion for Preliminary
Injunction, ECF No. 11; (3) Declaration of Professor Elisabeth Slooten, ECF No. 11-2; (4)
Declaration of Dr. Glenn Simmons, ECF No. 11-3; (5) Declaration of Dr. Timothy Ragen, ECF
No. 11-4; and (6) Declaration of Brett Sommermeyer, ECF No. 11-1.  <u>Id.</u> at 6.

set netting <u>throughout</u> the Māui dolphin habitat is required to comport with "United States standards" under the MMPA, <u>id.</u> at 13. As New Zealand's revised TMP and attendant measures do not do that, Plaintiffs maintain the United States must immediately ban imports from all implicated fisheries.[31] <u>Id.</u> at 3, 12–13.

       After providing a ten-day opportunity for public comment on Plaintiffs' supplemental petition, <u>see</u> <u>Notification of Receipt of a Supplemental Petition To Ban Imports of All Fish and Fish Products From New Zealand That Do Not Satisfy the Marine Mammal Protection Act</u>, 85 Fed. Reg. 60,946, 60,946 (Dep't Commerce Sept. 29, 2020), P.R. 25, NOAA again declined to impose Plaintiffs' requested import ban and instead issued comparability findings to New Zealand's West Coast North Island inshore trawl and set net fisheries on November 9, 2020,[32] <u>see</u> <u>Comp. Finding Determ.</u> at 71,298. NOAA reasoned that the Government of New Zealand's "regulatory program, implemented on October 1, 2020, will in all likelihood reduce Māui dolphin bycatch below PBR," Dec. Mem. at 8 -- which NOAA calculated to allow "1 death every 8 years," <u>id.</u> Attach. A at 18 -- and is otherwise comparable in effectiveness to U.S. standards, <u>see</u> <u>Comp. Finding Determ.</u> at 71,298. In so assessing, NOAA rejected Plaintiffs' proposed delineation of the Māui dolphin's habitat. <u>See</u> Dec. Mem. Attach. A at 6 (describing the Māui dolphin as "endemic

---

[31] To the point of implicated fisheries, Plaintiffs note that "since [the] issuance of their original petition, their analysis of New Zealand seafood trade data has identified a larger number of fish species and associated fish products that may originate in Māui dolphin habitat." Pls.' Suppl. Pet. at 20. Plaintiffs elaborate that "at least 33 fish species are caught in water that Māui dolphins inhabit" and that "of those 33 fish species, at least 23 are exported to the U.S." <u>Id.</u> at 19 (internal citations omitted). However, Plaintiffs do not enumerate those twenty-three fish species. <u>Compare</u> <u>id.</u>, <u>with</u> Pls.' Feb. 2019 Pet. at 21–25 (identifying ten fish species caught by gill nets or trawls (or both) along the west coast of New Zealand's North Island).

[32] In accordance with the court's order in <u>Sea Shepherd I</u>, NOAA notified the court and Plaintiffs of its remand determination on October 30, 2020. <u>See</u> 469 F. Supp. 3d at 1333; <u>see also</u> Defs.' Remand Results, Oct. 30, 2020, ECF No. 40.

to the <u>west coast</u> of the North Island" (emphasis added)); <u>supra</u> pp. 10–11 (describing parties'

disagreement regarding the Māui dolphin's habitat range). The issued comparability findings are

to remain in effect through January 1, 2023, subject to revocation by NOAA before that date if

warranted. <u>See</u> <u>Comp. Finding Determ.</u> at 71,297.[33]

   With their petition denied for a second time, Plaintiffs filed a Supplemental Complaint with

this court on November 24, 2020. <u>See</u> First Suppl. Compl. In addition to relodging the two claims

from their Original Complaint,[34] Plaintiffs introduced a third claim in the Supplemental

Complaint, namely that NOAA's grant of comparability findings to the two New Zealand fisheries

was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under

---

[33] On November 30, 2021, pursuant to the procedures set forth in 50 C.F.R. § 216.24(h)(6), the New Zealand Government submitted its Application to secure comparability findings for the period following January 1, 2023. <u>See</u> Joint Status Report in Resp. to Ct.'s Order, Jan. 7, 2022, ECF No. 90. As discussed, <u>infra</u>, NOAA originally anticipated issuing new comparability findings -- to cover the period following January 1, 2023 -- to New Zealand's fisheries on November 30, 2022. <u>See</u> Joint Status Report, Oct. 27, 2022, ECF No. 102; <u>see also</u> U.S. Gov't Resp. to Ct.'s Oct. 28, 2022 Suppl. Qs. at 1–2, Nov. 4, 2022, ECF No. 105 ("Defs.' Add'l Suppl. Qs. Resp."). However, on November 4, 2022, the United States informed the court that NOAA no longer expects to be able to issue new comparability findings to these fisheries prior to the January 1, 2023 expiration. <u>See</u> Defs.' Add'l Suppl. Qs. Resp. at 1–2; <u>see also</u> <u>Deadline Modification</u> (extending the deadline for foreign nations to secure comparability findings from December 31, 2022 to December 31, 2023).

[34] Recall that Plaintiffs' Original Complaint asserted that: (1) NOAA unlawfully withheld or unreasonably delayed agency action in violation of section 706(1) of the APA, <u>see</u> 5 U.S.C. § 706(1), by failing to ban the import of commercial fish and products from fish caught using gillnet and trawls in excess of U.S. standards in the Māui dolphin's range; and (2) that NOAA's denial of Plaintiffs' petition for emergency rulemaking was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under section 706(2)(A) of the APA, <u>see</u> 5 U.S.C. § 706(2)(A). <u>See</u> Original Compl. ¶¶ 84–88, 89–94.

section 706(2)(A) of the APA, <u>see</u> 5 U.S.C. § 706(2)(A).  <u>See</u> First Suppl. Compl. ¶¶ 117–121.[35]

Plaintiffs subsequently filed a Renewed Motion for Preliminary Injunction on December 11, 2020.  <u>See</u> Pls.' Ren. PI Mot.[36]  The United States and the Government of New Zealand responded in opposition to Plaintiffs' Renewed Motion on January 15, 2021.  <u>See</u> U.S. Gov't Resp. in Opp. to Pls.' Renewed Mot. for Prelim. Inj., Jan. 15, 2021, ECF No. 57 ("Defs.' Resp. Br."); N.Z. Gov't Resp. in Opp. to Pls.' Renewed Mot. for Prelim. Inj., Jan. 15, 2021, ECF No. 55 ("Def.-Inter.'s Resp. Br.").  In addition, the United States and the Government of New Zealand each moved to dismiss the first claim of Plaintiffs' Supplemental Complaint.  <u>See</u> U.S. Gov't Mot. to Dismiss Count I of Suppl. Compl., Jan. 27, 2021, ECF No. 58 ("Defs.' Mot. to Dismiss"); N.Z. Gov't Mot. to Dismiss Count I of Suppl. Compl., Jan. 15, 2021, ECF No. 56 ("Def-Inter.'s Mot. to Dismiss").  On February 17, 2021, Plaintiffs filed a Consolidated Reply in Support of the Renewed Motion for a Preliminary Injunction and Response in Opposition to Defendants' and

---

[35] The court notes an apparent typographical error in the paragraph numbering in Plaintiffs' First Supplemental Complaint.  <u>Compare</u> First Suppl. Compl. at 34–36, <u>with</u> <u>id.</u> at 37–38 (repeating paragraph numbers).  The citations to paragraphs herein reflect numbering retabulated by the court.

[36] Along with the Renewed Motion for Preliminary Injunction, Plaintiffs again submitted declarations from scientific experts and members of their organizations.  <u>See</u> Second Decl. of Brett Sommermeyer, Dec. 11, 2020, ECF No. 49-1; Second Decl. of Prof. Elisabeth Slooten, Dec. 11, 2020, ECF No. 49-2; Second Decl. of Dr. Glenn Simmons, Dec. 11, 2020, ECF No. 49-3; Second Decl. of Dr. Timothy Ragen, Dec. 11, 2020, ECF No. 49-4; Second Decl. of Michael Janisch-Lawry, Dec. 11, 2020, ECF No. 49-5; Second Decl. of Paul Watson, Dec. 11, 2020, ECF No. 49-6; Second Decl. James Boshier, Dec. 11, 2020, ECF No. 49-7; Second Decl. of Sylvia Philcox, Dec. 11, 2020, ECF No. 49-8; Second Decl. of Jennifer Matiu, Dec. 11, 2020, ECF No. 41-9; Second Decl. of Richard Hay, Dec. 11, 2020, ECF No. 49-10; Second Decl. of Aleisha Dockery, Dec. 11, 2020, ECF No. 49-11.

These expert declarations were updated to respond to various positions taken in NOAA's Decision Memorandum as well as to certain assertions made by the Government of New Zealand in its Application for Comparability Findings.  Although NOAA relied on the Government of New Zealand's Application throughout its analysis, <u>see, e.g.</u>, Dec. Mem. at nn. 6, 9–10, 24–27; <u>see also</u> Dec. Mem. Attach A at nn. 29, 51, 54–55, 57, 61–63, 66–68, 73, 77–80, 90–92, 104–05, 114–119, 121–22, 125, 128–37, 139–41, 143–46, 149, Plaintiffs maintain that the Application was never made available for public comment, <u>see</u> First Suppl. Compl. ¶ 97.

Defendant-Intervenor's Motion to Dismiss Plaintiffs' First Claim.  See Pls.' Combined Reply Br. in Supp. of Renewed Mot. for Prelim. Inj. and Resp. Br. in Opp. to Fed. Defs.' and Def.-Inter.'s Mots. to Dismiss, Feb. 17, 2021, ECF No. 64 ("Pls.' Resp. Br.").  The United States and New Zealand replied in support of their Motions to Dismiss on March 8, 2021 and March 10, 2021, respectively.  See U.S. Gov't Reply in Supp. of Mot. to Dismiss Count I of Suppl. Compl., Mar. 8, 2021, ECF No. 65 ("Defs.' Reply"); N.Z. Gov't Reply in Supp. of Mot. to Dismiss Count I of Suppl. Compl., Mar. 10, 2021, ECF No. 66 ("Def.-Inter.'s Reply").

In preparation for oral argument, the court issued questions on June 21, 2021, see Ct.'s Qs. for Oral Arg., June 21, 2021, ECF No. 70, to which parties responded in writing on June 29, 2021, see Defs.' OA Subm.; Def.-Inter.'s OA Subm.; Pls.' OA Subm.  Oral argument was held via Webex on July 1, 2021.  See Oral Arg., July 1, 2021, ECF No. 75.  Thereafter, on July 9, 2021, parties each submitted a post-argument brief.  See U.S. Gov't Post Oral Arg. Subm., July 9, 2021, ECF No. 76 ("Defs.' Suppl. Br."); N.Z. Gov't Post Oral Arg. Subm., July 9, 2021, ECF No. 77 ("Def.-Inter.'s Suppl. Br."); Pls.' Post Oral Arg. Subm., July 9, 2021, ECF No. 78 ("Pls.' Suppl. Br.").

As the court was deliberating, on September 13, 2021, Plaintiffs filed a Motion for Leave to Supplement the Evidentiary Record upon which the Renewed Motion for Preliminary Injunction is based.  See Pls.' Mot. for Leave to Suppl. Evid. R. on Renewed Mot. for Prelim. Inj., Sept. 13, 2021, ECF No. 81 ("Pls.' Mot. to Suppl.").  In said motion, Plaintiffs asked the court to consider: (1) the results of the 2020–2021 Māui dolphin population survey completed by New Zealand's Department of Conservation finding that the updated abundance estimate of Māui dolphins aged one year or more is fifty-four individuals; (2) a Third Declaration of Professor Elisabeth Slooten, supra notes 26, 30, 36, interpreting those survey results; and (3) a draft measure published by the

New Zealand Government ostensibly proposing to increase commercial set net and trawl fishing for snapper in the Māui dolphin's undisputed habitat range on the west coast of the North Island. See id. at 1, 5–6, 8.  The United States and the Government of New Zealand each responded in opposition to Plaintiffs' Motion, see U.S. Gov't Resp. in Opp. to Pls.' Mot. to Suppl. the Evid. R., Oct. 1, 2021, ECF No. 83; N.Z. Gov't Resp. in Opp. to Pls.' Mot. to Suppl., Oct. 4, 2021, ECF No. 84, and Plaintiffs filed a Reply Brief after the court granted Plaintiffs' unopposed motion for leave to do so, see Pls.' Unopp. Mot. for Leave to File a Reply to Pls.' Mot. to Suppl. Evid. R. on Renewed Mot. for a Prelim. Inj., Oct. 18, 2021, ECF No. 85; Ct. Order Granting Unopp. Mot. for Leave to File Reply, Oct. 21, 2021, ECF No. 86; Pls.' Reply in Supp. of Mot. for Leave to Suppl. Evid. R. on Renewed Mot. for Prelim. Inj., Oct. 21, 2021, ECF No. 87.

Upon consideration of the papers, the court granted Plaintiffs' Motion to Supplement the Evidentiary Record de bene -- subject to future consideration and limitations, as appropriate -- and ordered the Government of New Zealand to file a copy of the 2020–2021 Māui dolphin population survey and parties to submit a joint status report by January 7, 2022.  See Ct.'s Order Granting Pls.' Mot. for Leave to Suppl. Evid. R. on Renewed Mot. for a Prelim. Inj., Dec. 16, 2021, ECF No. 88.  Parties timely complied with the court's order, see N.Z. Gov't Resp. to Ct.'s Order, Jan. 6, 2022, ECF No. 89; Joint Status Report in Resp. to Ct.'s Order, Jan. 7, 2022, ECF No. 90, and the court issued questions to parties concerning these supplemental evidentiary materials, and other topics, on April 11, 2022, see Ct.'s April 11, 2022 Suppl. Qs., Apr. 11, 2022, ECF No. 92; see also U.S. Gov't Resp. to Ct.'s Apr. 11, 2022 Suppl. Qs., Apr. 30, 2022, ECF No. 95 ("Defs.' Suppl. Qs. Resp."); N.Z. Gov't Resp. to Ct.'s Apr. 11, 2022 Suppl. Qs., May 2, 2022, ECF No. 96 ("Def.-Inter.'s Suppl. Qs. Resp."); Pls.' Resp. to Ct.'s Apr. 11, 2022, Suppl. Qs., May 2, 2022, ECF No. 97 ("Pls.' Suppl. Qs. Resp.").

Finally, as the court was again deliberating, the United States submitted a Joint Status Report on October 27, 2022 stating that NOAA has extended the deadline from December 31, 2022 to December 21, 2023 for foreign nations to secure comparability findings. See Joint Status Report, Oct. 27, 2022, ECF No. 102; see also Modification of Deadlines Under the Fish and Fish Product Import Provisions of the Marine Mammal Protection Act, 87 Fed. Reg. 63,955 (Dep't Commerce Oct. 21, 2022) ("Deadline Modification"). In response to a supplemental question, see Ct.'s Oct. 28, 2022 Suppl. Qs., Oct. 28, 2022, ECF No. 103, the United States informed the court that NOAA no longer expects to be able to issue new comparability findings to New Zealand's multi-species set-net and trawl fisheries prior to the expiration of the current comparability findings on January 1, 2023, see U.S. Gov't Resp. to Ct.'s Oct. 28, 2022 Suppl. Qs. at 1–2, Nov. 4, 2022, ECF No. 105 ("Defs.' Add'l Suppl. Qs. Resp."). Accordingly, on November 8, 2022, the United States moved for a second voluntary remand to conform the expiration of New Zealand's comparability findings with the December 31, 2023 conclusion of the exemption period for all foreign fisheries. See U.S. Gov't Partial Consent Mot. to Remand at 1, Nov. 8, 2022, ECF No. 106 ("Defs.' Second Remand Mot."). Plaintiffs responded in opposition to the United States' Second Remand Motion on November 23, 2022. See Pls.' Opp. Br. to Defs.' Mot. for Voluntary Remand, Nov. 23, 2022, ECF No. 107 ("Pls.' Opp. to Second Remand Mot.").

Because the court assesses that it would benefit from oral argument on the Government's Second Remand Motion, see Further Order on Pls.' Mot. for Prelim. Inj. (issued with this Opinion), and because the United States submits that its latest Motion "does not delay a final decision on the [other] pending motions, which may proceed on a separate track," Defs.' Second Remand Mot. at 6, the court now addresses only Plaintiffs' Renewed Motion for Preliminary Injunction and Defendants' and Defendant-Intervenor's Motions to Dismiss Plaintiffs' First Claim.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(i)(1)(C).  That provision endows the court with exclusive jurisdiction over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for" "embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety," such as that provided for under the MMPA's Import Provision, 16 U.S.C. § 1371(a)(2); see also Earth Island Inst. v. Brown, 28 F.3d 76, 79 (9th Cir. 1994) ("[Plaintiffs'] suit under the MMPA is an action arising under a law providing for embargoes.  As such it is reserved for the exclusive jurisdiction of the CIT.").  For cases brought under subsection 1581(i), the Administrative Procedure Act, 5 U.S.C. § 500 et seq., provides the standard of review, see 28 U.S.C. § 2640(e),[37] which varies according to the nature of agency action challenged.

Where a plaintiff challenges final agency action, the court applies the "arbitrary and capricious" standard of review pursuant to section 706(2)(A) of the APA.  See 5 U.S.C. § 706(2)(A) (instructing a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  Under this standard, an agency acts "arbitrarily and capriciously" if it "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm

---

[37] 28 U.S.C. § 2640(e) instructs that for any action brought under 28 U.S.C. § 1581(i), "the Court of International Trade shall review the matter as provided in section 706 of title 5."

Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  The court will limit its review of a section 706(2)(A)

claim to the administrative record in existence at the time of the agency's decision.  See Citizens

to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971), overruled on other grounds by

Califano v. Sanders, 430 U.S. 99 (1977).

By contrast, where a plaintiff seeks to "compel agency action unlawfully withheld or

unreasonably delayed," section 706(1) of the APA governs.  5 U.S.C. § 706(1).  Under this

provision, "[m]andatory injunctive relief . . . is appropriate, 'if the court's study of the statute and

relevant legislative materials cause[s] it to conclude that the defendant official ha[s] failed to

discharge,'" Covelo Indian Cmty. v. Watt, 551 F. Supp. 366, 381 (D.D.C. 1982) (quoting Carpet,

Linoleum & Resilient Tile v. Brown, 656 F.2d 564, 566 (10th Cir. 1981)), "a discrete agency action

that it is required to take," Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 64 (2004)

("SUWA") (emphasis in original).  In making this determination, the court's review is not limited

to the administrative record.  See, e.g., Friends of the Clearwater v. Dombeck, 222 F.3d 552, 560

(9th Cir. 2000) (In APA section 706(1) cases, "review is not limited to the [administrative] record

as it existed at any single point in time, because there is no final agency action to demarcate the

limits of the record.").

## DISCUSSION

Before the court,[38] Plaintiffs advance three claims: First, the U.S. Government unlawfully

withheld agency action in violation of APA section 706(1) by failing to ban imports of fish and

---

[38] The court briefly notes that parties agree Plaintiffs have standing to pursue their claims.  See
Pls.' Resp. Br. at 20 n.9; see also Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)
("[S]tanding is an essential . . . part of the case-or-controversy requirement of Article III," which
requires Plaintiffs to show (1) injury in fact; (2) causation; and (3) redressability.).  As this court
held in NRDC I, where Plaintiffs have demonstrated that:

fish products from New Zealand that exceed "U.S. standards" under the MMPA, see 16 U.S.C. §

1371(a)(2); second, the U.S. Government acted arbitrarily and capriciously in violation of APA

section 706(2)(A) by denying Plaintiffs' petition for emergency rulemaking to ban New Zealand's

offending imports, see 16 U.S.C. § 1387(g)(1); 50 C.F.R. § 216.24(h)(8)(vii)(A); and third, the

U.S. Government acted arbitrarily and capriciously in violation of APA section 706(2)(A) by

granting comparability findings to two unsuitable New Zealand fisheries, see 50 C.F.R. §

216.24(h)(6)–(7).  See Pls.' First Suppl. Compl. ¶¶ 104–121.

        Pending final adjudication on the merits of their claims, Plaintiffs ask the court to grant a

preliminary injunction requiring the U.S. Government to ban the importation of all fish and fish

products from New Zealand's commercial gillnet and trawl fisheries within the Māui dolphin's

range.  See Pls.' Ren. PI Mot.  By contrast, the United States and the Government of New Zealand

ask the court to dismiss Plaintiffs' first APA section 706(1) claim for lack of subject matter

jurisdiction and to deny the Motion for a Preliminary Injunction with respect to Plaintiffs' second

and third APA section 706(2)(A) claims.  See Defs.' Mot. to Dismiss; Def-Inter.'s Mot. to Dismiss;

---

(1)  Their members have a recreational and aesthetic interest in viewing Māui dolphins that
     would be harmed by the species' potential extinction, see, e.g., Second Decl. James
     Boshier ¶¶ 8, 16; Second Decl. of Sylvia Philcox ¶¶ 9, 11; Second Decl. of Jennifer Matiu
     ¶¶ 6–7; Second Decl. of Richard Hay ¶¶ 6, 17; and Second Decl. of Aleisha Dockery ¶¶
     5–6;

(2)  The United States is a significant market for New Zealand's implicated exports, see, e.g.,
     Second Decl. of Brett Sommermeyer at Ex. 4 (data establishing that the United States is
     the second largest importer of New Zealand seafood); and

(3)  New Zealand is likely to respond to a United States import ban in a way that reduces
     danger to the Māui dolphin, see, e.g., id. at Ex. 8 ¶ 6 (internal New Zealand Government
     memo discussing Plaintiffs' February 6, 2019 petition and proposing, inter alia, interim
     measures that "would enable NOAA to reject [Plaintiffs'] petition")

Plaintiffs have established the tripart requirements for Article III standing.  NRDC I, 331 F. Supp.
3d at 1356–61.

see also Defs.' Resp. Br.; Def.-Inter.'s Resp. Br.   For the reasons outlined below, the court dismisses Plaintiffs' first claim, but grants Plaintiffs a preliminary injunction pending final resolution on the merits of the second and third claims.

### I.        The Court Dismisses Plaintiffs' First Claim.

Defendants contend that Plaintiffs cannot lodge their APA section 706(1) claim that NOAA "unlawfully withheld" agency action because NOAA "acted" by denying Plaintiffs' emergency rulemaking petition and by granting two comparability findings to New Zealand such that the Supreme Court's holding in SUWA compels dismissal.  See Defs.' Mot. to Dismiss at 10 (citing 542 U.S. at 64); Def.-Inter.'s Mot. to Dismiss at 2 (same).[39,40]  By contrast, Plaintiffs argue that because fisheries bycatch of Māui dolphins is occurring "in excess of United States standards," neither the agency's petition denials nor comparability findings can satisfy the Government's

---

[39] The United States moves to dismiss Plaintiffs' first claim for lack of subject matter jurisdiction, see USCIT R. 12(b)(1), as well as for failure to state a claim upon which relief can be granted, see USCIT R. 12(b)(6).  See Defs.' Mot. to Dismiss at 1.  Before the court, Plaintiffs submit that Defendants' arguments are controlled by Rule 12(b)(6) but concede that "[t]he case law is mixed." See Pls.' Resp. Br. at 4 n.1.

Because Plaintiffs have not supplied binding caselaw on this point, the court looks to the Supreme Court's determination in SUWA for guidance.  542 U.S. at 65–73.  The lower court decisions on review in SUWA concerned Rule 12(b)(1) motions to dismiss plaintiff environmentalists' APA section 706(1) claims.  See 2000 WL 33914094, at *2 (D. Utah 2000); 301 F.3d 1217, 1223 (10th Cir. 2002).  Without referencing Rule 12(b) at all, the Supreme Court declared certain alleged agency "failures to act" irremediable under APA section 706(1).  542 U.S. at  61, 65–73.  In the case at bar, the court grants Defendants' Motion to Dismiss on the basis of SUWA.

[40] Plaintiffs argue that the Government of New Zealand's Rule 12(b)(1) Motion is untimely because it was not raised before or in New Zealand's responsive pleading.  See Pls.' Resp. Br. at 5 n.2 (citing Fed. R. Civ. P. 12(b) and N.Z. Answer).  The Government of New Zealand counters that Plaintiffs' position "has no merit because [New Zealand] timely moved to dismiss the First Claim in [Plaintiffs'] First Supplemental Complaint" such that any "alleged failure to move to dismiss [the] original complaint is irrelevant."  Def.-Inter.'s Reply at 2 n.4.  Because the United States' and New Zealand's 12(b)(1) Motions to Dismiss are substantively similar -- and Plaintiffs do not contest the United States' Motion as untimely -- this line of argument is inconsequential.

"discrete and mandatory duty" to issue an import ban under the MMPA.  See Pls.' Resp. Br. at 4, 8.  Defendants' position prevails.

Section 706(1) of the APA directs that a "reviewing court shall" "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  The statute defines "[a]gency action" as "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  Id. § 551(13).  Given that "agency action" under APA section 706(1) is defined in part as a "failure to act," the Supreme Court undertook in SUWA to define this concept.  The Court assessed that because the first five "agency actions" enumerated in section 551(13) -- namely, "agency rule, order, license, sanction, [or] relief" -- each shared a "characteristic of discreteness," 542 U.S. at 63, and because section 706(1) only empowers a court to "compel agency action unlawfully withheld," id. (emphasis in original), an APA section 706(1) claim "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take," id. at 64 (emphasis in original).  In so ruling, the Court clarified that a "denial" -- i.e., an "agency's act of saying no to a request" -- is not a "failure to act" that is remediable under APA section 706(1).  Id. at 63.

This point of clarification is dispositive in the case at bar.  "Agency action" is defined in part as an "agency rule," 5 U.S.C. § 551(13), and an agency "rule" is further defined as "an agency statement of . . . future effect designed to implement, interpret, or prescribe law or policy," id. § 551(4).  Consistent with this definition, NOAA -- "[u]nder the authority of the Marine Mammal Protection Act" -- rejected Plaintiffs' petition for emergency rulemaking and issued comparability findings to New Zealand via notice and comment rulemaking in the Federal Register.  See Comp. Finding Determ. at 71,297; see also 85 Fed. Reg. at 60,946.  Quite the opposite of an "omission of an action without formally rejecting a request," NOAA "sa[id] no to [Plaintiffs'] request."  542

U.S. at 63.  Thus, having taken "agency action" within the meaning of APA section 551(13), NOAA has not "unlawfully withheld or unreasonably delayed" agency action for the purposes of APA section § 706(1).

Plaintiffs' contrary argument -- that neither NOAA's petition denials nor comparability findings can satisfy its duty to ban New Zealand's imports under the MMPA -- amounts to nothing more than an assertion that the agency made a mistake in "saying no to [Plaintiffs'] request" for emergency rulemaking.  Id.  Plaintiffs are correct that where a nation's fisheries are causing incidental kill and/or serious injury of ocean mammals "in excess of United States standards," NOAA is required to ban the offending imports under the MMPA's Imports Provision.  See NRDC I, 331 F. Supp. 3d at 1353–55 (explaining that 16 U.S.C. § 1371(a)(2) -- which provides the Government "shall ban the importation of commercial fish or products from fish . . . in excess of United States standards" -- implicates "the [mandatory] application of a single provision" rather than an "impermissible broad programmatic attack" (emphasis in NRDC)).  However, here, NOAA found New Zealand's fisheries to be compliant with U.S. standards.[41]  See, e.g., Dec. Mem. at 10.  Assessing Plaintiffs' challenge to NOAA's finding of compliance requires the court to undertake the kind of rationality analysis prototypical of arbitrary and capricious review under

---

[41] Such a finding of compliance renders this case distinguishable from NRDC I.  In NRDC I, NOAA calculated that the vaquita porpoise population could sustain only one fishery-related mortality every thirty-one to sixty-one years to comply with the MMPA's PBR standard; accordingly, where NOAA found that three vaquita had died in gillnets in 2016 and 2017 -- in acknowledged excess of U.S. standards -- and yet failed to take any action to ban the offending imports, this court assessed NOAA to have unlawfully withheld agency action under the MMPA for purposes of APA section 706(1).  See 331 F. Supp. 3d at 1365, 1368.

By contrast, NOAA here has explicitly rejected Plaintiffs' arguments that New Zealand is killing and/or seriously injuring Māui dolphins in excess of U.S. standards.  See, e.g., Dec. Mem. Attach. A at 25 (rejecting Plaintiffs' argument that the best mortality estimates suggest New Zealand's fisheries are killing 1.5 to 2.4 Māui dolphin each year in contravention of Defendants' proffered PBR).  Accordingly, the question is whether NOAA has somehow erred in assessing New Zealand to be compliant with U.S. standards.

section 706(2)(A) of the APA. Thus, the court discerns that Plaintiffs' first claim is not truly a failure to act claim, but rather a claim that NOAA's action is inadequate.

Because <u>SUWA</u> instructs that such claims fall outside the purview of APA section 706(1), the court grants Defendants' Motion to Dismiss Plaintiffs' First Claim.

## II.    *The Court Grants Plaintiffs a Preliminary Injunction Pending Final Resolution on the Merits of the Second and Third Claims.*

Having dismissed Plaintiffs' first claim under APA section 706(1), the court now considers Plaintiffs' request for a preliminary injunction pending final adjudication on the merits of the remaining APA section 706(2)(A) claims. <u>See</u> Pls.' Ren. PI Mot. When considering a preliminary injunction motion, the court evaluates four factors: (1) whether the moving party is likely to prevail on the merits of the claims; (2) whether the moving party is likely to suffer irreparable harm in the absence of a preliminary injunction; (3) the balance of equities; and (4) whether a preliminary injunction is in the public interest. <u>See</u> <u>Silfab Solar, Inc. v. United States</u>, 892 F.3d 1340, 1345 (Fed. Cir. 2018). The court's examination of the first preliminary injunction factor is limited to the administrative record in existence at the time of the agency's decision, <u>see</u> <u>Overton Park</u>, 401 U.S. at 420, while, the court's examination of the remaining factors is not so limited, <u>see</u> <u>Eco Tour Adventures, Inc. v. Zinke</u>, 249 F. Supp. 3d 360, 369 n.7 (D.D.C. 2017) (explaining that the court is not confined to the administrative record in assessing, inter alia, the irreparable harm prong).[42]

Before the court, Plaintiffs argue that each of the preliminary injunction factors weighs in their favor, <u>see</u> Pls.' Ren. PI Mot. at 24–46; Defendants argue the opposite, <u>see</u> Defs.' Resp. Br. at

---

[42] <u>See also</u> Steven Sark & Sarah Wald, <u>Setting No Records: The Failed Attempts to Limit the Record in Review of Administrative Actions</u>, 36 Admin. L. Rev. 333, 345 (1984) (explaining that because the issue of injunctive relief is generally not raised in below administrative proceedings, "there usually will be no administrative record developed on these issues," such that "it will often be necessary for a court to take new evidence to fully evaluate" claims "of irreparable harm . . . and [claims] that the issuance of the injunction is in the public interest").

28–43; Def.-Inter.'s Resp. Br. at 49–54.  For the reasons outlined below, the court agrees with

Plaintiffs and grants Plaintiffs a preliminary injunction.[43]

### A.    Plaintiffs Are Likely to Prevail on the Merits

The court evaluates Plaintiffs' likelihood of success with regard to each of the remaining

APA section 706(2)(A) claims -- namely, that NOAA acted arbitrarily and capriciously both in

denying Plaintiffs' petition for emergency rulemaking and in issuing comparability findings to two

New Zealand fisheries -- and assesses that Plaintiffs are likely to prevail on both.  Because

NOAA's denial of Plaintiffs' petition for emergency rulemaking turned on the agency's grant of

comparability findings to New Zealand, the court evaluates the latter claim first.

### 1.    Third Claim: NOAA's Grant of Comparability Findings

Plaintiffs argue they have carried their burden to set aside NOAA's comparability findings

as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under

section 706(2)(A) of the APA because, among other issues, NOAA failed to undertake several

mandatory considerations, draw rational conclusions, and insist on reasonable proof.  See Pls.'

Ren. PI Mot. at 35–41.  In contrast, the Government and New Zealand maintain Plaintiffs "cannot

reasonably contest that NOAA met the APA standard," see Defs.' Resp. Br. at 41; see also Def.-

Inter.'s Resp. Br. at 50, where the court would have to "reweigh the evidence," "reject every

element of the scientific findings," and "substitute its [own] judgment," to set aside the

comparability findings as arbitrary and capricious, see Def.-Inter.'s Reply at 1–2; see also Defs.'

Resp. Br. at 32, 38 (substantively similar).  The court disagrees with Defendants' characterization.

As an overall proposition, Defendants are correct that "[w]hen examining [an agency's]

scientific determination, . . . a reviewing court must generally be at its most deferential."

---

[43] The court articulates the scope of the granted preliminary injunction, infra pp. 64–66.

Baltimore Gas and Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 103 (1983).  However, this does not transform the court's review into a mere rubber stamp.  The court "review[s] scientific judgments of the agency 'not as a chemist, biologist, or statistician that [the court is] qualified neither by training nor experience to be, but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimal standards of rationality.'"  Shafer & Freeman Lakes Env't Conservation Corp. v. FERC, 992 F.3d 1071, 1090 (D.C. Cir. 2021) (quoting Troy Corp. v. Browner, 120 F.3d 277, 283 (D.C. Cir. 1997)).  Accordingly, "the . . . question before [the court] is whether [NOAA] acted reasonably in its analysis" and "explained [its] assumptions and methodology." Id. at 1091, 1093 (internal citations omitted).

Plaintiffs advance myriad reasons as to why the court should answer this question in the negative, see Pls.' Ren. PI Mot. at 34–41, as underscored by the Government of New Zealand's rebuttal of twenty specific challenges in its response brief, see Def.-Inter.'s Resp. Br. at 16–47. The court reiterates that it will not attempt "to settle [any] scientific debate[s]," Shafer, 992 F.3d at 1093, but will "hold[] [the] agenc[y] to certain minimal standards of rationality," id. at 1090 (quoting Troy Corp., 120 F.3d at 283).  Moreover, at this phase in the proceedings -- the preliminary injunction phase -- the court need not resolve each and every point of contention surrounding NOAA's determination, but need only assess whether Plaintiffs have raised at least some challenge sufficient to undermine the legal sufficiency of the agency's deliberation.  Because the court concludes that -- at a minimum -- NOAA failed, at various points, to: (1) consider all mandatory regulatory factors; (2) respond to all significant comments; and (3) articulate a rational connection between certain facts found and choices made, Plaintiffs are likely to succeed on their third claim that NOAA acted arbitrarily and capriciously in issuing comparability findings to New

Zealand, such that the agency contravened section 706(2)(A) of the APA.

The court expands upon each of these assessed deficiencies in turn.

a.    *NOAA Failed to Consider All Mandatory Regulatory Factors in Issuing Comparability Findings to New Zealand.*

NOAA's Imports Regulation establishes the requirements for a comparability finding.  See 50 C.F.R. § 216.24(h)(6)(iii) and (h)(7) [Excerpted in full in Appendix A].  Paragraph 216.24(h)(6)(iii) of 50 C.F.R. provides "[t]he following are conditions for [NOAA] to issue a comparability finding for [a] fishery," and enumerates over ten criteria.  See Dec. Mem. at 5 n.15. Paragraph 216.24(h)(6)(iii) is further "subject to the additional considerations set out in paragraph (h)(7) of this section;" paragraph (h)(7) -- entitled "Additional considerations for comparability finding determinations" -- instructs that "[w]hen determining whether to issue any comparability finding for a harvesting nation's export fishery [NOAA] shall also consider" the enumerated eight conditions, which include as just one example, "U.S. implementation of its regulatory program for similar marine mammal stocks and similar fisheries," 50 C.F.R. § 216.24(h)(7)(i).

Before the court, Plaintiffs argue that NOAA "did not sufficiently consider several mandatory factors before issuing . . . comparability finding[s]" to New Zealand.  Pls.' Ren. PI Mot. at 35.  Specifically, Plaintiffs assert that NOAA "did not consider how New Zealand's protective measures compare to the United States' implementation of its regulatory program for similarly imperiled marine mammals, as required by [50 C.F.R. § 216.24(h)(7)(i)]."  Id. at 40.  The Defendants disagree, with the United States maintaining that "NOAA evaluated [New Zealand's] Comparability Finding application in accordance with . . . 50 C.F.R. §§ 216.24(h)(6) and (7) as [it] does for all Comparability Finding applications," Defs.' OA Subm. at 6, and New Zealand arguing that "the Comp[arability] Finding expressly evaluated the applicable considerations in Section 216.24(h)(7)," including the U.S. implementation of its regulatory program for similar

marine mammal stocks and similar fisheries, but found them "irrelevant." Def.-Inter.'s OA Subm. at 6–7. Plaintiffs' position prevails.

As a threshold matter, by the Imports Regulation's plain language, NOAA is indeed required to "consider" the eight considerations enumerated in Paragraphs 216.24(h)(7)(i) to (viii) before issuing comparability findings. See 50 C.F.R. § 216.24(h)(7) ("When determining whether to issue any comparability finding for a harvesting nation's export fishery [NOAA] shall also consider . . .") (emphasis added); see also K-Con, Inc. v. Sec'y of Army, 908 F.3d 719, 725 (Fed. Cir. 2018) ("[T]he words 'must' and 'shall' in . . . regulatory language establish that the requirement . . . is mandatory." (citing Kingdomware Techs., Inc. v. United States, 579 U.S. 162, 171–72 (2016))). Thus, the question is whether NOAA sufficiently considered the mandatory factors in issuing comparability findings to New Zealand.

Using Plaintiffs' example, the court concludes that at a minimum, NOAA did not sufficiently consider U.S. regulatory programs for similarly imperiled marine mammals, as required by 50 C.F.R. § 216.24(h)(7)(i), before granting New Zealand's comparability findings. The only explicit mention of factor (h)(7)(i) identified by Defendants in the agency's analysis is found in NOAA's denial of Plaintiffs' original February 6, 2019 petition:

> 50 CFR 216.24(h)(7) outlines additional considerations for comparability finding determinations. Those considerations include the extent to which the harvesting nation has successfully implemented measures in the export fishery to reduce the incidental mortality and serious injury of marine mammals caused by the harvesting nation's export fisheries to levels below the bycatch limit; and whether the measures adopted by the harvesting nation for its export fishery have reduced or will likely reduce the cumulative incidental mortality and serious injury of each marine mammal stock below the bycatch limit, and the progress of the regulatory program toward achieving its objectives (50 CFR 216.24(h)(7)(i–ii)).

84 Fed. Reg. at 32,855; see also Def.-Inter.'s OA Subm. at 4 (identifying the above agency reference to factor (h)(7)(i)); Def.-Inter.'s Suppl. Br. at 4 (same); Def.-Inter.'s Suppl. Qs. Resp. at 13 (same). Quite apart from the fact that when NOAA rejected Plaintiffs' original petition on July

10, 2019, the Government of New Zealand had not yet finalized its revised TMP -- announced on June 24, 2020 -- that is the subject of New Zealand's July 15, 2020 comparability finding request,[44] the above excerpt makes no reference to the United States' regulatory approach towards similarly imperiled species.[45] "While incorporation by reference is not per se arbitrary and capricious," Oceana, Inc. v. Ross, 2020 WL 5995125, at *16 (D.D.C. 2020), "[c]onclusory statements [and citations] that do not explain how a determination was reached are . . . insufficient," In re Section 301 Cases, 46 CIT __, __, 570 F. Supp. 3d 1306, 1338 (2022) (citing Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin., 626 F.3d 84, 94 (D.C. Cir. 2010)).[46]

---

[44] For this reason, the court finds unpersuasive Defendants' and Defendant-Intervenor's contention that Plaintiffs failed to raise its (h)(7) allegations administratively and thus failed to exhaust. See Defs.' Resp. Br. at 40; Def-Inter.'s OA Subm. at 6. Recall that the comparability finding requirement is a creation of regulation and that NOAA has made this regulatory requirement inapplicable until January 1, 2024. Supra note 9. Accordingly, the conditions to secure a comparability finding enumerated in 50 C.F.R. § 216.24(h)(6)(iii) and (h)(7) were not controlling until New Zealand requested early comparability findings on July 15, 2020.

Thus, when Plaintiffs submitted their supplemental petition for emergency rulemaking on August 27, 2020 -- prior to NOAA's issuance of the comparability findings to New Zealand on November 9, 2020 -- Plaintiffs had no reason to believe that NOAA would not consider each of the mandatory factors enumerated in 50 C.F.R. § 216.24(h)(7). And as the United States itself acknowledged in response to the court's question as to whether "Plaintiffs were required to proactively seek consideration of the factors outlined in 50 C.F.R. § 216.24(h)(7)," Ct.'s Qs. for Oral Arg. at 4, "NOAA did not require prompting by the plaintiffs to force such evaluations," Defs.' OA Subm. at 6. Accordingly, the court rejects this exhaustion argument.

[45] In fact, the statement comprises an unembellished recitation of factors (h)(7)(ii) and (iii), which require NOAA to consider: "(ii) [t]he extent to which the harvesting nation has successfully implemented measures in the export fishery to reduce the incidental mortality and serious injury of marine mammals caused by the harvesting nation's export fisheries to levels below the bycatch limit," and "(iii) [w]hether the measures adopted by the harvesting nation for its export fishery have reduced or will likely reduce the cumulative incidental mortality and serious injury of each marine mammal stock below the bycatch limit, and the progress of the regulatory program toward achieving its objectives." 50 C.F.R. § 216.24(h)(7)(ii)–(iii). As such, NOAA's citation to factor (h)(7)(i) in its initial denial of Plaintiffs' original petition seems to have been in error.

[46] Defendants' additional arguments as to why the court should find NOAA to have implicitly considered (h)(7)(i) are likewise unavailing.

In the alternative, Defendants appear to ask this court to construe NOAA's silence as an

assessment by the agency that any undiscussed (h)(7) factors are irrelevant. See, e.g., Defs.' Suppl.

Qs. Resp. at 8 ("NOAA considered certain [(h)(7)] factors when relevant."); Def.-Inter.'s Suppl.

Qs. Resp. at 13 ("For th[e] [(h)(7)(i)] consideration to be relevant, there would need to be evidence

that similar U.S. mammal stocks and similar U.S. fisheries existed."). This the court cannot do.

---

Defendants first note that NOAA assessed New Zealand's Management Review Trigger to be comparable in effectiveness to the United States' harbor porpoise consequence closure strategy. Defs.' Resp. Br. at 37–38 (citing Dec. Mem. Attach. A at 34–35); Def.-Inter.'s Suppl. Qs. Resp. at 13 (citing same). However, nowhere in the agency's analysis does NOAA connect its discussion of the U.S. harbor porpoise consequence closure to factor (h)(7)(i). See Dec. Mem. The court declines to read in such a connection in light of countervailing evidence suggesting that harbor porpoise and Māui dolphins are not "similar." Compare 50 C.F.R. § 216.24(h)(7)(i) (requiring NOAA to consider "U.S. implementation of its regulatory program for similar marine mammal stocks" (emphasis added)), with Pls.' Suppl. Qs. Resp. at 12, n.6 (citing Harbor Porpoise (Phocoena phocoena phocoena): Gulf of Maine/Bay of Fundy Stock, Dep't of Commerce, media[.]fisheries[.]noaa[.]gov/dam-migration/2019_sars_atlantic_harborporpoise[.]pdf (last visited Nov. 27, 2022) (a study by NOAA stating "[h]arbor porpoise . . . are not listed as threatened or endangered under the Endangered Species Act")). See also Martinez-Bodon v. McDonough, 28 F.4th 1241, 1246 (Fed. Cir. 2022) (It is the court's "'duty to give effect, if possible, to every clause and word' of [a] regulation[]." (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001))).

The United States' further argument that factor (h)(7)(i) is satisfied because "NOAA considered the entire context of New Zealand's approach to marine mammal bycatch reduction and concluded that the process was similar to the United States take reduction team and [T]ake [R]eduction [P]lan process," Defs.' Suppl. Qs. Resp. at 8 (citing Dec. Mem. Attach. A at 37), likewise, runs the risk of eliding the word "similar" from factor (h)(7)(i). As just one example, the United States has implemented a Take Reduction Plan for the aforementioned harbor porpoise, see Dec. Mem. Attach. A at 35 n.147 (citing Harbor Porpoise Take Reduction Plan Regulations, 78 Fed. Reg. 61,821 (Dep't Commerce Oct. 4, 2013)), a marine mammal stock that Plaintiffs argue is dissimilar from that of the Māui dolphin, see Pls.' Suppl. Qs. Resp. at 12, n.6. Assuming arguendo that Plaintiffs are correct on this "similarity" point, comparing New Zealand's Māui dolphin approach to the United States' overall Take Reduction Plan process -- which ostensibly can apply to similar and dissimilar marine mammal stock alike -- sheds minimal comparative light on the United States' regulatory treatment of marine mammals similar to the Māui dolphin.

For the foregoing reasons, the court declines to read in implicit consideration by NOAA of factor (h)(7)(i). In so declining, the court does not conclusively hold that the harbor porpoise is dissimilar to the Māui dolphin or that the United States' overall Take Reduction Plan process is irrelevant to New Zealand's approach to the Māui dolphin; the court only holds that if NOAA seeks to satisfy factor (h)(7)(i) on such bases, the agency must explain in the first instance how these U.S. regulatory programs concern marine mammal stocks similar to the Māui dolphin.

First, it is axiomatic that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." State Farm, 463 U.S. at 50 (citing SEC v. Chenery, 332 U.S. 194, 196 (1947)). Second, the court declines to infer (h)(7)(i)'s irrelevance from agency silence where the administrative record contains evidence to the opposite effect. For example, Dr. Timothy Ragen -- former Executive Director of the U.S. Marine Mammal Commission and lead analyst for NOAA's Hawaiian Monk Seal Recovery Program -- submitted in a declaration before the agency:

> Faced with a similar situation, the U.S. has implemented much stronger protective measures. For example, in 1991 the Western Pacific Fishery Management Council and NMFS established a protected species zone extending 50 nautical miles around the Northwestern Hawaiian Islands and prohibited longline fishing within the zone. The intent was to "provide a protected species zone around the centers of activity of the endangered Hawaiian monk seal (Monachus schauinslandi), thereby eliminating the incidental take of monk seals in fishing operations." That is the nature and scale of management response needed to save the Māui dolphin.

Decl. of Dr. Timothy Ragen ¶¶ 2–3, 31, ECF No. 11-4 (first and third emphasis added) (footnote omitted).[47] Before the court, Defendants now argue that the U.S. approach to the Hawaiian monk seal is irrelevant to the Māui dolphin, see Def.-Inter.'s Resp. Br. at 46 (asserting "the setting of PBR to zero for the Hawaiian monk seal ha[s] no relevance to the calculation of PBR or the determination of likely mortality for the Māui dolphin."); see also Defs.' Resp. Br. at 40–41 (substantively similar). This may be true; however, it is for the agency to so explain in the first instance. See, e.g., U.H.F.C. Co. v. United States, 916 F.2d 689, 700 (Fed. Cir. 1990) ("Post-hoc rationalizations of agency actions first advocated by counsel in court may not serve as the basis

---

[47] Recall that in their August 27, 2020 supplemental petition, Plaintiffs explicitly enumerated and "incorporate[d] . . . in their entirety as support for the requested trade ban" the expert declarations -- including Dr. Ragen's declaration -- attached to Plaintiffs' original Motion for a Preliminary Injunction. See Pls.' Suppl. Pet. at 5–6. As such, Dr. Ragen's declaration, ECF No. 11-4, was part of the administrative record before the agency.

for sustaining the agency's determination.").

In short, an agency acts "arbitrarily and capriciously" where it "entirely fail[s] to consider an important aspect of the problem," State Farm, 463 U.S. at 43, and as established above, NOAA did not consider all mandatory regulatory factors when issuing comparability findings to New Zealand. As such, there is at least one basis upon which to find Plaintiffs are likely to succeed in their APA section 706(2)(A) challenge to NOAA's issuance of comparability findings under the third claim.

### b.    NOAA Failed to Respond to All Significant Comments.

To secure a comparability finding, NOAA's Imports Regulation requires "harvesting nation[s] [to] maintain[] a regulatory program . . . that is comparable in effectiveness to the U.S. regulatory program with respect to incidental mortality and serious injury of marine mammals in the course of commercial fishing operations." 50 C.F.R. § 216.24(h)(6)(iii)(B). While many elements comprise the "U.S. program," an important feature is that the MMPA requires NOAA to enact a "Take Reduction Plan" for any marine mammal population incurring mortality in excess of PBR due to commercial fishing. See 16 U.S.C. §§ 1387(f)(1)–(2), (5), 1362(19); 50 C.F.R. §§ 229.30–229.37 (NOAA regulations implementing Take Reduction Plans for various marine mammals); see also Dec. Mem. Attach. A at 4 (asserting the Take Reduction Plan forms "the basis" of the U.S. regulatory program for marine mammals facing human-caused mortality and/or serious injury in excess of PBR). In granting comparability findings to New Zealand, Commerce assessed that New Zealand's regulatory "Management Review Trigger"[48] -- which "allows for the immediate imposition of additional bycatch reduction measures in the event that a fishing-related

---

[48] Recall that the Government of New Zealand announced its mortality limit -- referred to by NOAA as the "Management Review Trigger" -- as part of the package of regulatory revisions attending the latest TMP. Supra note 25.

incident [involving Māui dolphins] occur[s]" -- is "similar to the U.S. Take Reduction process."
Comp. Finding Determ. at 71,298.

Before the court, Plaintiffs contest the legal sufficiency of this conclusion on the grounds
that in so finding, "[NOAA] ignored numerous objections from the scientific community warning
[that] the . . . discretionary nature of New Zealand's regulatory program" renders it incomparable
to that of the United States. See Pls' Ren. PI Mot. at 34. While an agency is "not require[d]...to
address every argument raised by a party or explain every possible reason supporting its
conclusion," Synopsys, Inc. v. Mentor Graphics Corp., 814 F.3d 1309, 1322 (Fed. Cir. 2016),
overruled on other grounds by Aqua Prods., Inc. v. Matal, 872 F.3d 1290, 1296 n.1 (Fed. Cir.
2017), it does "need to respond, in a reasoned manner, to any comments received . . . that raise
significant issues with respect to a proposed rule," Mid Continent Nail Corp. v. United States, 846
F.3d 1364, 1379 n.11 (Fed. Cir. 2017) (quoting Disabled Am. Veterans v. Gober, 234 F.3d 682,
692 (Fed. Cir. 2000)). The court concludes that given the weight NOAA afforded the Management
Review Trigger in assessing comparable New Zealand's regulatory program,[49] see Dec. Mem. at
4, 9–10; see also Dec. Mem. Attach. A at 1, 34–35, 37, the agency's failure to respond to
countervailing comments "challenge[d] a fundamental premise" underlying NOAA's decision,
MCI WorldCom, Inc. v. FCC, 209 F.3d 760, 765 (D.C. Cir. 2000). As such, Plaintiffs have
established an additional basis upon which they are likely to succeed in their APA section
706(2)(A) challenge to the comparability findings.

---

[49] The court assesses that NOAA afforded significant weight to New Zealand's Management
Review Trigger in deeming 50 C.F.R. § 216.24(h)(6)(iii)(B) satisfied in light of NOAA's statement
that "[i]n implementing the U.S. regulatory program for a marine mammal stock in which
incidental mortality and serious injury from commercial fisheries exceeds the [PBR] level, the
[T]ake [R]eduction [P]lan forms the basis for the regulatory program for that species," Dec. Mem.
Attach. A at 4, as well as the agency's equation of New Zealand's Management Review Trigger
to the U.S. Take Reduction Plan, id. at 35.

The court proceeds by first laying out the legal frameworks implementing U.S. Take Reduction Plans and New Zealand's Management Review Trigger, then by surveying the relevant countervailing comments on the administrative record, and finally by analyzing the agency's failure to respond to these comments.

Concerning the U.S. approach to "incidental mortality and serious injury of marine mammals in the course of commercial fishing operations" for purposes of 50 C.F.R. § 216.24(h)(6)(iii)(B), subsection 1387(f) of the MMPA instructs, in relevant part:

> **(f) TAKE REDUCTION PLANS**
>
> > **(1)** The Secretary shall develop and implement a take reduction plan designed to assist in the recovery or prevent the depletion of each strategic stock[50] which interacts with a commercial fishery . . .
> >
> > . . .
> >
> > **(5)**
> >
> > > **(A)** For any stock in which incidental mortality and serious injury from commercial fisheries exceeds the potential biological removal level . . . , the plan shall include measures the Secretary expects will reduce, within 6 months of the plan's implementation, such mortality and serious injury to a level below the potential biological removal level.

16 U.S.C. § 1387(f)(1), (5) (footnote not in original).  Thus, where commercial fishing causes mortality of a marine mammal population in excess of PBR, NOAA is required to develop a "Take Reduction Plan" with measures designed to reduce fishery-related mortalities to less than PBR within six months.  Id.

For its part, New Zealand's "Management Review Trigger" -- which New Zealand refers to as a "mortality limit" -- is codified in its Fisheries (Commercial Fishing) Regulations 2001:

**Part 3A**

**Fishing-related mortality limit of Hector's and Māui Dolphin in defined area**

---

[50] "Strategic stock" is defined, in relevant part, as "a marine mammal stock" "for which the level of direct human-caused mortality exceeds the potential biological removal level."  16 U.S.C. § 1362(19).

**52D Māui Dolphin habitat zone**

> In these regulations, the **Māui Dolphin habitat zone** means the waters within the area bounded by a line that—
>
> (a) starts at the Cape Egmont lighthouse (at 39°16.575′S and 173°45.300′E); and
>
> (b) then proceeds due west to the outer limit of the Territorial Sea (at 39°16.575′S and 173°29.583′E); and
>
> (c) then proceeds in a generally northerly direction along the outer limit of the Territorial Sea to a point (at 34°13.193′S and 172°40.780′E); and
>
> (d) then proceeds due south to Cape Reinga (at 34°25.210′S and 172°40.780′E); and
>
> (e) then proceeds in a generally southerly direction along the mean high-water mark of the west coast of the North Island to the starting point at Cape Egmont lighthouse (at 39°16.575′S and 173°45.300′E).

**52E Fishing-related mortality limit for Hector's or Māui Dolphin within Māui Dolphin habitat zone**

> (1) The fishing-related mortality limit for a Hector's or Māui Dolphin within the Māui Dolphin habitat zone is 1.
>
> (2) In this regulation, a **Hector's or Māui Dolphin** means a dolphin of the subspecies <u>Cephalorhynchus hectori hectori</u> or <u>Cephalorhynchus hectori maui</u>.

Fisheries (Commercial Fishing) Regulations 2001, s 52D–E (N.Z.) (emphasis in original).[51]  While

New Zealand's regulations establish a "mortality limit" of one, by design, they do not dictate any

subsequent actions or deadlines that such an event would trigger.  As the New Zealand Minister

of Fisheries explained in his public announcement of the revised TMP:

> The action that will be taken in the event of a [Māui dolphin] capture will depend on the circumstances of the event.  I will not predetermine what fishing methods may be impacted or across what spatial area.  The intention of putting in place the fishing related mortality limit is so that action can be taken quickly if necessary.

N.Z. TMP Letter app. one at 2.

In submissions before the agency, various commentors[52] argued that the discretionary

---

[51] This "mortality limit" applies in the same manner to amateur fishing in New Zealand.  <u>See</u> Fisheries (Amateur Fishing) Regulations 2013, s 155O–P (N.Z.).

[52] For purposes of the below discussion, recall that in their August 27, 2020 supplemental petition, Plaintiffs explicitly enumerated and "incorporate[d] . . . in their entirety as support for the

nature of New Zealand's regulatory program -- particularly the lack of mandatory deadlines for remedial action following a take in excess of PBR -- render it incomparable in effectiveness to U.S. Take Reduction Plans.  As a few examples, in their original Motion for Preliminary Injunction, Plaintiffs argued:

> New Zealand has no equivalent to a [T]ake [R]eduction [P]lan. . . . The [T]ake [R]eduction [P]lan requirement forces policymakers to create actionable measures that can be implemented on immediate time frames. . . . [T]he time frames embedded in [T]ake [R]eduction [P]lans are essential.

Pls.' Original PI Mot. at 40, ECF No. 11.  Dr. Timothy Ragen, supra p. 38, further asserted:

> New Zealand does not require anything remotely equivalent to the "[T]ake [R]eduction [P]lans" that must be developed under the U.S. MMPA for marine mammal populations with the same endangered status as the Māui dolphin.  Instead, New Zealand has elected to follow a highly discretionary threat management planning process that, among other things, fails to include the timelines required for U.S. [T]ake [R]eduction [P]lans.

Decl. of Dr. Timothy Ragen ¶ 85, ECF No. 11-4.  And finally, Professor Elisabeth Slooten -- Professor of Zoology at the University of Otago in Dunedin, New Zealand -- concurred:

> [T]here is currently no requirement for conservation management to ensure that Māui dolphin recover within . . . any . . . time period.

Decl. of Prof. Elisabeth Slooten ¶¶ 1, 44, ECF No. 11-2.[53]

Contrary to addressing commentors' concerns regarding the lack of mandatory action or deadlines associated with New Zealand's TMP -- including the new Management Review Trigger

---

requested trade ban," inter alia, the Original Motion for Preliminary Injunction, ECF No. 11, Declaration of Professor Elisabeth Slooten, ECF No. 11-2, and Declaration of Dr. Timothy Ragen, ECF No. 11-4.  See Pls.' Suppl. Pet. at 5–6.  As such, each of the submissions herein discussed was properly before the agency.

[53] That these comments were submitted to the agency prior to New Zealand's finalization of its revised TMP on June 24, 2020 does not, in the court's view, alter the agency's obligation to respond to them.  This is so, first, because Plaintiffs resubmitted these comments via incorporation with their August 27, 2020 supplemental petition, see Pls.' Suppl. Pet. at 5–6; and second, because, as explained above, the Government of New Zealand purposefully retained the TMP's discretionary quality with the new mortality limit, see N.Z. TMP Letter app. one at 2.  Thus, New Zealand's revision of the TMP did not moot the commentors' relevant submissions to the agency.

-- the agency's analysis merely highlights its discretionary nature.  See, e.g., Dec. Mem. at 9 (asserting that under the Management Review Trigger, New Zealand "<u>can</u> take protective management actions" and "<u>may</u> . . . prohibit all or any fishing or other fishing methods in the Māui dolphin habitat zone" in the event of interactions -- lethal or otherwise -- between fisheries and Māui dolphins (emphasis added)); <u>see also</u> <u>id.</u> ("The setting of a [M]anagement [R]eview [T]rigger <u>allows</u> [New Zealand] to quickly put in place (<u>e.g.</u>, within a week) additional measures and restrictions." (first emphasis added)).  While NOAA's analysis focuses on the responsive measures New Zealand <u>could</u> take pursuant to its Management Review Trigger, the agency fails to account for the fact that this mechanism does not <u>require</u> New Zealand to do anything on any particular timeframe following a fishery-related interaction with a Māui dolphin in excess of PBR.[54]

As Plaintiffs note, such a discretionary approach contrasts with the MMPA's mandatory directive that where commercial fishing causes marine mammal mortality and/or serious injury in excess of PBR, NOAA "<u>shall</u> develop and implement a [T]ake [R]eduction [P]lan" with measures to reduce such mortality and/or serious injury to levels below PBR within six months of the Plan's implementation.  <u>See</u> 16 U.S.C. § 1387(f)(1), (5) (emphasis added); <u>see also</u> <u>NRDC I</u>, 331 F. Supp. 3d at 1353 ("'Shall' is mandatory language, demonstrating that Congress left the Government with no discretion whether to act." (citing <u>Murphy v. Smith</u>, 138 S.Ct. 784, 787 (2018))).

---

[54] This remains true despite the agency's assertions that "[o]nce [a new] prohibition is in place" pursuant to New Zealand's Management Review Trigger, "within three months of the incident, the [New Zealand Government] will undertake a more detailed review of the bycatch incident and will determine what longer-term measures are required," <u>see</u> Dec. Mem. Attach. A at 35, or that any "prohibitions notified in the New Zealand Gazette would remain in place until the notice was amended [or] revoked," <u>id.</u>  While these features would appear to impose some nondiscretionary elements in the event New Zealand chooses to impose new prohibitions following a Māui dolphin interaction under the Management Review Trigger, they do not address commentors' threshold concern that unlike the U.S. Take Reduction Plan, New Zealand's mortality limit does not actually require <u>any</u> actionable measures on <u>any</u> defined timeline.

The closest NOAA comes to addressing parties' concerns is the agency's general assertion that "[t]he MMPA Import Provisions do not require . . . a nation's approach [to] be identical to the U.S. regulatory program or standards, just comparable in effectiveness to [them]."  Dec. Mem. Attach. A at 37.  While true, the agency's statement does not clarify how New Zealand's regulatory program -- under which New Zealand could conceivably do nothing (however unlikely NOAA may assess such a response by the New Zealand Government to be) following a taking in excess of PBR -- is comparable in effectiveness to the U.S. program -- under which doing nothing is decisively not an option.  Compare Fisheries (Commercial Fishing) Regulations 2001, s 52D–E (N.Z.), with 16 U.S.C. § 1387(f)(1), (5).  "It is not in keeping with the rational process to leave vital questions, raised by comments which are of cogent materiality, completely unanswered." United States v. Nova Scotia Food Prods. Corp., 568 F.2d 240, 252 (2nd Cir. 1977).

In short, although -- as NOAA notes -- whether New Zealand "maintains a regulatory program . . . that is comparable in effectiveness to the U.S. regulatory program with respect to incidental mortality and serious injury of marine mammals" under 50 C.F.R. § 216.24(h)(6)(iii)(B) entails a multifactorial inquiry, see Dec. Mem. Attach. A at 3–4, NOAA afforded significant weight to the assessed comparability between New Zealand's Management Review Trigger and U.S. Take Reduction Plans in rendering an affirmative determination, see Dec. Mem. at 4, 9–10; see also Dec. Mem. Attach. A at 1, 34–35, 37.  Accordingly, by failing to address the discretionary quality of New Zealand's TMP -- including the new Management Review Trigger -- the agency did not "respond, in a reasoned manner, to . . . comments . . . rais[ing] significant issues with respect to a proposed rule," Disabled Am. Veterans, 234 F.3d at 692, such that Plaintiffs have established an additional basis upon which they are likely to succeed in their challenge to the comparability findings under APA section 706(2)(A).

> ### c.    NOAA failed to articulate a rational connection between certain facts found and choices made.

Finally, as an additional condition for comparability findings, NOAA requires foreign nations to "[i]mplement[] . . . monitoring procedures in the[ir] export fisher[ies] designed to estimate incidental mortality or serious injury . . . of marine mammal stocks in waters under [their] jurisdiction" and to provide "an indication of the statistical reliability of those estimates." 50 C.F.R. § 216.24(h)(6)(iii)(C)(4). NOAA concluded that where New Zealand has "100% . . . electronic monitoring" coverage of "fishing vessels currently operating in the core Māui dolphin habitat zone," Dec. Mem. Attach. A at 15, and where the percent of observed fishing days averaged ninety-five percent in the target set-net area and ninety percent in the target trawl area over the previous three years, New Zealand's onboard camera monitoring program exceeds U.S. standards and its broader observer monitoring program is otherwise comparable in effectiveness for purposes of 50 C.F.R. § 216.24(h)(6)(iii)(C)(4), id. at 17.

Before the court, Plaintiffs argue that New Zealand's figures are "nothing more than red herrings and statistical subterfuge," Pls.' Ren. PI Mot. at 32, because New Zealand claims "100% . . . electronic monitoring" coverage while excluding "vessels smaller than 8 meters" from its onboard camera requirement and reported the percentage of fishing days observed, without "provid[ing] data on the amount of net observed," Pls.' Resp. Br. at 47. Plaintiffs maintain these deficiencies render estimates of incidental mortality or serious injury of marine mammals generated under New Zealand's monitoring regime statistically unreliable for purposes of 50 C.F.R. § 216.24(h)(6)(iii)(C)(4). See Pls.' Ren. PI Mot. at 38. Because NOAA failed to account for these deficiencies in deeming satisfied 50 C.F.R. § 216.24(h)(6)(iii)(C)(4), the court concludes that the agency has not established the requisite "rational connection between [relevant] facts found and . . . choice[s] made." State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines v.

<u>United States</u>, 371 U.S. 156, 168 (1962)).  Thus, here too, Plaintiffs have alleged a basis upon which the court can find Plaintiffs likely to succeed in their APA section 706(2)(A) challenge to the comparability findings.

Beginning with New Zealand's onboard camera program, New Zealand requires electronic monitoring on any set net or trawl vessel (≥8 meters and ≤29 meters in registered length) operating around the West Coast North Island.  <u>See</u> Fisheries (Electronic Monitoring on Vessels) Regulations 2017, sch 1, pt 1, cl 1 (N.Z.).  Plaintiffs submitted to the agency that New Zealand's exclusion of vessels "smaller than eight meters, [wa]s a[] critical flaw in the observer coverage data," Pls.' Suppl. Qs. Resp. at 11, because "commercial gillnetters commonly use" "[s]maller craft (i.e., [those] less than six meters in length)" "in the larger harbors of the North Island's west coast [that] Māui dolphins inhabit."  Pls.' Feb. 2019 Pet. at 15.[55]  Nowhere did NOAA account for this exclusion in endorsing New Zealand's representation of "100% . . . electronic monitoring" coverage.  Dec. Mem. Attach. A at 15.  As Plaintiffs persuasively argue, Commerce's failure to do so constituted legal error because:

> a city c[an]not use evidence of a lack of speeding tickets issued as proof that people are not speeding if the police department is not monitoring the roadways and enforcing the speed limit.  Yet, the [Government of New Zealand] attempts to do . . . that by excluding . . . relevant vessels from coverage, which not only artificially inflates the observer coverage numbers purported[,] . . . but also suppresses the instances of bycatch that are observed and reported without actually reducing the real number of dolphins caught in nets.

---

[55] Because Plaintiffs explicitly reincorporated the legal and factual grounds underpinning their February 6, 2019 petition in their August 27, 2020 supplemental petition, <u>see</u> Pls.' Suppl. Pet. at 5–6, Plaintiffs' objection concerning the exclusion of smaller vessels from New Zealand's electronic monitoring regime was properly before the agency.  Moreover, submissions in response to NOAA's solicitation of public comments on Plaintiffs' petition echoed this critique.  <u>See, e.g.</u>, Sommermeyer Pub. Comment at 4 (Mar. 27, 2019), P.R. 3383 (objecting that "smaller craft have no [observer] coverage at all").  [Please note, this P.R. number reflects that listed in the Administrative Record Index, Nov. 23, 2020, ECF No. 44-1.]

Pls.' Suppl. Qs. Resp. at 11.[56]  Accordingly, the court assesses NOAA needs to reconcile -- in the

first instance -- New Zealand's exclusion of smaller vessels from its monitoring program with the

agency's determination that New Zealand's estimates of incidental mortality or serious injury are

statistically reliable for purposes of 50 C.F.R. § 216.24(h)(6)(iii)(C)(4).[57]

---

[56] One might question the significance of a lack of electronic monitoring coverage on smaller vessels in light of NOAA's statement that "[n]o U.S. Take Reduction Plans currently require any fishery . . . to use on-board cameras as a monitoring device," but "only require observers onboard at pre-determined levels." Dec. Mem. Attach. A at 16.  However, beyond just onboard cameras, commentors' critiques suggest that "[s]maller craft (i.e., [those] less than six meters in length) have no observer coverage at all." Pls.' Feb. 2019 Pet. at 15 (emphasis added); Sommermeyer Pub. Comment at 4 (same).  This critique is confirmed, at least to some extent, by New Zealand's Comparability Finding Application. See, e.g., N.Z. Comp. Finding App. at 47 ("Work is underway to explore alternative means of verifying protected species captures on small vessels that operate within harbours (e.g.[,] open dory boats) that do not have the means to carry a fisheries observer or the on-board camera system." (emphasis added)).  Moreover, as discussed infra, the metric NOAA has accepted as a measure of New Zealand's broader observer coverage -- namely, percentage of fishing days observed, see Dec. Mem. Attach. A at 17 -- does not necessarily dispel Plaintiffs' objections to the lack of any observer coverage on smaller vessels.

[57] For its part, the Government of New Zealand maintains that the exclusion of smaller craft from the electronic monitoring program is not impactful because "[v]essels smaller than 8 meters typically operate within harbors where Māui dolphin presence is low." Def.-Inter.'s Resp. Br. at 38 n.31.  Even if the court could credit New Zealand's post-hoc rationalization in place of NOAA's silence -- which it cannot, see U.H.F.C. Co., 916 F.2d at 700 -- doing so would not necessarily nullify Plaintiffs' objections.
    For example, in granting a comparability finding to New Zealand's West Coast North Island set-net fishery, NOAA noted:

> [This] fishery comprises two main sub-fleets: coastal set-net vessels, and harbor set-net vessels.  Coastal set-net vessels (≥ 6m registered length) operate within the deeper offshore waters and primarily target species such as common warehou, spotted estuary smooth-hound, and tope shark.  The harbor set net vessels (predominantly < 6m registered length) primarily operate in the upper reaches of the West Coast North Island harbors (i.e.[,] Herekino, Whangape, Hokianga, Kaipara, Manukau, Raglan, and Kawhia) targeting species such as flatfishes nei, flathead grey mullet, and spotted estuary smooth-hound.

Dec. Mem. Attach. A at 22.  Importantly, NOAA's description acknowledges that fishing vessels under six meters in registered length -- which indisputably fall outside of New Zealand's size-based electronic monitoring requirements -- operate in the upper reaches of the West Coast North Island harbors, including Kaipara, Manukau, and Raglan harbors. Id.  NOAA elsewhere appears to describe the "upper reaches" of these harbors as within "the core Māui dolphin habitat."  See,

Beyond onboard cameras, Plaintiffs contest NOAA's broader determination that New Zealand's overall "fisheries observer . . . program is comparable in effectiveness to U.S standards." See Dec. Mem. Attach. A at 17. In submissions properly before the agency, Plaintiffs made clear their position that the percentage of observed set net and/or trawl vessels is the proper metric by which to measure the robustness of New Zealand's monitoring program. See Decl. of Prof. Elisabeth Slooten ¶ 31, ECF No. 11-2 (submitting Table 1, which lists fishing effort and observer coverage for the West Coast North Island; "[f]ishing effort is reported as km of gillnet per year, and number of trawls per year" and "[o]bserved effort is reported as the proportion of fishing effort

---

e.g., id. at 29 (describing "the entrances of the Kaipara, Manukau, and Raglan harbors (core distribution and part of the southern tail)" (footnote omitted)). And yet, NOAA still accepts New Zealand's claim of 100 percent electronic monitoring on all "fishing vessels currently operating in the core Māui dolphin habitat zone." Id. at 15 (emphasis added). While NOAA does elsewhere qualify that "[w]ithin this core area, Māui dolphins are only occasionally found in the outer portions of harbors such as Manukau, Kaipara, Raglan harbors" and only "occasionally enter the mouth of the Manukau and Kaipara harbors," id. at 7, the Māui dolphin presence is significant enough in these areas that New Zealand prohibits the use of set nets in the entrances of these harbors, id. at 29; see also Def.-Inter.'s Resp. Br. at 36 n.30 ("[S]et nets are banned in the entrances of the Kaipara, Manukau, and Raglan harbors (which are part of the Māui dolphin's core distribution)."). These countervailing factual findings undermine both New Zealand's claim of 100 percent electronic monitoring coverage in the Māui dolphin's core range as well as the statistical reliability of the incidental mortality or serious injury estimates generated under New Zealand's monitoring program for purposes of 50 C.F.R. § 216.24(h)(6)(iii)(C)(4).

Moreover, the court notes that New Zealand requires on-board cameras for qualifying fishing vessels in "the coastal area of the Māui dolphin habitat," Dec. Mem. Attach. A at 15, and NOAA describes New Zealand's West Coast North Island set-net fishery as having "[c]oastal set-net vessels (≥ 6m registered length) operat[ing] within the deeper offshore waters," id. at 22. This description begs the question as to whether the West Coast North Island set-net fishery has vessels greater than six meters, but less than eight meters -- which, again, would fall outside of New Zealand's size-based onboard camera requirements -- operating in coastal waters within "the core Māui dolphin habitat zone." Id. at 15. If yes, any such uncovered vessels would further undermine New Zealand's 100 percent electronic monitoring figure as well as the statistical reliability of New Zealand's mortality or serious injury estimates.

In short, even considered arguendo, New Zealand's proffered post-hoc rationalization does not necessarily supply the missing "rational connection" requisite to sustain NOAA's assessment of New Zealand's monitoring program under 50 C.F.R. § 216.24(h)(6)(iii)(C)(4). State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines, 371 U.S. at 168).

with an independent observer on board"); <u>see also</u> Decl. of Dr. Timothy Ragen ¶ 57, ECF No. 11-4 (same).[58]   Nevertheless, in issuing comparability findings, NOAA assessed New Zealand's monitoring program to satisfy 50 C.F.R. § 216.24(h)(6)(iii)(C)(4) because the percent of <u>fishing days</u> observed averaged ninety-five percent in the target set net area and ninety percent in the target trawl area over the previous three years.  <u>See</u> Dec. Mem. Attach. A at 17.[59]

Before the court, Plaintiffs contest the rationality of NOAA's determination on the grounds that "'fishing days' [are] not a reliable method of detecting bycatch," but rather "provide[] a biased picture of Māui dolphin catchability." Pls.' Resp. Br. at 45–46.  This is so, in Plaintiffs' estimation, because "nets are not deployed in equal amounts every day," thereby creating a potential "mismatch between seemingly high observer coverage as measured by fishing days and low coverage as to amount of net observed." <u>Id.</u> (citing Second Decl. of Dr. Timothy Ragen ¶ 115, ECF No. 49-4 (stating "[i]f a single vessel with an observer fished for two days, setting 1,000 meters of net on day one and 10,000 meters on day two, fishing effort and observer coverage would not be equal on those two days; the second day imposes a risk 10 times larger")).

---

[58] <u>Supra</u> note 52 (explaining why the Declarations of Professor Elisabeth Slooten and Dr. Timothy Ragen are properly before the agency).

[59] NOAA did not include nor rely on fishing day-derived observer coverage figures in its rejection of Plaintiffs' original February 6, 2019 petition for emergency rulemaking.  <u>See</u> 84 Fed. Reg. 32,853 (no mention of New Zealand's percentage of fishing-days observed); <u>see also</u> Mem. from A. Cole to C. Oliver, re: Decision Mem. for the Den. of Pet. for Rulemaking (Dep't Commerce June 13, 2019), P.R. 5432 (same) [Please note, the P.R. number here reflects that listed in the Administrative Record Index, Nov. 23, 2020, ECF No. 44-1.].  Rather, NOAA adopted these fishing day-derived observer coverage figures from the Government of New Zealand's Comparability Finding Application.  <u>See</u> Dec. Mem. Attach. A at 17 (citing N.Z. Comp. Finding App. at 47, app. F).  Plaintiffs maintain that NOAA never made New Zealand's Application available for public comment.  <u>See</u> First Suppl. Compl. ¶ 97.
    In such case, although Plaintiffs' submissions to NOAA put the agency on notice that Plaintiffs endorsed the percentage of set net/trawls observed as the proper metric of observer coverage, <u>supra</u> pp. 49–50, Plaintiffs' briefing before this court comprises their first opportunity to respond to New Zealand's submission of and NOAA's reliance on observer coverage figures derived from the percentage of fishing days observed.

In endorsing New Zealand's claimed ninety-five and ninety-percent set net and trawl observer coverage figures, respectively, NOAA did not explain its reliance on the percentage of observed fishing days metric over Plaintiffs advocated for percentage of set net/trawls observed metric.  The court agrees that NOAA's failure to account for the potential "mismatch" between "high observer coverage as measured by fishing days and low coverage as to amount of net [and/or trawls] observed," see Pls.' Resp. Br. at 45–46, undermines the rationality of the agency's conclusion that New Zealand "has a sufficiently high level of observer coverage to detect interactions or bycatch and obtain an unbiased statistically-reliable bycatch estimate" for purposes of 50 C.F.R. § 216.24(h)(6)(iii)(C)(4), see Dec. Mem. Attach. A at 17.

Thus, the court holds that NOAA did not establish a rational connection between certain facts found and choices made in deeming comparable New Zealand's monitoring program, thereby creating another likely avenue for Plaintiffs' successful challenge to the comparability findings under section 706(2)(A) of the APA.

### d.    Conclusion

In light of the foregoing, the court concludes that Plaintiffs are likely to succeed on the merits of their third claim that NOAA acted arbitrarily and capriciously -- in contravention of section 706(2)(A) of the APA -- in issuing comparability findings to two New Zealand fisheries, because, at a minimum, NOAA failed to: (1) consider all mandatory regulatory factors; (2) respond to all significant comments; and (3) articulate a rational connection between certain facts found and choices made.  In so holding, the court reiterates that the above identified deficiencies are not necessarily exhaustive, but merely that at this stage in the proceedings -- the preliminary injunction

stage -- Plaintiffs have established a basis upon which the court can find they are likely to prevail on their third claim.

### 2.    *Second Claim: NOAA's Denial of Plaintiffs' Petition for Emergency Rulemaking*

The court further assesses that Plaintiffs are likely to succeed on the merits of their second claim challenging NOAA's denial of the August 27, 2020 supplemental petition as arbitrary and capricious under section 706(2)(A) of the APA.  This is so -- most basically -- because NOAA's rejection of Plaintiffs' petition for emergency rulemaking turned on the agency's grant of comparability findings to New Zealand.  See Comp. Finding Determ. at 71,298 (announcing the rejection of Plaintiffs' petition and issuance of comparability findings and stating "[t]he rationale for the determination announced in this notice is articulated in an analysis of [New Zealand's] application for a comparability finding").  Logically, where the court has determined that NOAA's grant of comparability findings to New Zealand was arbitrary and capricious, the court must correspondingly hold that NOAA's rejection of Plaintiffs' petition for emergency rulemaking on the basis of such comparability findings was likewise arbitrary and capricious.  Thus, Plaintiffs are likely to succeed on the merits of their second claim.

Beyond this purely logic-based argument, Plaintiffs contend they are likely to succeed on the merits of their second claim by operation of NOAA's Imports Regulation and the Import Provision of the MMPA.  This is so, in Plaintiffs' estimation, because "only a valid comparability finding can relieve [NOAA] of [its] duty to impose a ban," and comparability findings arbitrarily and capriciously granted do not suffice.  See Pls.' Resp. Br. at 50 (emphasis in the original).  The court agrees.

NOAA's Imports Regulation establishes that fish or fish products for which a valid comparability finding is not in effect are per se in excess of U.S. standards, with Paragraph (h)(1)(i)

stating in relevant part:

> [A] fish or fish product caught with commercial fishing technology which results in the incidental mortality or incidental serious injury of marine mammals in excess of U.S. standards is any fish or fish product harvested in an exempt or export fishery for which a <u>valid</u> comparability finding is not in effect.

50 C.F.R. § 216.24(h)(1)(i) (emphases added).  This Paragraph "prohibit[s]" fish imports "in excess of U.S. standards," <u>id.</u>, and (h)(1)(ii)(A) explicitly states that imports of fish or fish products for which a valid comparability finding is not in effect are "unlawful":

> (ii) Accordingly, it is unlawful for any person to import, or attempt to import, into the United States for commercial purposes any fish or fish product if such fish or fish product:
>
> > (A) Was caught or harvested in a fishery that does not have a <u>valid</u> comparability finding in effect at the time of import;

50 C.F.R. § 216.24(h)(1)(ii)(A) (emphasis added).[60]  Accordingly, if New Zealand's West Coast North Island multi-species set-net and trawl fisheries do not have valid comparability findings in effect, the importation of fish or fish products into the United States from them is per se in excess of U.S. standards under Paragraph (h)(1)(i), unlawful under (h)(1)(ii)(A), and thereby prohibited by operation of NOAA's Imports Regulation, 50 C.F.R. § 216.24(h)(1)(i)–(ii), and the Import

---

[60] Although NOAA's Imports Regulation instructs that "[t]he prohibitions of paragraph (h)(1) . . . shall not apply during the exemption period," <u>id.</u> § 216.24(h)(2)(ii), which "extends through December 31, 2023," <u>id.</u> § 216.3, "nothing prevents a nation from . . . seeking a comparability finding during the . . . exemption period," <u>Comp. Finding Determ.</u> at 71,297.  Crucially, the Government of New Zealand did that for its West Coast North Island multi-species set-net and trawl fisheries, <u>id.</u> at 71,297–98, thereby waiving the Imports Regulation's grace period, <u>see</u> Defs.' Suppl. Br. at 2 ("[New Zealand] applied early for a comparability finding before the exemption period ends, waiving the regulation's [seven]-year grace period.").

Thus, having waived the benefit of the seven-year exemption period, <u>see id.</u>, the prohibitions of Paragraph (h)(1) now <u>do apply</u> to the two New Zealand fisheries, <u>see</u> 50 C.F.R. § 216.24(h)(2)(ii) -- a reading which is supported by NOAA's own analysis, <u>see</u> Dec. Mem. at 2, 8 (stating that "[d]ue to [New Zealand]'s request for an early comparability finding, the fisheries identified above would be under the <u>full effect</u> of [the Imports Regulation]" (emphasis added)).

Provision of the MMPA, 16 U.S.C. § 1371(a)(2).[61]  Thus, the operative question is: what constitutes a <u>valid</u>[62] comparability finding?

Black's Law Dictionary defines "valid" as "legally sufficient."  <u>Valid</u>, <u>Black's Law Dictionary</u> (11th ed. 2019); <u>see also</u> <u>Nat'l Mining Ass'n v. Kempthorne</u>, 512 F.3d 702, 708 (D.C. Cir 2008) (defining "valid" as "[l]egally sufficient"); <u>In re Sealed Case</u>, 494 F.3d 139, 149 (D.C. Cir. 2007) (same).  Courts have held that agency action that is arbitrary, capricious, or otherwise not in accordance with law is not "legally sufficient."  <u>See, e.g.</u>, <u>Advanced Micro Devices v. C.A.B.</u>, 742 F.2d 1520, 1544–45 (D.C. Cir. 1984).  Therefore, in order for a comparability finding to be "valid" -- such that it can avoid implicating the agency's obligation to impose an import ban under the combination of NOAA's Imports Regulation and the MMPA's Import Provision -- the agency must not have acted arbitrarily or capriciously in granting it.

---

[61] Bringing all the pieces together, recall that the Import Provision of the MMPA instructs, in relevant part, that "[t]he Secretary of the Treasury shall ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals <u>in excess of United States standards</u>," 16 U.S.C. § 1371(a)(2) (emphasis added); and Paragraph (h)(1)(i) of NOAA's Imports Regulations instructs that "[a] fish or fish product . . . <u>in excess of U.S. standards</u> is any fish or fish product . . . for which a valid comparability finding is not in effect," 50 C.F.R. § 216.24(h)(1)(i) (emphasis added).

Accordingly, because New Zealand's West Coast North Island multi-species set-net and trawl fisheries are currently subject to the prohibitions of Paragraph (h)(1) of NOAA's Imports Regulation (by virtue of New Zealand's waiver of the seven-year exemption period), <u>supra</u> note 60 and accompanying text, if these fisheries do not have valid comparability findings in effect at the time of importation, imports of fish and/or fish products into the United States from them are per se in excess of U.S. standards under Paragraph (h)(1) of the Imports Regulation, and thereby prohibited under the MMPA's Import Provision.

[62] The court notes that Paragraph (h)(1) of the Imports Regulation does not merely require that fisheries have "comparability findings" in effect for their imports to be permissible, but rather requires that fisheries have <u>valid</u> comparability findings in effect.  It is the court's "'duty to give effect, if possible, to every clause and word' of [a] regulation[]."  <u>Martinez-Bodon</u>, 28 F.4th at 1246 (quoting <u>Duncan</u>, 533 U.S. at 174).  As such, this court must imbue with significance the term "valid" in NOAA's Imports Regulation.

As previously established, supra pp. 32–52, Plaintiffs are likely to succeed on the merits of their third claim that NOAA acted arbitrarily and capriciously -- in contravention of section 706(2)(A) of the APA -- in issuing comparability findings to New Zealand's West Coast North Island multi-species set-net and trawl fisheries. Accordingly, because New Zealand has waived the seven-year exemption period from the prohibitions of Paragraph (h)(1) of the Imports Regulation for these fisheries, Plaintiffs are likely to prove that these fisheries' lack of valid comparability findings renders any imports from them per se in excess of U.S. standards under (h)(1)(i), unlawful under (h)(1)(ii)(A), and thereby prohibited under both NOAA's Imports Regulation, 50 § C.F.R. 216.24(h)(1)(i)–(ii), and the Import Provision of the MMPA, 16 U.S.C. § 1371(a)(2).[63] Thus, Plaintiffs have persuasively alleged they are likely to succeed on the merits

---

[63] The United States disagrees that a determination by this court that the issued comparability findings are legally insufficient -- or not "valid" -- would render the pertinent New Zealand fisheries per se in excess of U.S. standards under 50 C.F.R. § 216.24(h)(1)(i), such that any derivative imports would be prohibited by operation of the Imports Regulation, id. § 216.24(h)(1)(i)–(ii), and the MMPA's Import Provision, 16 U.S.C. § 1371(a)(2). See Defs.' Suppl. Qs. Resp. at 10–11. Defendants argue that "[a]n import ban would be required only if NOAA were to issue a negative comparability finding." Defs.' Suppl. Qs. Resp. at 10 (emphasis added). Such an argument misapprehends the scope of New Zealand's waiver of the grace period and constitutes an unreasonable interpretation of NOAA's Imports Regulation.

Concerning the scope of New Zealand's waiver, the United States argues that "[b]y applying for comparability findings, New Zealand . . . waived the benefit of the [seven]-year exemption period and risked subjecting its fisheries to an import ban only in the event that NOAA were to deny its application." Id. at 10–11 (emphasis added). It is unclear from where the United States derives any such parameters. For instance, in the Federal Register notice rejecting Plaintiffs' petition and issuing comparability findings to New Zealand, NOAA stated that "New Zealand . . . has requested an early Comparability Finding for several of its fisheries," and clarified that "[a]ll other exempt and export fisheries operating under the control of [New Zealand] are subject to the exemption period under 50 C.F.R. § 216.24(h)(2)(ii)," which provides "[t]he prohibitions of paragraph (h)(1)" -- namely the valid comparability finding requirement -- "shall not apply during the exemption period." Comp. Finding Determ. at 71,297–98. By specifying that "all other" New Zealand fisheries are still covered by the exemption period of (h)(2)(ii), the logical extension is that the two fisheries for which New Zealand sought early comparability findings are not, thereby rendering them presently subject to Paragraph (h)(1)'s valid comparability finding requirement. 50 C.F.R. § 216.24(h)(1)–(2)(ii). Again, this reading is

of their second claim that NOAA contravened section 706(2)(A) of the APA in denying their

petition for emergency rulemaking.

### B.    *Plaintiffs Are Likely to Suffer Irreparable Harm Absent a Preliminary Injunction*

Having determined that Plaintiffs are likely to succeed on the merits of their remaining

claims, the court now turns to the second preliminary injunction factor: whether Plaintiffs are likely

to suffer irreparable harm in the absence of injunctive relief.  See Silfab Solar, 892 F.3d at 1345.

Plaintiffs argue that they are, see Pls.' Resp. Br. at 22–23, while Defendants maintain that Plaintiffs

---

supported by NOAA's own analysis.  See Dec. Mem. at 2, 8 ("Due to [New Zealand]'s request for
an early comparability finding, the fisheries identified above would be under the full effect of the
[Imports Regulation]." (emphasis added)).

    The United States further invokes Paragraph (h)(9)(i) to argue that NOAA's Imports
Regulation requires a ban only where NOAA "has denied or terminated a comparability finding
for a fishery," Defs.' Suppl. Qs. Resp. at 10 (citing 50 C.F.R. § 216.24(h)(9)(i)), but this constitutes
an unreasonable interpretation of the regulation, see Kisor v. Wilkie, 139 S. Ct. 2400, 2416 (2019).
Paragraph (h)(1) of NOAA's Imports Regulation -- entitled "Prohibitions" -- sets out disjunctive
conditions that render the importation of fish or fish product "unlawful."  Specifically, (h)(1)(ii)
declares "unlawful" the importation of fish from: (A) a fishery without a valid comparability
finding or (B) an intermediary nation unaccompanied by a "Certification of Admissibility" or other
documentation required to show that the imported fish/fish products did not derive from a fishery
otherwise subject to an import ban.  50 C.F.R. § 216.24(h)(1)(ii)(A)–(B).  The court cannot permit
Defendants to eliminate the disjunctive "or" between (h)(1)(ii)(A) and (B), which critically
illuminates that the lack of a valid comparability finding -- standing alone -- is sufficient to render
the importation of fish or fish products "unlawful."  Id. § 216.24(h)(1)(i)–(ii).

    Nor is the United States correct that 50 C.F.R. § 216.24(h)(9)(i) establishes that affirmative
denials and/or terminations of comparability findings are the only conditions that trigger an import
ban.  Defs.' Suppl. Qs. Resp. at 10.  While (h)(9)(i) of the Imports Regulation -- under Paragraph
(h)(9) entitled "Imposition of import prohibitions" -- does enumerate the procedures the agency
must follow to embargo fish and fish products from a fishery in the event that said fishery's
comparability finding is "denied or terminated," (h)(9)(i) does not supply an exhaustive list of
conditions that necessitate an import ban.  This point is illuminated by (h)(9)(ii)(B), which
introduces a third condition that would portend an import prohibition -- namely, the expiration of
a comparability finding.  See 50 C.F.R. § 216.24(h)(9)(ii)(B).  As the United States' proposed
construction would render the enumeration of "expiration" in (h)(9)(ii)(B) surplusage, see
Cammarano v. United States, 358 U.S. 498, 505 (1959), the United States cannot be correct that
only a denial or termination of a comparability finding would require the imposition of an import
ban under the Imports Regulation.

have failed to make the requisite showing, see Defs.' Resp. Br. at 41–42; Def.-Inter.'s Resp. Br. at

51.  The seminal preliminary injunction case -- Winter v. Nat. Res. Def. Council, 555 U.S. 7 (2008)

-- underscores that this second factor comprises two elements: (1) whether any harm arising in the

absence of injunctive relief will be irreparable; and (2) whether any such irreparable harm is likely.

The court easily concludes that Plaintiffs have proven the first element.  Although the second

element presents a more complicated question, the court ultimately deems it satisfied.  As such,

the court holds that the "likelihood of irreparable harm" factor weighs in Plaintiffs' favor.

Considering the first element -- whether any harm arising in the absence of injunctive relief

will be irreparable -- this court explained in NRDC I that "harm is irreparable when 'no damages

payment, however great,' could address it," 331 F. Supp. 3d at 1368 (quoting Celsis In Vitro, Inc.

v. CellzDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012)), and that "by its nature," "[e]nvironmental

injury . . . can seldom be adequately remedied by money damages," id. (internal quotation marks

omitted) (quoting Fed'n of Japan Salmon Fisheries Co-op. Ass'n v. Baldridge, 679 F. Supp. 37,

48 (D.D.C. 1987) (quoting Amoco Prod. Co. v. Gambell, 480 U.S. 531, 545 (1987))), aff'd and

remanded sub nom. Kokechik Fishermen's Ass'n v. Sec'y of Commerce, 839 F.2d 795, 800 (D.C.

Cir. 1988)).  Here, parties appear to agree that fishing-induced deaths of Māui dolphins would give

rise to irreparable harm.  See Pls.' Resp. Br. at 23 ("Bycatch of a single Māui dolphin will hamper

the dolphin's likelihood of recovery and increase its risk of extinction."); see also Dec. Mem.

Attach. A at 30 (describing potential consequences of fishing-related interactions with Māui

dolphins as "very high"); N.Z. TMP Letter app. one at 2 ("Given the very small number of Māui

dolphins that remain there is a high likelihood of extinction should the population decline

further.").  Because no amount of money could remedy the harm to Māui dolphins or Plaintiffs'

enjoyment of them should the species become extinct, the court agrees that fishing-induced deaths constitute irreparable harm.

The court next considers whether such irreparable harm is likely to arise absent preliminary injunctive relief. See Winter, 555 U.S. at 22 (reiterating that "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is likely in the absence of an injunction" and rejecting a "possibility" of irreparable harm standard as "too lenient" (emphasis in original)). Plaintiffs argue such irreparable harm is likely because "bycatch [of Māui dolphins] is continuing to occur and poses an ongoing threat" where commercial gillnet and trawl fisheries are still allowed to operate in portions of even the Māui dolphin's undisputed range. Pls.' Resp. Br. at 21–22 (citing Dec. Mem. Attach A at 29–30 (stating proportion of Māui dolphin spatial distribution in which set nets and trawls are still allowed)). By contrast, Defendants argue irreparable harm is not likely, because "the last fishing related mortality for Māui dolphin[s] was [in] 2012, and the last interaction between a commercial fishing vessel and a Māui dolphin was [also] in 2012." Defs.' Resp. Br. at 42; Def.-Inter.'s Resp. Br. at 52 n.35 (same). Plaintiffs' position prevails.

The court begins by noting that the rate of Māui dolphin bycatch is contested, supra pp. 11–13, and reiterating that it will not attempt to resolve this scientific debate, see Shafer, 992 F.3d at 1093. However, even accepting arguendo Defendants' representation that the last fishing-related morality of a Māui dolphin occurred in 2012,[64] see Defs.' Resp. Br. at 42; Def.-Inter.'s

---

[64] Although the court will not attempt to resolve the scientific debate regarding bycatch rates, in light of the preceding discussion on certain deficiencies attending New Zealand's monitoring program, supra pp. 46–51, the court is persuaded that the agency has not met "minimal standards of rationality" in maintaining that the 2012 incident was the last instance of Māui dolphin bycatch by a commercial fishing vessel. Shafer, 992 F.3d at 1090 (quoting Troy Corp., 120 F.3d at 283). The court so assesses, because Defendants themselves recognize that "the level of monitoring coverage must be high enough to reliably detect any non-zero capture rate" of Māui dolphins. See Dec. Mem. Attach. A at 17; N.Z. Comp. Finding App. at 47 (same). It is not clear -- absent further

Resp. Br. at 52 n.35, a finding of likely irreparable harm is not precluded by Winter.  In Winter, despite accepting as a fact that the U.S. Navy's sonar training program -- which plaintiff environmentalists sought to enjoin -- "ha[d] been going on for 40 years with no documented episode of harm to a marine mammal," the Supreme Court proceeded on the assumption that plaintiffs faced a "near certainty" of irreparable harm.  See 555 U.S. at 15, 21–23, 33 (nevertheless vacating the preliminary injunction on public interest grounds in light of national security imperatives).

In stark contrast, here, it is uncontested that there have been "documented episode[s] of harm to [Māui dolphins]" from commercial fishing over the years.  Id. at 33.  By Defendants' own account, "[b]etween 1921 and [the] present there have been five beachcast recovered carcasses of Cephalorhynchus spp. dolphins (Māui/Hector's dolphin) off the West Coast North Island where fishing was implicated via necropsy in the cause of death, the last in 2012."  See Comp. Finding Determ. at 71,299.  Moreover, it is undisputed that set net and trawl fishing are presently allowed to operate in at least portions of the Māui dolphin's range.  See, e.g., Dec. Mem. Attach A at 29–30 (stating that New Zealand's current set net closures cover approximately 92.6% (summer) and 83.8% (winter) and trawl closures cover approximately 73.3% (summer) and 50% (winter) of the Māui dolphin's spatial distribution).  Thus, where the Winter Court entertained as satisfied the "likelihood of irreparable harm" prong absent any documented evidence of harm to marine

agency explanation -- that New Zealand's monitoring coverage, which excludes vessels under 8 meters from certain requirements and relies on percentage of fishing days observed as a metric of robustness, is "high enough to reliably detect any non-zero capture rate."  This uncertainty is compounded by the Government of New Zealand's acknowledgment that "most [Māui dolphin] carcasses are not recovered," Def.-Inter.'s OA Subm. at 1, and by the reality that even when carcasses are recovered, the cause of death may not be determinable, see id. (discussing a pathology report from New Zealand's School of Veterinary Science that declares indeterminate the cause of death of a female Māui dolphin found on February 25, 2021).

mammals, this court holds that -- given the undisputed instances of Māui dolphin bycatch and the continued threat -- there exists a likelihood of irreparable harm absent injunctive relief.[65]

The court notes that to hold otherwise would undermine the very purpose of the MMPA, which requires protection of marine mammals that "are, or may be, in danger of extinction or depletion as a result of man's activities," 16 U.S.C. § 1361(1), from "diminish[ing] below their optimum sustainable population," id. § 1361(2). See NRDC I, 331 F. Supp. 3d at 1369 ("A determination of irreparable harm should . . . be guided by reference to the purposes of the statute being enforced." (citing Tenn. Valley Auth. v. Hill, 437 U.S. 153, 184–88 (1978), among other cases)). As parties acknowledge, the Māui dolphin's scarcity makes interactions with commercial fishing vessels inherently unlikely, thereby complicating the "likelihood" inquiry. See, e.g., Pls.' Resp. Br. at 47–48 ("The likelihood of interacting with a critically endangered species is always going to be lower than for a more populous species because there are so few individuals remaining."); N.Z. TMP Letter app. one at 2 ("[W]e know that given the very small number of Māui dolphins remaining that the likelihood of interactions with fishing [vessels] are estimated to be rare, not common."). But as Plaintiffs persuasively argue, where -- as here -- the probability "that a single fishery-induced mortality will push the population closer to . . . extinction" "is high,"

---

[65] In so holding, the court acknowledges that New Zealand implemented new restrictions -- effective October 1, 2020 -- that extended existing and created new prohibitions on set net and trawl fishing in the Māui dolphin's habitat zone. See N.Z. TMP Letter at 1. The court recognizes that these new restrictions are intended to reduce the risk of harm to Māui dolphins posed by commercial fishing. Id. But see Dec. Mem. Attach A at 29–30 (acknowledging that set nets and trawls are still allowed to operate in a proportion of the Māui dolphin's spatial distribution).

Nevertheless, until the aforementioned deficiencies attending New Zealand's monitoring program -- which undermine the "rationality" of certain assessments and assertions by NOAA -- are accounted for, supra pp. 46–51, the court deems unreliable Defendants' representations concerning the efficacy of these new restrictions. Pending further explanation by the agency, the court looks to documented instances of prior Māui dolphin bycatch and the continuation of set net and trawl fishing in portions of the Māui dolphin's undisputed habitat range to conclude that irreparable harm is likely.

"the relatively low probability of" bycatch stemming from the species' meager numbers "must not foreclose . . . protections against fisheries threats."  Pls.' Resp. Br. at 47–48.  Indeed, to hold otherwise "would deny MMPA protections to marine mammal populations that need them most."  Id. at 47.

The court, therefore, concludes that in a case such as this one -- where there is "so little margin for error," id. at 47 -- the "likelihood of irreparable harm" prong weighs in favor of injunctive relief.

### C.    *The Balance of Equities Favors Granting a Preliminary Injunction*

Turning to the third preliminary injunction factor, the court "'must balance the competing claims of injury and . . . consider the effect' that granting or denying [injunctive relief] will have on each party."  NRDC I, 331 F. Supp. 3d at 1369 (quoting Winter, 555 U.S. at 24).  Plaintiffs argue that "the impact to [their] members and the public more broadly from the death and possible extinction of a critically endangered dolphin is incredibly high," Pls.' Resp. Br. at 50, but that the United States Government "will suffer little to no hardship from imposing a preliminary ban," id.  For its part, the United States argues that a preliminary injunction would do more harm than good because "[i]f New Zealand, a country with considerable resources and a strong conservation ethic, is held not to meet United States standards," then other exporting nations might be "discourag[ed] . . . from providing any protections due to perceived futility."  Defs.' Resp. at 42–43 (emphasis in original).  Plaintiffs' position prevails.

The court is again guided by the MMPA's purpose, which -- at its base -- is to preserve marine mammals.  NRDC I, 331 F. Supp. 3d at 1369 (citing Tenn. Valley Auth., 437 U.S. at 184–88).  Parties agree that extinction is likely should the Māui dolphin population decline much further.  See, e.g., N.Z. TMP Letter app. one at 2.  Any such extinction poses a direct threat to

Plaintiffs' interests.  See Second Decl. James Boshier ¶¶ 8, 16 (describing the declarant's recreational and aesthetic interests in viewing Māui dolphins); see also Second Decl. of Sylvia Philcox ¶¶ 9, 11 (same); Second Decl. of Jennifer Matiu ¶¶ 6–7 (same); Second Decl. of Richard Hay ¶¶ 6, 17 (same); Second Decl. of Aleisha Dockery ¶¶ 5–6 (same).  Moreover, "loss of the species prior to the end of this litigation would . . . moot [Plaintiffs'] substantive legal contention under the Imports Provision, and thus foreclose [their] access to meaningful judicial review." NRDC I, 331 F. Supp. 3d at 1370 (citing Kwo Lee, Inc. v. United States, 38 CIT __, __, 24 F. Supp. 3d 1322, 1327, 1331 (2014)).

By contrast, although not without some burden, the administrative inconvenience of administering an embargo can be characterized as "routine." Id.  And the court declines to engage in the kind of "prognostication" the Government invites with its speculative assertion that enjoining certain imports from New Zealand will discourage other nations from protecting marine mammals.[66] Id. at 1371.

Accordingly, the balance of equities favors granting a preliminary injunction.

### D.    A Preliminary Injunction is in the Public Interest

Finally, the court considers whether granting a preliminary injunction would benefit the public interest and concludes that it would.  Plaintiffs argue that the Māui dolphin is "an undisputedly critically endangered species of significant cultural value," Pls.' Resp. Br. at 3, and that "the protection of a critically endangered species is in the public interest," id. at 18.  The United States does not disagree but reiterates that a preliminary injunction "will not [in fact] foster

---

[66] The United States' "futility" argument is particularly unpersuasive in light of the fact that by NOAA's own account, as of October 21, 2022, the agency has "received applications for comparability findings from 132 nations and for 2,504 foreign fisheries" and is actively "consult[ing] with nations . . . regarding the marine mammal bycatch mitigation programs described in their submissions." Deadline Modification at 63,957.

the public interest or . . . protection of marine mammals," because such a prohibition would discourage "other countries [from] improv[ing] their marine mammal protections."  Defs.' Resp. Br. at 42.[67]  And the Government of New Zealand, along with certain U.S. industry commentors, posit that a preliminary injunction could negatively impact people's livelihoods, local communities, and consumers both at home and abroad.  See N.Z. TMP Letter at 3; see also 84 Fed. Reg. at 32,855 (summarizing comments from the National Fisheries Institute on Plaintiffs' February 6, 2019 petition).  Upon weighing these arguments, the court concludes a preliminary injunction will best further the public interest.

In so deciding, the court does not minimize the considerations raised by New Zealand or U.S. industry -- consumer welfare, economic stability, and community impact indeed comprise important elements of the public interest.  However, as with the irreparable harm and balance of equities prongs, "the public interest inquiry [must be] guided by reference to 'the underlying statutory purposes at issue.'"  NRDC I, 331 F. Supp. 3d at 1371 (quoting SSAB N. Am. Div. v. U.S. Bureau of Customs & Border Prot., 32 CIT 795, 801, 571 F. Supp. 2d 1347, 1353 (2008)). Here, Congress has been explicit that the MMPA is "to be administered for the benefit of the protected species rather than for the benefit of commercial exploitation."  Id. at 1345 (quoting Kokechik Fishermen's Ass'n, 839 F.2d at 800); see also H.R. Rep. No. 92-707, at 4154 (1972) ("The primary objective of this management must be to maintain the health and stability of the marine ecosystem; this in turn indicates that the animals must be managed for their benefit and not for the benefit of commercial exploitation.").

---

[67] The court is unpersuaded by the Government's dual-purpose "futility" argument for the reasons detailed above.  Supra note 66.

Accordingly, because the MMPA is clear that "the wellbeing of marine mammals takes precedence," Pac. Ranger, LLC v. Pritzker, 211 F. Supp. 3d 196, 216 (D.D.C. 2016), the court discerns that a preliminary injunction is in the public interest.

### E.    Scope of the Preliminary Injunction

Having determined that the weight of the balancing test favors Plaintiffs, the court deems preliminary injunctive relief appropriate pending final resolution of Plaintiffs' second and third claims.  In closing, the court articulates the scope of the injunction granted.  Plaintiffs ask the court to enjoin imports of all fish and fish products from New Zealand's commercial gillnet and trawl fisheries within the Māui dolphin's range, which Plaintiffs define as "the entire coastline of the North Island out to the 100m depth contour."  See Pls.' Ren. PI Mot.; Pls.' Suppl. Pet. at 5.  As previously noted, the Māui dolphin's habitat range is hotly contested.  Supra pp. 10–11.  To grant the injunction as envisioned by Plaintiffs would hew towards "settl[ing] the scientific debate" surrounding the Māui dolphin's range, which the court declines to do.  Shafer, 992 F.3d at 1093.

Accordingly, as an exercise of its discretion, the court issues an injunction enjoining imports of (1) snapper; (2) tarakihi; (3) spotted dogfish; (4) trevally; (5) warehou; (6) hoki; (7) barracouta; (8) mullet; and (9) gurnard deriving from New Zealand's West Coast North Island multi-species set-net and trawl fisheries.[68]  The court decides as such, because for the reasons

---

[68] Recall that in their supplemental petition for emergency rulemaking, Plaintiffs asserted that "at least 33 fish species are caught in water that Māui dolphins inhabit" and that "of those 33 fish species, at least 23 are exported to the U.S."  Pls.' Suppl. Pet. at 19.  However, Plaintiffs did not enumerate those twenty-three fish species and the court does not have a clear sense of which -- if any -- of these fish New Zealand's West Coast North Island multi-species set-net and trawl fisheries export to the United States.  Id.

In light of this paucity of information, the court enjoins imports of those fish species that overlap with the Māui dolphin's undisputed habitat and that New Zealand's West Coast North Island multi-species set-net and trawl fisheries acknowledge harvesting.  Compare Pls.' Feb. 2019 Pet. at 21–24 (identifying ten fish species caught by gill nets or trawls (or both) along the west coast of New Zealand's North Island), with N.Z. Comp. Finding App. at 40, 41 (identifying target

previously articulated, <u>supra</u> pp. 52–56, Plaintiffs have established that they are likely to succeed

in proving that these fisheries do not presently have valid comparability findings, such that by

virtue of New Zealand's waiver of the seven-year exemption period,[69] their imports are per se in

excess of U.S. standards under the Imports Regulation, 50 C.F.R. § 216.24(h)(1), and thereby

prohibited under the MMPA's Import Provision, 16 U.S.C. § 1371(a)(2).

   Absent intervening events,[70] this preliminary injunction will remain in place until the

earlier of: (1) NOAA's issuance of valid comparability findings to New Zealand's West Coast

---

fish species associated with New Zealand's West Coast North Island multi-species set-net and
trawl fisheries, which cover each of the species identified in Plaintiffs' original petition, except for
flounder.

[69] <u>See</u> 50 C.F.R. §§ 216.24(h)(2)(ii), 216.3.

[70] The current comparability findings held by New Zealand's West Coast North Island multi-
species set-net and trawl fisheries will expire on January 1, 2023. <u>See</u> <u>Comp. Finding Determ.</u> at
71,297. NOAA originally anticipated issuing new comparability findings -- to cover the period
following January 1, 2023 -- to these fisheries on November 30, 2022. <u>See</u> Defs.' Add'l Suppl.
Qs. Resp. at 1–2. However, on November 4, 2022, the United States informed the court that
NOAA no longer expects to be able to issue new comparability findings to these fisheries prior to
the January 1, 2023 expiration date. <u>See</u> Defs.' Add'l Suppl. Qs. Resp. at 1–2; <u>see also</u> <u>Deadline</u>
<u>Modification</u> at 63,955 (extending the deadline for foreign nations to secure comparability findings
from December 31, 2022 to December 31, 2023).

   Before the court, the United States asserts that once the current comparability findings
expire on January 1, 2023, New Zealand's West Coast North Island multi-species set-net and trawl
fisheries will again be subject to the Imports Regulation's exemption period under 50 C.F.R. §§
216.24(h)(2)(ii) and 216.3, thereby mooting this case; accordingly, on November 8, 2022, the
United States submitted a Partial Consent Motion for Remand so that NOAA could conform the
expiration of New Zealand's comparability findings with the expiration of the general exemption
period on December 31, 2023. <u>See</u> Defs.' Second Remand Mot. For their part, in a November 23,
2022 filing, Plaintiffs opposed the United States' Second Remand Motion, arguing that "[i]t is
premature to determine whether Sea Shepherd's Third Claim would become moot if the
Comparability Findings expire at the end of this year." <u>See</u> Pls.' Opp. to Second Remand Mot at
4 n.2.

   Because the court assesses that it would benefit from oral argument on the United States'
Second Remand Motion, the court reserves judgment on this latest Motion. In so deferring, the
court neither accepts nor rejects the United States' position that "upon expiration of [New
Zealand's] Comparability Findings, the [latest] [e]xtension will toss the New Zealand fisheries
back into the pool of all foreign fisheries" currently exempted from the Regulation's valid

North Island multi-species set-net and trawl fisheries; or (2) final resolution on the merits of

Plaintiffs' remaining claims (at which point, the court may -- but not necessarily will -- issue a

permanent injunction).[71]

       In assessing that such injunctive relief is "just and proper," First Suppl. Compl., the court

reiterates that it is attempting neither to displace the agency's scientific expertise nor to express a

policy view.  The court seeks only to interpret and apply the MMPA as enacted by Congress and

to ensure that the agency adheres to certain minimal standards of rationality in doing the same.

## CONCLUSION

       For the foregoing reasons, the court grants Defendants' Motion to Dismiss Plaintiffs' First

Claim and grants Plaintiffs a preliminary injunction on the remaining two claims.


       **SO ORDERED.**

                                         */s/   Gary S. Katzmann*
                                        Gary S. Katzmann, Judge


Dated: <u>November 28, 2022</u>
       New York, New York

---

comparability finding requirement, thereby mooting this case.  See Defs.' Add'l Remand Mot. at 6 (emphasis omitted).

[71] Given the routine administrative costs associated with implementing the import ban and the interest in preserving Plaintiffs' ability to obtain judicial review of the Government's conduct, the court, in its discretion, requires Plaintiffs to post $1.00 as security.  See USCIT R. 65(c).  See generally <u>Zenith Radio Corp. v. United States</u>, 2 CIT 8, 518 F. Supp. 1347 (1981) (discussing the court's discretion in setting security, particularly when granting a preliminary injunction to preserve plaintiff's access to judicial review); 11A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2954 (3d ed. 2022).

# APPENDIX A

50 C.F.R. § 216.24(h)(6) and (7) reads in relevant part:

> **(h)** *Taking and related acts of marine mammals in foreign commercial fishing operations not governed by the provisions related to tuna purse seine vessels in the eastern tropical Pacific Ocean* –
>
> . . .
>
>> **(6)** *Procedure and conditions for a comparability finding* –
>>
>> . . .
>>
>>> **(iii)** *Conditions for a comparability finding.* The following are conditions for the Assistant Administrator to issue a comparability finding for the fishery, subject to the additional considerations set out in paragraph (h)(7) of this section:
>>>
>>>> **(A)** For an exempt or export fishery, the harvesting nation:
>>>>
>>>>> *(1)* Prohibits the intentional mortality or serious injury of marine mammals in the course of commercial fishing operations in the fishery unless the intentional mortality or serious injury of a marine mammal is imminently necessary in self-defense or to save the life of a person in immediate danger; or
>>>>>
>>>>> *(2)* Demonstrates that it has procedures to reliably certify that exports of fish and fish products to the United States are not the product of an intentional killing or serious injury of a marine mammal unless the intentional mortality or serious injury of a marine mammal is imminently necessary in self-defense or to save the life of a person in immediate danger; and
>>>>
>>>> **(B)** For an export fishery, the harvesting nation maintains a regulatory program with respect to the fishery that is comparable in effectiveness to the U.S. regulatory program with respect to incidental mortality and serious injury of marine mammals in the course of commercial fishing operations, in particular by maintaining a regulatory program that includes, or effectively achieves comparable results as, the conditions in paragraph (h)(6)(iii)(C), (D), or (E) of this section as applicable (including for transboundary stocks).
>>>>
>>>> **(C)** *Conditions for an export fishery operating under the jurisdiction of a harvesting nation within its EEZ (or the equivalent) or territorial sea.* In making the finding in paragraph (h)(6)(ii) of this section, with respect to an export fishery operating under the jurisdiction of a harvesting nation within its EEZ (or the equivalent) or territorial sea, the Assistant Administrator shall determine whether

the **harvesting nation** maintains a regulatory program that provides for, or effectively achieves comparable results as, the following:

> *(1)* Marine mammal assessments that estimate population abundance for marine mammal stocks in waters under the harvesting nation's jurisdiction that are incidentally killed or seriously injured in the export fishery.

> *(2)* An export fishery register containing a list of all fishing vessels participating in the export fishery, including information on the number of vessels participating, the time or season and area of operation, gear type and target species.

> *(3)* Regulatory requirements that include:

>> *(i)* A requirement for the owner or operator of a vessel participating in the export fishery to report all intentional and incidental mortality and injury of marine mammals in the course of commercial fishing operations; and

>> *(ii)* A requirement to implement measures in the export fishery designed to reduce the total incidental mortality and serious injury of a marine mammal stock below the bycatch limit; and

>> *(iii)* with respect to any transboundary stock or any other marine mammal stocks interacting with the export fishery, measures to reduce the incidental mortality and serious injury of that stock that the United States requires its domestic fisheries to take with respect to that transboundary stock or marine mammal stock.

> *(4)* Implementation of monitoring procedures in the export fishery designed to estimate incidental mortality or serious injury in the export fishery, and to estimate the cumulative incidental mortality and serious injury of marine mammal stocks in waters under its jurisdiction resulting from the export fishery and other export fisheries interacting with the same marine mammal stocks, including an indication of the statistical reliability of those estimates.

*(5)* Calculation     of bycatch     limits for marine mammal stocks in waters under its jurisdiction that are  incidentally  killed  or  seriously  injured  in the export fishery.

*(6)* Comparison      of      the incidental mortality and serious injury of each marine mammal stock or stocks that interact with the export fishery in relation to the bycatch limit for each stock; and comparison of  the  cumulative incidental mortality  and serious injury of each marine mammal stock or stocks that interact with the export fishery and any other export fisheries of the harvesting nation showing that these export fisheries:

> *(i)* Do not exceed the bycatch limit for that stock or stocks; or

> *(ii)* Exceed the bycatch limit for that stock or stocks, but  the  portion of incidental marine mammal mortality   or serious    injury for which the export fishery is responsible is at a level  that,  if  the  other  export  fisheries interacting   with   the   same marine mammal stock  or  stocks were at the same level,     would     not     result     in cumulative incidental mortality   and serious injury in excess of the bycatch limit for that stock or stocks.

. . .

*(7)* ***Additional       considerations       for       comparability       finding determinations.*** When  determining  whether  to  issue  any comparability finding for    a harvesting     nation's export     fishery the Assistant Administrator shall also consider:

**(i)** U.S. implementation of its regulatory program for similar marine mammal stocks and similar fisheries (*e.g.,* considering gear or target species),  including transboundary  stocks governed  by regulations implementing a take reduction plan (§ 229.2 of this chapter), and any other relevant information received during consultations;

**(ii)** The  extent  to  which  the harvesting  nation has  successfully implemented  measures   in   the export   fishery to  reduce the  incidental mortality      and serious      injury of marine mammals caused  by  the harvesting  nation's  export  fisheries  to levels below the bycatch limit;

**(iii)** Whether  the  measures adopted by  the harvesting  nation for its  export  fishery have  reduced  or  will  likely  reduce  the cumulative incidental mortality  and serious  injury of  each marine

mammal stock below the bycatch limit, and the progress of the regulatory program toward achieving its objectives;

**(iv)** Other relevant facts and circumstances, which may include the history and nature of interactions with marine mammals in this export fishery, whether the level of incidental mortality and serious injury resulting from the fishery or fisheries exceeds the bycatch limit for a marine mammal stock, the population size and trend of the marine mammal stock, and the population level impacts of the incidental mortality or serious injury of marine mammals in a harvesting nation's export fisheries and the conservation status of those marine mammal stocks where available;

**(v)** The record of consultations under paragraph (h)(5) of this section with the harvesting nation, results of these consultations, and actions taken by the harvesting nation and under any applicable intergovernmental agreement or regional fishery management organization to reduce the incidental mortality and serious injury of marine mammals in its export fisheries;

**(vi)** Information gathered during onsite inspection by U.S. government officials of a fishery's operations;

**(vii)** For export fisheries operating on the high seas under an applicable intergovernmental agreement or regional fishery management organization to which the United States is a party, the harvesting nation's record of implementation of or compliance with measures adopted by that regional fishery management organization or intergovernmental agreement for data collection, incidental mortality and serious injury mitigation or the conservation and management of marine mammals; whether the harvesting nation is a party or cooperating non-party to such intergovernmental agreement or regional fishery management organization; the record of United States implementation of such measures; and whether the United States has imposed additional measures on its fleet not required by an intergovernmental agreement or regional fishery management organization; or

**(viii)** For export fisheries operating on the high seas under an applicable intergovernmental agreement or regional fisheries management organization to which the United States is not a party, the harvesting nation's implementation of and compliance with measures, adopted by that regional fisheries management organization or intergovernmental agreement, and any additional measures implemented by the harvesting nation for data collection, incidental mortality and serious injury mitigation or the conservation and management of marine mammals and the extent to which such measures are comparable in effectiveness to the U.S. regulatory program for similar fisheries.